## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **DANIEL BARKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Civil Action No. _____** |
| | ) | |
| **HOUSE OF REPRESENTATIVES** | ) | |
| **CHAPLAIN PATRICK CONROY;** | ) | |
| **ASSISTANT TO THE CHAPLAIN** | ) | |
| **ELISA AGLIECO;** | ) | |
| **CHAPLAIN'S LIAISON TO STAFF** | ) | |
| **KAREN BRONSON;** | ) | |
| **PAUL RYAN, SPEAKER OF THE HOUSE** | ) | |
| **OF REPRESENTATIVES IN HIS** | ) | |
| **OFFICIAL CAPACITY; and** | ) | |
| **THE UNITED STATES HOUSE OF** | ) | |
| **REPRESENTATIVES,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      The Supreme Court recently upheld the legislative prayer exception to state-church separation largely because the town involved "at no point excluded or denied an opportunity to a would-be prayer giver" and "maintained that a minister or **layperson of any persuasion**, **including an atheist**, could give the invocation." *Town of Greece, N.Y. v. Galloway.* 134 S. Ct. 1811, 1815 (2014) (emphasis added).

2.      Using this legislative prayer exception, "guest chaplains" regularly deliver invocations before the U.S. House of Representatives.

3.      The House employs a chaplain who coordinates and approves guest chaplains,

1

historically allowing them to deliver about 40% of invocations—more than 800—in the last 15 years.

4.      The current House Chaplain, Father Patrick Conroy, has imposed requirements for guest chaplains that discriminate against the nonreligious and minority religions, and has explicitly refused to allow Plaintiff Dan Barker, who actually met the requirements, to serve as guest chaplain because Barker is nonreligious.

5.      Barker challenges this discriminatory denial and the rules and practice on which it is based.

## I.      JURISDICTION AND VENUE

6.      The Court has jurisdiction under 28 U.S.C. § 1331.

7.      This is an action to remedy deprivations, actual and imminent, under color of law, of individual rights secured to plaintiff by the First and Fifth Amendments to the United States Constitution, the Religious Freedom Restoration Act of 1993, 42 U.S.C.A. § 2000bb–1(b), and Article 6 of the Constitution.

8.      Plaintiff also asserts a *Bivens* action against Defendant Conroy in his individual capacity for violating plaintiff's constitutional rights.

9.      This is an action for a declaratory judgment under 28 U.S.C. § 2201, injunctive relief under 28 U.S.C. § 1343, and a mandamus order under 28 U.S.C. § 1361.

10.     The Court has subject matter jurisdiction under 28 U.S.C. § 1343a(4) and jurisdiction to award costs and reasonable fees to prevailing plaintiffs under 42 U.S.C. § 1988.

11.     Venue is proper under 28 U.S.C. § 1391.

## II.     PARTIES

2

12.     The plaintiff, Dan Barker, is a federal taxpayer who resides in Madison, Wisconsin.

13.     Barker is co-president and a lifetime member of the Freedom From Religion Foundation, a non-profit that promotes non-belief and works to keep state and church separate.

14.     Barker was ordained to the Christian ministry in 1975.

15.     Barker was a pastor in three California churches, a missionary to Mexico, a Christian songwriter, and a traveling evangelist.

16.     After 19 years in the ministry, Barker "lost faith in faith" and became an atheist. As an atheist, Barker has deeply held convictions that occupy the place of religious beliefs.

17.     Barker's convictions include his opposition to governmental preferences and favoritism toward religion and a belief that there are no gods or other supernatural higher powers.

18.     Barker now tours the country and the world giving lectures and participating in debates with theists, all in an effort to educate the public about nontheism.

19.     Barker also co-founded The Clergy Project, an online community support service for former and active religious professionals who no longer believe in a supernatural higher power.

20.     Barker retains his ordination and uses it to perform weddings, though he no longer preaches the tenets of his former religion.

21.     Barker has deeply and sincerely held beliefs that are purely ethical or moral in source and content but that impose upon him a duty of conscience parallel to his former religion.

22.     Barker believes in the power of reason, not the supernatural, to guide lives.

23.     There is no governing entity behind Barker's deeply and sincerely held beliefs

that issues ordinations.

24.     Defendant Father Patrick Conroy holds the office of U.S. House of Representatives Chaplain.

25.     Conroy was elected and sworn in on May 25, 2011. He is a Roman Catholic priest.

26.     Defendant Elisa Aglieco is Assistant to the Chaplain, an official position in the Chaplain's Office and the U.S. House of Representatives.

27.     Defendant Karen Bronson is the Chaplain's Liaison to Staff, an official position in the Chaplain's Office and the U.S. House of Representatives.

28.     Defendant Speaker of the House of Representatives Paul Ryan is the presiding officer of the House and performs certain administrative and procedural duties.

29.     Speaker Ryan oversees the other House officers, including the chaplain, can dismiss those officers, and can temporarily fill the Office of Chaplain if there is an unexpected vacancy.

30.     Conroy, Aglieco, Bronson, and Ryan are all sued in their official capacities.

31.     Barker also brings a *Bivens* action for damages against Conroy in his individual capacity.

32.     Defendant United States House of Representatives employs Chaplain Conroy, Aglieco, and Bronson and has the power to regulate their practices.

33.     The United States of America is an appropriate defendant under 28 U.S.C.A. § 1346.

## III.   FACTS

### A.   The House Chaplain refuses to allow Barker to deliver an invocation, even

**though he meets the chaplain's unwritten requirements for guest chaplains.**

34.     Five weeks after the Supreme Court handed down the *Galloway* decision, Barker's representatives visited the U.S. Capitol and met in the chaplain's office with Elisa Aglieco and Karen Bronson to inquire about a nonreligious citizen serving as guest chaplain and delivering the opening invocation at the House.

35.     Bronson and Aglieco explained that there are no written requirements to become a guest chaplain, but that guest chaplains are permitted to give invocations if:

(1) they are sponsored by a member of the House,

(2) they are ordained, and

(3) they do not directly address House members and instead address a "higher power."

36.     By February 2015, the Chaplain's Office had documentation showing that Barker met or would meet all these requirements.

37.     Representative Mark Pocan, Barker's representative to the House, officially requested that Chaplain Conroy grant Barker permission to serve as a guest chaplain and deliver the morning invocation. (*See* February 18, 2015 letter, *Exhibit A*.)

38.     Two days later, Aglieco requested Barker's contact information, biography, and ordination certificate because the Chaplain's Office wanted "to check his credentials." All of which was quickly provided.

39.     Chaplain Conroy subsequently expressed to Representative Pocan that he was dubious that an atheist could craft an appropriate invocation.

40.     Chaplain Conroy indicated that reviewing a draft copy of Barker's invocation might allay his concerns.

41.     Barker was reluctant to provide his remarks because he believed that Chaplain

Conroy was imposing requirements on him because of his atheism that the chaplain would not impose on other guest chaplains, including a more substantial vetting process and submitting the invocation for pre-approval.

42.    After months of silence from the Chaplain's Office, Barker felt forced to submit his invocation rather than forgo this unique, prestigious opportunity.

43.    Barker provided a draft of his proposed invocation in June 2015. (*See Exhibit B.*)

44.    Meeting all the requirements, Barker waited to be scheduled as a guest chaplain.

45.    Four months later, the Chaplain's Office had still not acted on Barker's requests.

46.    When asked about the delay, the Chaplain's Office claimed, without explanation, that it did not think the previous requests were "genuine."

47.    The Chaplain's Office formally denied Barker permission in December 2015.

48.    That denial came nearly 18 months after Aglieco and Bronson were asked about a nonreligious citizen acting as guest chaplain and nearly 10 months after Barker had submitted all his documentation.

49.    The Chaplain's Office reaffirmed that initial denial a month later. (*See* January 7, 2016 letter, *Exhibit C.*)

**B.    The House Chaplain has a policy and practice of approving guest chaplains; guest chaplains have been overwhelmingly, disproportionately Christian.**

50.    The House of Representatives' Rules provide for the election of a chaplain at the beginning of each Congress.

51.    The House chaplain holds office until a successor is elected. Rule II.1

52.    The chaplain's sole codified duty is to "offer a prayer at the commencement of each day's sitting of the House." Rule II.5

53.    At the start of each day's session, the House's first "order of business . . . shall be

[a] . . . [p]rayer by the Chaplain." Rule XIV.1.

54.     The House Rules do not include requirements for guest chaplains.

55.     There are no other official, written rules or requirements for the opening invocations or guest chaplains.

56.     The Chaplain's Office approves guest chaplains.

57.     Each day that the House is in session, the chaplain or a guest chaplain gives an invocation.

58.     Guest chaplains have been giving opening invocations in the House since at least 1948. *See* Cong. Rec., June 9, 1948, pp. 7597-7599.

59.     On average, two guest chaplains deliver invocations every week and the chaplain has said that no more than two guest chaplains are allowed per week.

60.     Representatives who want to invite guests write letters to the chaplain, who makes arrangements.

61.     Typically, the sponsoring Representative introduces the guest chaplain.

62.     The Representative gives a short biography of the guest chaplain and usually mentions the church, temple, or other organization the chaplain represents.

63.     This introduction is recorded in the Congressional Record.

64.     The introduction is alternatively listed as "honoring," "recognizing," "welcoming," or "a special tribute to" the guest chaplain.

65.     Local media often cover the congressional introduction and the invocation the guest chaplain delivers.

66.     When an invocation is broadcast on C-SPAN or other video outlets, the chaplain's name and organization typically appear on the video.

67.     Barker views the opportunity to give an invocation, to be introduced by a member of the U.S. House of Representatives, and to have that tribute recorded for posterity in the Congressional Record and memorialized on C-SPAN as a great honor and an opportunity to participate in solemnizing the venerable work of the U.S. government.

68.     Chaplain Conroy's denial prevents Barker from receiving the prestige and status that comes with giving an invocation before the U.S. House.

69.     Chaplain Conroy has the power and discretion to invite guest chaplains to fulfill the responsibilities of the Chaplain's Office by offering a prayer at the commencement of a session of the House, and to permit Members to recommend particular clergy for consideration as guest chaplains. (*See* January 7, 2016 letter, *Exhibit C.)*

70.     The Chaplain's Office typically recommends inclusive invocations, but it has admitted "that the [Chaplain's] office cannot tell people how to pray." *See* Bowman.

71.     From 2000 to 2015, the religious breakdown of chaplains and guest chaplains was:

| | | |
|---|---|---|
| **96.7%** | **Christian** | **(2,085 invocations)** |
| **2.7%** | **Jewish** | **(59 invocations)** |
| **<0.4%** | **Muslim** | **(8 invocations)** |
| **<0.2%** | **Hindu** | **(3 invocation)** |
| **<0.05%** | **Other non-Christian** | **(1 invocation)** |
| **n/a** | **Atheist/Agnostic** | **(0 invocations)** |

72.     857 of the 2,198 invocations were delivered by guest chaplains, about 39%

73.     These numbers contrast with the religious makeup of the people the House represents, according to *America's Changing Religious Landscape*, Pew Research Center (May 12, 2015), available at www.pewforum.org/2015/05/12/americas-changing-religious-landscape:

| | |
|---|---|
| **70.6%** | **Christian** |
| **1.9%** | **Jewish** |
| **0.9%** | **Muslim** |

| | |
|---|---|
| **0.7%** | **Hindu** |
| **7.1%** | **Unaffiliated, Atheist/Agnostic** |
| **15.8%** | **Unaffiliated, nothing in particular** |

[Note: That 23% (7.1 + 15.8) makes "Nones," those who self-identify as "nonreligious," the second largest "denomination" after evangelical Protestants at 25.4%.]

| | |
|---|---|
| **0.7%** | **Buddhist** |
| **1.8%** | **Other non-Christian religions** |

74.    Put another way, Abrahamic religions gave 99.8% of all invocations from 2000 to 2015—all but four—even though they make up less than 75% of the population:

[please see charts on next page]





**C.     The House Chaplain's policies and practices needlessly restrict and inhibit minority believers and nonbelievers from acting as guest chaplain.**

75.     Chaplain Conroy's imposed requirements disparately burden nonreligious and minority groups.

76.     The House of Representatives has never had an open atheist or agnostic assume the office of guest chaplain and deliver an invocation.

77.     The House rarely has minority religions assume the office of guest chaplain and deliver an invocation.

78.     Like atheists, many minority religions also have never had the opportunity to deliver an invocation.

79.     There is nothing inherent in atheism, Jainism, Rastafarianism, Buddhism, or any other minority religion known to the plaintiffs that would prohibit their leaders from performing the duties of the guest chaplain.

80.     Nonreligious individuals, most of them lacking religious ordinations, have delivered invocations before local government meetings.

81.     The Central Florida Freethought Community, a local chapter of the Freedom From Religion Foundation, maintains a list of those invocations on its website at http://cflfreethought.org/invocations/.

82.     Since 2004, nonreligious individuals have given more than 75 documented invocations at legislative meetings, including state legislatures, around the country.

83.     No legislative meeting has suffered because of a secular invocation.

84.     The Supreme Court has recognized that nonreligious individuals can deliver invocations: "The town at no point excluded or denied an opportunity to a would-be prayer giver. Its leaders maintained that a minister or layperson of any persuasion, ***including an atheist***, could

give the invocation." *Galloway*, at 1815 (2014) (emphasis added).

85.    The  *Galloway* decision concerned the Town of Greece, New York, and shortly after it was decided, an atheist, Dan Courtney, delivered a nonreligious invocation to the town board.

86.    In his invocation, Courtney invoked the signers of the Declaration of Independence and We the People, "as citizens":

> "…We, as citizens, the beginning and the end, the alpha and the omega of our destiny, are not, as the great philosopher Immanuel Kant warned, mere means to the ends of another, but we are ends in ourselves. This basic premise, this profound idea, guides us such that we need not kneel to any king, and we need not bow to any tyrant."

87.    As this and other nonreligious invocations show, nonreligious speakers are perfectly capable of solemnizing proceedings by delivering an opening invocation at government meetings.

88.    Secular invocations, in fact, have been delivered at government meetings with requirements that are less restrictive and more narrowly tailored to the invocation's purpose than Chaplain Conroy's unwritten requirements.

89.    Some religions, such as Shintoists, Jains, Rastafarians, Buddhists, Baha'is, German Baptists, and Quakers, among others, do not ordain or acknowledge clergy.

90.    Nor do atheists or agnostics ordain or acknowledge clergy.

91.    Some of these religions and others do not worship or acknowledge supernatural or god-like higher powers, although all are capable of invoking some power outside of themselves when delivering an invocation.

**D.     Even though the guest chaplain requirements are inherently discriminatory against the nonreligious and minority religions, Dan Barker met all three.**

92.     Barker met the sponsorship and ordination requirements and he agreed to the third requirement—not addressing the House but a higher power—and he even provided a draft of his invocation, a predicate inquiry not made of religious guest chaplains.

93.     **Barker satisfied the first requirement** on February 18, 2015, when Representative Mark Pocan officially requested that Mr. Barker serve as a guest chaplain. (*Exhibit A*).

94.     **Barker satisfied the second requirement** a week later when the Chaplain's Office received copies of Barker's ordination, biography, and contact information to confirm the validity of that ordination.

95.     Barker was ordained by the Standard Christian Center in Standard, California on May 25, 1975.

96.     A copy of Barker's Certificate of Ordination contains the signature of four SCC officials and was provided to the Chaplain's Office. (*Exhibit D*).

97.     Neither Barker's certificate nor his ordination have been rescinded or otherwise abrogated.

98.     Barker regularly uses his ordination to perform marriages.

99.     Barker has performed marriages in many states, including more than a dozen in Dane County, Wisconsin, which Rep. Pocan represents, and others such as Alabama, California, Colorado, Indiana, Iowa, and Washington.

100.     Barker most recently performed a wedding in Minnesota, which recognized his ordination and the subsequent marriage.

101.     The U.S. Air Force Academy in Colorado Springs also has allowed Barker to

officiate a nonreligious wedding in its chapel using this ordination.

102.     None of the weddings Barker has performed using his ordination have been called into question or annulled even though he now holds deep and sincere beliefs that are different than the ones he held when he was ordained.

103.     Although Barker is ordained and uses his ordination to perform marriages and other duties, he has not done so as an employee of or in the course of his duties at the Freedom From Religion Foundation.

104.     **Barker satisfied the third requirement** by submitting a copy of his draft remarks, which did not directly address House members, to the Chaplain's Office. *(See Exhibit B.)*

105.     Barker invoked a higher power, although not a god or supernatural power, in his draft remarks:

> Celebrating the wondrous fact that the sovereign authority of our great nation is not a monarch, lord, supreme master or any power higher than "We, the people of these United States," and recognizing that we Americans, a proudly rebellious people, fought a Revolutionary War to shatter the bonds of tyranny, let us rejoice in the inalienable liberty of conscience our forefathers and foremothers risked their lives to establish and our country continues to defend against those enemies who despise freedom of religion, freedom of speech, and freedom of thought.
>
> An invocation is meant to invoke the assistance and guidance of someone outside of ourselves. In the United States, our "higher power" is the authority the electorate has provisionally bestowed upon the guidance of our representatives, who work not for a king or dictator, but for the public good.
>
> Representing tens of millions of good Americans who are not religious and millions of patriotic citizens who do not believe in a god, I cannot invoke a spirit or supernatural agency before this esteemed body.

But I *can* invoke the "spirit" of the founding patriot Thomas Paine,
a nonChristian deist who argued for Common Sense over dogma.

. . .

106.     Chaplain Conroy barred Barker from performing as guest chaplain despite receiving evidence that he met each demand from the Chaplain's office.

**E.     The Chaplain's Office denied Dan Barker permission to be a guest chaplain because he is nonreligious.**

107.     Chaplain Conroy denied Dan Barker the opportunity to serve in the office of guest chaplain to the United States House of Representatives and to give the opening invocation.

108.     But for Chaplain Conroy's denial, Barker would have served as guest chaplain, delivered an opening invocation to the House, and received all the concomitant benefits and notoriety of that position.

109.     Chaplain Conroy cited several reasons for the denial, all of which were pretextual.

110.     Barker was denied because he is an atheist.

111.     The Chaplain's Office tried to rationalize its decision by explaining that "Daniel Barker was ordained in a denomination in which he no longer practices," and that "All guest chaplains have been practicing in the denomination in which they were ordained." (*See* December 10, 2015 email, *Exhibit E.)*

112.     Acting for Dan Barker as a lifetime member of the Freedom From Religion Foundation, FFRF attorneys objected to this denial: "When the government allows invocation speakers to deliver remarks, government officials, including chaplains, cannot legally determine whether or not a message is 'religious enough' or approve the content of messages," nor can they "legally determine whether or not a person is 'religious enough' " to deliver an invocation. (*See* December 17, 2015 letter, *Exhibit F*.)

113.     Chaplain Conroy reiterated his Office's denial by stating that Barker's ordination certificate "is not current or legitimate for purposes of my considering your recommendation that he be invited to offer an opening invocation." (*See Exhibit C*.)

114.     Chaplain Conroy's letter also stated that Barker was denied because he left "the faith in which he [had] practice[d]."

115.     Stated even more clearly in the letter, the Chaplain's Office denied Barker because he is not "a religious clergyman." He had "part[ed] with his religious beliefs."

116.     Through this denial, Chaplain Conroy, acting as a government official, has made an intrusive inquiry into the particular religious beliefs (or lack thereof) of a candidate for the office of guest chaplain and judged his fitness for that office on the basis of the perceived quality of those beliefs.

117.     Had Barker stayed in "the faith in which he practice[d]," or been "a *religious* clergyman," or had he not "part[ed] with his religious beliefs," he would have been approved to deliver an invocation, but as a *nonreligious* officiant with a valid ordination, he was denied.

**F.     The Chaplain's Office used the three unwritten requirements as a pretext for excluding Barker and has *not* enforced these requirements against other guest chaplains.**

118.     Chaplain Conroy's unwritten requirements serve to exclude minority religious and nonreligious applicants from acting in the role of guest chaplain and from receiving the benefits and notoriety that come with that position.

119.     Chaplain Conroy enforced these unwritten requirements against Barker, effectively denying him equal opportunity to act as guest chaplain, but he has not enforced the same requirements against other, religious applicants.

120.     **Not all guest chaplains have had a Representative sponsor.**

16

121.    On August 5, 2011, Thomas J. Wickham, the House Parliamentarian, served as guest chaplain, approved by Chaplain Conroy.

122.    Wickham did not have a Representative sponsor and he is not ordained.

123.    **Not all guest chaplains have been ordained.**

124.    Since 2000, Muslims identified as imams have given eight invocations.

125.    Islam does not have formal or ordained clergy.

126.    None of the Muslim guest chaplains were ordained, at least not in Islam.

127.    As guest chaplain, Yolanda Adams gave the opening invocation on April 18, 2013.

128.    Chaplain Conroy approved Ms. Adams as a guest chaplain.

129.    Ms. Adams, a former schoolteacher, is now a gospel singer and a radio show host, but was not ordained when she served as guest chaplain.

130.    As guest chaplain, Rajan Zed gave opening invocations on July 12, 2007 and June 19, 2014.

131.    Chaplain Conroy approved Mr. Zed as a guest chaplain in 2014 and Chaplain Conroy's predecessor in the office approved Zed in 2007.

132.    Mr. Zed is the President of Universal Society of Hinduism, but was not ordained when he served as guest chaplain.

133.    As guest chaplain, Chandra Bhanu Satpathy gave the opening invocation on June 24, 2015.

134.    Chaplain Conroy approved Satpathy as a guest chaplain.

135.    Satpathy visited the Holy Shrine of Shri Sai Baba located in Shirdi (Maharashtra) in 1989 and has since been spreading that philosophy, but he was not ordained when he served as

guest chaplain.

136.    As guest chaplain, Randy Bezet, gave the opening invocation on June 25, 2015.

137.    Chaplain Conroy approved Bezet as a guest chaplain.

138.    Randy Bezet is a pastor at Bayside Church in Florida but was not ordained when he served as guest chaplain.

139.    Bayside Church is a member of the Association of Related Churches, which does not require its pastors to be ordained.

140.    Both Satpathy and Bezet served as unordained guest chaplains four months after Chaplain Conroy enforced the unwritten ordination requirement against Barker by demanding a copy of his ordination.

141.    The Chaplain's Office approved these guest chaplains either without investigating their ordination status or with knowledge that they were not ordained.

142.    **Not only were some guest chaplains unordained, some guest chaplains were also not "practicing" in the religion in which they were ordained when they delivered opening invocations.**

143.    John Clark Buchanan served as the guest chaplain on June 3, 2003, yet, at the time he was "the <u>retired</u> Episcopal bishop of West Missouri." 149 Cong. Rec. H4795 (daily ed. Jun 3, 2003) (statement of Rep. Karen McCarthy) (emphasis added).

144.    Fred Holloman served as the guest chaplain on April 27, 2005, yet, "Reverend Holloman <u>retired</u> in 2002 after serving 50 years in the ministry." 151 Cong. Rec. H2553 (daily ed. Apr. 27, 2005) (prayer by Guest Chaplain Fred S. Holloman) (emphasis added).

145.    Other guest chaplains were ordained in one denomination, switched denominations (a common occurrence), and delivered invocations as guest chaplains

representing their subsequent faith, a denomination in which they lacked an ordination.

146.     **Chaplain Conroy disparately enforces the supernatural higher power requirement.**

147.     Reverend Andrew Walton served as guest chaplain on May 5, 2015 and did not invoke a supernatural higher power, but rather the "spirit of life that unites all people":

> As the gavel sounds and a new day of business begins, we pause to acknowledge the eternal, creative, redemptive spirit of life that unites all people, transcending political persuasion, personal bias, or cultural creed.
>
> We come seeking the wisdom of the ages that points us away from easy choices of rigid certitude that divide and separate but, rather, guides us toward challenging compromises of flexible possibility that connect and unite.
>
> May we seek a common good where all people know freedom, equality, justice, and mercy; a common good grounded in compassion, gratitude, and generosity. May we remember we are one human family in which the pain of one is the pain of all and the joy of one is the joy of all.
>
> May we find this common good in the conversations, deliberations, and achievements of this day and in the countless opportunities that come our way each and every day.

148.     Four months after this invocation, Chaplain Conroy again approved Andrew Walton to serve as guest chaplain on September 10, 2015.

149.     Walton gave his second invocation three months after Chaplain Conroy received a draft copy of Barker's invocation, and once again he did not address a supernatural higher power:

> As vacations and recesses draw to a close, we give thanks for the gift of rest and recreation afforded us while so many in our country and world have spent those same days in fear and suffering.

> May we leave business as usual in the shadows of yesterday, seeking to shine with renewed purpose, inspired wisdom, and transformative action.
>
> May every person associated with these Halls of power remember their calling as public servants to humbly hold the hopes, dreams, and trust of people from every walk of life in every State, city, town, village, and neighborhood of our country and world.
>
> As numerous streams of opinion, interest, and need flow into the procedures, process, and decisions of this day and days ahead, may there be wisdom and patience to allow them to find their way to pools and ponds of peace, rivers of mercy, and eventually oceans of compassion and common good for all people. (Sept. 10, 2015 invocation)

150.     Reverend Michael Wilker served as guest chaplain on October 16, 2015, and he did not invoke or address a god but instead addressed the "Spirit of truth and reconciliation."

151.     Reverend Wilker served as guest chaplain without addressing a supernatural higher power, about four months after the Chaplain's Office received Barker's draft remarks.

152.     Chaplain Conroy does not require other potential guest chaplains to submit written drafts of their invocations prior to approval.

153.     Indeed Chaplain Conroy has admitted that he "cannot tell people how to pray" or "censor what [guest chaplains] can say…" (*See Exhibit G.)*

154.     The Chaplain's Office, nonetheless, requested Barker's draft remarks before denying his application to serve as guest chaplain.

155.     The three requirements Chaplain Conroy imposed on Dan Barker are not written down and are disparately applied.

156.     Chaplain Conroy and the Chaplain's Office have used the three requirements as a pretext to censor content and viewpoints with which they do not agree.

IV.   **GROUNDS FOR RELIEF**

157.   Plaintiff challenges:

- the denial of the opportunity to give an invocation as an instance of discrimination against a citizen for lacking religious belief and his chosen means of expressing that belief (i.e., invoking a non-supernatural higher power);

- the requirement that guest chaplains be ordained and practicing in the religion in which they were ordained, be it a written rule, tradition, or practice of the House or House Chaplain; and

- the requirement that guest chaplains address a supernatural higher power, be it a written rule, tradition, or practice of the House or House Chaplain.

**A.   The Establishment Clause of the First Amendment.**

158.   The clearest command of the Establishment Clause of the First Amendment is that one religious denomination cannot be officially preferred over another.

159.   The Supreme Court reaffirmed that this principle applies to government invocation policies in Town of Greece, N.Y. v. Galloway, 134 S. Ct. 1811, 1816, 1824 (2014) (emphasizing that the town's "leaders maintained that a minister or layperson of any persuasion, including an atheist, could give the invocation" and ruling that the government must "maintain[] a policy of nondiscrimination" in deciding who will deliver an invocation).

160.   The Chaplain's unwritten requirements discriminate against those whose religious beliefs do not include a belief in a supernatural higher power or those who practice a religion that does not have ordinations.

161.   The Chaplain, moreover, has applied the unwritten requirements in a manner that excludes atheists and other minority religions, in violation of the Establishment Clause's

nondiscrimination principle.

162.     The Chaplain's refusal to allow Barker to be guest chaplain, and the unwritten requirements cited as justification for that denial, create a preference by the Chaplain's Office and the House of Representatives for certain religions over others, and religion over nonreligion.

163.     The only purpose behind the Chaplain's unwritten requirements is a religious one: To limit guest chaplains and the invocations they give to those meeting a specific, inherently religious standard.

164.     The effect of the Chaplain's unwritten requirements is to disproportionately favor speakers holding a narrow range of religious beliefs over speakers with other minority religious or nonreligious beliefs.

165.     The Chaplain's unwritten requirements impermissibly entangle the Chaplain's Office in quintessentially religious inquiries, including determinations as to whether guest chaplains are "practicing" in the religion in which they were ordained and whether a higher power is sufficiently supernatural to be invoked before the House of Representatives.

166.     The Chaplain's unwritten requirements enmesh religion in the processes of government.

167.     In this case, at the seat of our national government—in the congressional chamber based on proportional representation—the Chaplain is dividing and excluding citizens based on their religious or nonreligious beliefs.

168.     The Chaplain's unwritten requirements also coerce applicants for the guest chaplain position to actively practice a religion that provides ordinations and to address a supernatural higher power when speaking before Congress. The Chaplains Office has conditioned the receipt of a significant honor and benefit on these inherently religious

requirements.

**B.    The Due Process Clause of the Fifth Amendment.**

169.    The Fifth Amendment's "due process" clause requires the federal government to afford equal protection of the laws to all citizens.

170.    Equal protection requires that citizens in similar situations be treated equally and not discriminated against because of their religion or lack thereof.

171.    Because of his nonreligious beliefs, Barker was discriminated against compared to other, similarly situated or less qualified religious guest chaplains.

172.    Barker was subjected to:

(a)    an extensive governmental vetting process that exceeded the scope permissible for a government agent inquiring into a citizen's religion;

(b)    an extensive and unreasonable delay—at least ten months—before a final decision on his application to become guest chaplain was made, including the offensive supposition that his request was not genuine;

(c)    pre-approval and prior restraint on his chosen language and the form of his invocation;

(d)    the application of unwritten rules that were not applied to other guest chaplains; and

(e)    the denial of his request even though he satisfied onerous, unconstitutional requirements.

173.    Barker was denied equal treatment solely because he no longer believes in god.

174.    Chaplain Conroy's requirements for guest chaplains classify applicants on the basis of their religion, a suspect classification, and discriminate against nontheists and other minority religions.

175.    Chaplain Conroy applied the guest chaplain requirements against Barker in an intentionally discriminatory manner because of Barker's status as an atheist.

176.     Chaplain Conroy's requirements for guest chaplains have an adverse effect on nontheists and many minority religious leaders who are otherwise capable of serving their country as guest chaplains.

177.     Plaintiff seeks declaratory, injunctive, and mandamus relief under this ground for relief.

### C.     The Religious Freedom Restoration Act.

178.     The Religious Freedom Restoration Act (RFRA), 42 U.S.C. §2000bb et seq., provides that the federal government, which includes the House Chaplain, "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the government demonstrates that the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering" that interest. 42 U.S.C. § 2000bb-l(a)(b).

179.     Barker's atheism and other nontheistic beliefs are sincerely held and occupy a place in his life equivalent to that of religious beliefs.

180.     By conditioning a significant government benefit, the opportunity to be a guest chaplain before the House of Representatives, on requirements that exclude atheists—that applicants be ordained, be practicing in the religion in which they were ordained, and that they address a supernatural higher power—the Chaplain's Office is putting substantial pressure on Barker to modify his behavior and to violate his sincerely held beliefs.

181.     By requiring Barker to maintain religious activity in the church that originally ordained him, the Chaplain's office is placing a substantial burden on Barker, forcing him to either act in opposition to his sincerely held beliefs or forego a government benefit and opportunity that he is otherwise qualified to receive.

182.     To meet the unwritten ordination requirement, for example, Barker must give up his current belief system, which does not have ordinations, and either: 1) convert to Christianity (the religion of his current ordination) or 2) convert to another religion with ordinations and acquire an ordination in that religion.

183.     *There is no greater free exercise burden than the government requiring a person to convert to a different religion.*

184.     By requiring Barker to craft an invocation to a supernatural higher power, a higher power that the Chaplain's Office finds acceptable but in which Barker does not believe, the government is coercing him to either: 1) abandon his beliefs and adopt beliefs the government deems more acceptable or 2) forego the government benefit that he is otherwise qualified to receive.

185.     Forcing Barker to choose between his beliefs and the opportunity to deliver an invocation places a substantial burden on the free exercise of his chosen belief system.

186.     Chaplain Conroy's restrictive rules for guest chaplains—that applicants be ordained, be practicing in the religion in which they were ordained, and that they address a supernatural higher power—do not further a compelling state interest.

187.     There is no compelling state interest in limiting guest chaplains to those who are ordained and actively practicing in the religion in which they were ordained.

188.     No compelling state interest requires guest chaplains to address a supernatural higher power while delivering their invocation.

189.     Any articulated interest is a pretext, meant to obscure the actual purpose of the unwritten requirements, which is to filter out otherwise qualified guest chaplains of whom Chaplain Conroy does not approve.

190.     Defendants' requirements for guest chaplains also are not the least restrictive means of furthering a compelling state interest.

191.     Indeed, many government bodies currently operate successfully with less restrictive requirements for guest chaplains.

192.     The Chaplain's Office's unwritten rules currently exclude not only atheists, but any minority religion that does not recognize a supernatural higher power or does not have the equivalent of an ordination.

193.     Plaintiff accordingly is entitled to declaratory, injunctive, and mandamus relief pursuant to the Religious Freedom Restoration Act.

**D.     U.S. Constitution, Article 6, Paragraph 3.**

194.     The Religious Test Clause compels that "no religious test shall ever be required as a qualification of any office or public trust under the United States." U.S. Const. art. VI, ¶3.

195.     Requiring that a guest chaplain "be ordained by a recognized body in the faith in which he/she practices" or even that a guest chaplain possess an ordination "certificate" that is "current or legitimate" amounts to a religious test.

196.     Requiring that a guest chaplain direct an invocation to a supernatural higher power is a religious test.

197.     The House Chaplain is an "office . . .  under the United States," and by  assuming the House Chaplain's duties, the guest chaplain is also an "office or public trust under the United States."

198.     The Chaplain's requirements prohibit any nonreligious individual, including Barker and individuals from some minority religions, from occupying the office of guest chaplain, however briefly.

199.    The Supreme Court has recognized that nonreligious individuals are capable of fulfilling any opening invocation requirement, and therefore, no government interest justifies prohibiting nonreligious citizens from occupying the guest chaplain office.

200.    Plaintiff accordingly also seeks declaratory, injunctive, and mandamus relief compelling compliance with the Religious Test Clause.

### E. *Bivens* action against Chaplain Conroy in his personal capacity for discriminating against plaintiff for his personal religious choices.

201.    Plaintiff has a constitutionally protected right to equal treatment vis-à-vis similarly situated guest chaplains under the First and Fifth Amendments, as alleged above.

202.    Chaplain Conroy, a federal official, has intentionally violated Barker's constitutional right to equal treatment by discriminating against him.

203.    Chaplain Conroy's discrimination occurred under color of federal law.

204.    Defendant cannot raise any appropriate immunity defense to this claim.

205.    If this Court cannot otherwise grant Barker effective relief from Chaplain Conroy's discrimination, it can do so under *Bivens*.

206.    Plaintiff seeks monetary damages against Chaplain Conroy in his personal capacity, as outlined in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for the injury he has suffered.

## V.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

   a.  Declare that barring atheists and other nonreligious individuals from the position of guest chaplain violates the Religious Freedom Restoration Act, Article 6 of the U.S. Constitution, and the First and Fifth Amendments to the U.S. Constitution.

b. Declare that requiring guest chaplains to invoke a supernatural or god-like higher power violates the Religious Freedom Restoration Act, Article 6 of the U.S. Constitution, and the First and Fifth Amendments to the U.S. Constitution.

c. Declare that requiring guest chaplains to be ordained and currently practicing in a religion that has ordinations violates the Religious Freedom Restoration Act, Article 6 of the U.S. Constitution, and the First and Fifth Amendments to the U.S. Constitution.

d. Enjoin defendants from barring otherwise qualified atheist and nonreligious individuals from the position of guest chaplain on the basis of their lack of religion.

e. Enjoin defendants from censoring the invocations of guest chaplains or requiring that those invocations address a supernatural higher power.

f. Enjoin defendants from requiring that guest chaplains be ordained and practicing in an approved religious sect.

g. Enjoin defendants from selectively imposing restrictions on guest chaplains in a way that inhibits the equal participation of minority religions or nonreligious citizens.

h. Issue a mandamus order requiring Defendant Conroy to approve Dan Barker's appointment to the post of guest chaplain to the U.S. House of Representatives and schedule Barker to give an invocation as soon as possible.

i. Award reasonable damages to Barker, to be assessed against Defendant Conroy in his personal capacity for violating plaintiff's clearly established rights.

j. Award plaintiff the reasonable costs and expenses of this action, including attorneys' fees, under the Equal Access to Justice Act, 28 U.S.C. § 2412; the Civil Rights Act, 42 U.S.C. § 1988; the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb; and/or any other applicable statute or rule of law or equity.

k.   Award or order such further relief as the Court deems just and equitable.

Dated this 5th day of May, 2016.

BOARDMAN & CLARK LLP
By:

*/s/ Eric A. Baker*
Eric Baker
DC Bar Number: 481394
One South Pinckney Street, Fourth Floor
P.O. Box 927
Madison, WI  53701-0927
(608) 283-1783 – Telephone
(608) 283-1709 – Facsimile
ebaker@boardmanclark.com

Andrew L. Seidel (*Pro Hac Vice* pending)
Samuel T. Grover (*Pro Hac Vice* pending)
Freedom From Religion Foundation, Inc.
PO Box 750
Madison, WI 53701

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I, Eric A. Baker, hereby certify that on May 5, 2016, I caused to be electronically filed the Complaint for Declaratory and Injunctive Relief with the Clerk of Court using the CM/ECF system.

*/s/ Eric A. Baker*
Eric A. Baker