## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DANIEL BARKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:16-cv-00850-RMC |
| | ) | |
| HOUSE OF REPRESENTATIVES | ) | |
| CHAPLAIN PATRICK CONROY, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANT PATRICK CONROY'S
## MOTION TO DISMISS ALL INDIVIDUAL-CAPACITY CLAIMS

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Patrick J. Conroy, as sued in his individual capacity, respectfully moves this court to dismiss the constitutional claims asserted against him (Count "E") in Plaintiff Daniel Barker's Complaint.[1] These claims, which seek damages directly under the Constitution, should be dismissed because plaintiff has failed to state a claim upon which relief may be granted. Specifically, special factors counsel hesitation in implying the damages remedy that plaintiff seeks and Father Conroy is entitled to qualified immunity. The grounds for this motion are set forth in the accompanying memorandum of points and authorities. A proposed order is attached.

Dated: September 30, 2016                    Respectfully submitted,

                                             BENJAMIN C. MIZER
                                             Principal Deputy Assistant Attorney General
                                             Civil Division

---

[1] Counsel for the Official Defendants has filed a motion to dismiss the claims asserted against the U.S. House of Representatives and the official-capacity claims asserted against Father Conroy and the other defendants.

KALI N. BRACEY
Deputy Assistant Attorney General

C. SALVATORE D'ALESSIO
Acting Director, Torts Branch

ANDREA W. MCCARTHY
Senior Trial Counsel, Torts Branch

*/s/ Sarah E. Whitman*
SARAH E. WHITMAN
MA Bar 657726, under LCvR 83.2(e)
Trial Attorney
Torts Branch, Civil Division
United States Department of Justice
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-0089
Facsimile: (202) 616-4314
Email: Sarah.Whitman@usdoj.gov

*Counsel for Defendant Patrick Conroy, as sued in his individual capacity*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DANIEL BARKER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No.: 1:16-cv-00850-RMC |
| | ) |
| HOUSE OF REPRESENTATIVES | ) |
| CHAPLAIN PATRICK CONROY, et al. | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT CONROY'S MOTION TO DISMISS ALL INDIVIDUAL-CAPACITY CLAIMS

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
Civil Division

KALI N. BRACEY
Deputy Assistant Attorney General

C. SALVATORE D'ALESSIO
Acting Director, Torts Branch

ANDREA W. MCCARTHY
Senior Trial Counsel, Torts Branch

*/s/ Sarah E. Whitman*
SARAH E. WHITMAN
MA Bar 657726, under LCvR 83.2(e)
Trial Attorney
Torts Branch, Civil Division
United States Department of Justice
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-0089
Facsimile: (202) 616-4314
Email: Sarah.Whitman@usdoj.gov

*Counsel for Defendant Patrick Conroy in his individual capacity*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 2

   I.    The U.S. House of Representatives and Applicable House Rules ............................ 2

   II.   Plaintiff's Allegations ............................................................................................. 3

LEGAL STANDARD ......................................................................................................... 6

ARGUMENT ...................................................................................................................... 7

   I.    Special Factors Counsel Against Creating the *Bivens* Remedy That
Plaintiff Seeks Here. ............................................................................................... 8

      A.    Plaintiff Seeks to Extend *Bivens* Liability Into a Novel Context. ..................... 10

      B.    Plaintiff's Claims Directly Implicate Numerous Special Factors. ..................... 12

         1.    Plaintiff's Claims Raise Fundamental Separation-of-Powers
Concerns. ..................................................................................................... 13

         2.    Other Special Factors Counsel Against Inferring a *Bivens*
Remedy. ....................................................................................................... 17

   II.   The Speech or Debate Clause Precludes Judicial Review of
Father Conroy's Implementation of Rules Governing Proceedings
on the House Floor. ............................................................................................... 23

   III.   Qualified Immunity Bars Plaintiff's Individual-Capacity Claims
Against Father Conroy. ......................................................................................... 24

      A.    The Framework for the Qualified Immunity Defense. ....................................... 24

      B.    Legislative Prayer Jurisprudence. ..................................................................... 25

      C.    Plaintiff Fails to Plead Facts Stating a Claim for a Violation of
His First Amendment Rights. ............................................................................ 30

      D.    Plaintiff Fails to Plead Facts Stating an Equal Protection Claim. ..................... 37

      E.    To the Extent Plaintiff Has Alleged the Violation of a
Constitutional Right, the Right Was Not Clearly Established. .......................... 40

CONCLUSION .................................................................................................................. 44

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Al-Aulaqi v. Panetta,*
  35 F. Supp. 3d 56 (D.D.C. 2014) ........................................................................... 2

*Alvarez v. USICE,*
  818 F.3d 1194 (11th Cir. 2016) ............................................................. 12, 13, 15, 20

*Anderson v. Creighton,*
  483 U.S. 635 (1987) ............................................................................................ 40

*Arar v. Ashcroft,*
  585 F.3d 559 (2d Cir. 2009) .................................................................. 10, 13, 17, 18

*Ashcroft v. al-Kidd,*
  563 U.S. 731 (2011) ................................................................... 25, 40, 41, 42

\* *Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ...................................................................................... passim

*Atheists of Florida, Inc. v. City of Lakeland, Fla.,*
  779 F. Supp. 2d 1330 (M.D. Fla. 2011) ...................................................... 31

*Bame v. Dillard,*
  637 F.3d 380 (D.C. Cir. 2011) ...................................................................... 25, 41

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ...................................................................................... 7, 38, 39

*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,*
  403 U.S. 388 (1971) ......................................................................... 1, 8, 12, 19

*Board of Ed. of Kiryas Joel Village Sch. Dist. v. Grumet,*
  512 U.S. 687 (1994) ........................................................................................ 41

*Brosseau v. Haugen,*
  543 U.S. 194 (2004) ........................................................................................ 41

*Bush v. Lucas,*
  462 U.S. 367 (1983) ........................................................................................ 11

*Carlson v. Green,*
  446 U.S. 14 (1980) .......................................................................................... 8

*Chappell v. Wallace*,
    462 U.S. 296 (1983) ................................................................................... 12, 13, 15

*Cioca v. Rumsfeld*,
    720 F.3d 505 (4th Cir. 2013) ............................................................................. 9, 13, 16

*Coleman v. Hamilton Cnty., Tenn*,
    104 F. Supp. 3d 877 (E.D. Tenn. 2015) ................................................................. 36, 37

*Consumers Union of United States, Inc. v. Periodical Correspondents Ass'n.*,
    515 F.2d 1341 (D.C. Cir. 1975) ........................................................................... 14

\* *Corr. Servs. Corp. v. Malesko*,
    534 U.S. 61 (2001) .............................................................................. passim

*Davis v. Billington*,
    681 F.3d 377 (D.C. Cir. 2012) ............................................................................ 3

*Davis v. Passman*,
    442 U.S. 228 (1979) ................................................................................. 8, 16, 19, 21

*Doe v. Rumsfeld*,
    683 F.3d 390 (D.C. Cir. 2012) ............................................................................ 9, 16

*FDIC v. Meyer*,
    510 U.S. 471 (1994) .................................................................................. 18, 19

*GasPlus, LLC v. United States Dep't of Interior*,
    593 F. Supp. 2d 80 (D.D.C. 2009) ........................................................................ 6

*Hamilton-Hayyim v. Jackson*,
    No. 12cv6392, 2013 WL 3944288 (N.D. Ill. July 31, 2013) .................................................. 22

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982) .................................................................................. 24

*Hatfill v. Gonzales*,
    519 F. Supp. 2d 13 (D.D.C. 2007) ........................................................................ 6

*Heap v. Carter*,
    112 F. Supp. 3d 402 (E.D. Va. 2015) ..................................................................... 16, 20

*Hensley v. Office of Architect of the Capitol*,
    806 F. Supp. 2d 86 (D.D.C. 2011) ........................................................................ 22

*Hunter v. Bryant*,
   502 U.S. 224 (1991) .......................................................................................... 24

*Idaho v. Coeur d'Alene Tribe of Idaho*,
   521 U.S. 261 (1997) .......................................................................................... 12

*Jones v. Hamilton Cnty. Gov't, Tenn.*,
   530 F. App'x 478 (6th Cir. 2013) .................................................................... 35

*Jones v. Nat'l Council on Disability*,
   66 F. Supp. 3d 94 (D.D.C. 2014) .................................................................... 39

*Kelley v. Fed. Bureau of Investigation*,
   67 F. Supp. 3d 240 (D.D.C. 2014) .................................................................. 12

*Klay v. Panetta*,
   758 F.3d 369 (D.C. Cir. 2014) .................................................................. 12, 23

\*   *Kurtz v. Baker*,
   829 F.2d 1133 (D.C. Cir. 1987) ............................................................... passim

*Lebron v. Rumsfeld*,
   670 F.3d 540 (4th Cir. 2012) ................................................................... passim

*Lund v. Rowan Cnty.*,
   – F.3d –, 2016 WL 4992499 (4th Cir. Sep. 21, 2016) .................................... 30

*Lynch v. Donnelly*,
   465 U.S. 668 (1984) .......................................................................................... 41

*Malley v. Briggs*,
   475 U.S. 335 (1986) .......................................................................................... 24

\*   *Marsh v. Chambers*,
   463 U.S. 783 (1983) ............................................................................... passim

*McCreary County v. ACLU*,
   545 U.S. 844 (2005) .......................................................................................... 28

*McGowan v. Maryland*,
   366 U.S. 420 (1961) .......................................................................................... 27

*Meshal v. Higgenbotham*,
   804 F.3d 417 (D.C. Cir. 2015) ............................................................... passim

*Minneci v. Pollard*,
    132 S. Ct. 617 (2012)............................................................................................. 9

*Mirmehdi v. United States*,
    689 F.3d 975 (9th Cir. 2011) .............................................................................. 10

*Mitchell v. Forsyth*,
    472 U.S. 511 (1985)....................................................................................... 24, 25

*Morrow v. United States*,
    723 F. Supp. 2d 71 (D.D.C. 2010) ..................................................................... 23

*Murray v. Buchanan*,
    720 F.2d 689 (D.C. Cir. 1983) ........................................................... 28, 31, 34-35

*Newdow v. Bush*,
    355 F. Supp. 2d 265 (D.D.C. 2005) ............................................................ 28, 41-42

*Newdow v. Eagen*,
    309 F. Supp. 2d 29 (D.D.C. 2004) ........................................................... 34, 35, 37

*Packer v. U.S. Comm'n on Sec. & Cooperation in Europe*,
    843 F. Supp. 2d 44 (D.D.C. 2012) ................................................................ 17, 22

*Payne v. Meeks*,
    200 F. Supp. 2d 200 (E.D.N.Y. 2002) ............................................................... 22

*Pearson v. Callahan*,
    555 U.S. 223 (2009).............................................................................................. 25

*Pelphrey v. Cobb Cnty., Ga.*,
    547 F.3d 1263 (11th Cir. 2008) ..................................................................... 41, 43

*Pers. Adm'r of Massachusetts v. Feeney*,
    442 U.S. 256 (1979).............................................................................................. 38

*Plumhoff v. Rickard*,
    134 S. Ct. 2012 (2014)........................................................................................ 41

*Reichle v. Howards*,
    132 S. Ct. 2088 (2012)........................................................................................ 10

*Sanchez-Espinoza v. Reagan*,
    770 F.2d 202 (D.C. Cir. 1985) ........................................................................... 16

*Saucier v. Katz*,
   533 U.S. 194 (2001) ........................................................................................... 40

*Schweiker v. Chilicky*,
   487 U.S. 412 (1988) ............................................................................. 9, 12, 22

*Simkins v. District of Columbia Gov't*,
   108 F.3d 366 (D.C. Cir. 1997) ......................................................................... 24

*Simpson v. Chesterfield Cnty. Bd. of Supervisors*,
   404 F.3d 276 (4th Cir. 2005) ................................................................... passim

*Snyder v. Murray City Corp.*,
   159 F.3d 1227 (10th Cir. 1998) ............................................................... passim

\*   *Town of Greece v. Galloway*,
   134 S. Ct. 1811 (2014) ............................................................................. passim

*Trudeau v. Fed. Trade Comm'n*,
   456 F.3d 178 (D.C. Cir. 2006) ........................................................................... 7

*Tull v. Office of Architect of the Capitol*,
   806 F. Supp. 2d 80 (D.D.C. 2011) .................................................................. 22

*Turkmen v. Hasty*,
   789 F.3d 218 (2d Cir. 2015), *pet. for cert. filed*, No. 15-1358 (U.S. May 9, 2016) ..... 10, 18, 23

*Unification Church v. INS*,
   762 F.2d 1077 (D.C. Cir. 1985) ......................................................................... 6

*United States v. Ballin*,
   144 U.S. 1 (1892) ............................................................................................. 14

\*   *United States v. Stanley*,
   483 U.S. 669 (1987) ................................................................................... 15, 20

*Vance v. Rumsfeld*,
   701 F.3d 193 (7th Cir. 2012) ............................................................................. 9

*Wilkie v. Robbins*,
   551 U.S. 537 (2007) ................................................................................. passim

*Wilson v. Libby*,
   535 F.3d 697 (D.C. Cir. 2008) ................................................................. 11, 19

**Statutes**

2 U.S.C. § 1301 ........................................................................................ 17, 21

28 U.S.C. § 2412 ............................................................................................ 6

42 U.S.C. § 2000bb-4 ................................................................................... 6, 22

42 U.S.C. § 1988 ............................................................................................ 6

**Constitution**

U.S. Const. art. 1 § 2 , cl. 5 ........................................................................ 2, 13-14

U.S. Const. art. 1 § 5 , cl. 2 ........................................................................ 2, 14

**Rules**

Fed. R. Civ. P. 8(a)(2) ................................................................................. 7

Fed. R. Civ. P. 12(b)(6) ............................................................................... 6

**Other Authorities**

Asher C. Hinds,
  Hinds' Precedents of the House of Representatives § 272, n.2 (1907) ...................................... 2

H.R. Doc. No. 112-161 (2013) .................................................................... 2

H.R. Doc. No. 113-181 (2015) .................................................................... 2

Rules of the House of Representatives (114th Cong.), Rule II ...................................... 2, 14

Rules of the House of Representatives (114th Cong.), Rule IV ..................................... 2

Rules of the House of Representatives (114th Cong.) Rule XIV ............................................ 2, 14

Rules of the House of Representatives (114th Cong.), Rule XVII .................................. 2

**INTRODUCTION**

Plaintiff Daniel Barker, a self-described atheist and co-president of the Freedom From Religion Foundation, seeks to recover money damages from the personal assets of Father Patrick J. Conroy, the Chaplain of the U. S. House of Representatives, because Father Conroy did not invite plaintiff to serve as a guest chaplain for the House. Although plaintiff brings his claims against Father Conroy directly under the Constitution pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), alleging that Father Conroy discriminated against him on account of his "religious choices" in violation of the First and Fifth Amendments, plaintiff's Complaint makes plain that his true goal is to challenge the House Rule requiring that each day's sitting of the House start with a "prayer."

This court should dismiss the individual-capacity claims against Father Conroy because plaintiff seeks to extend *Bivens* into a wholly new context in the face of numerous special factors counseling against implying a damages remedy. In addition to the separation-of-powers concerns and other practical concerns inherent in implying a remedy here, the Supreme Court has made clear that *Bivens* remedies have never been considered a proper vehicle for challenging an entity's policy. Extending *Bivens* to the claims in this case is all the more inappropriate given that, unlike the plaintiff in *Bivens*, plaintiff has more traditional forms of relief available to him. For these reasons alone, the *Bivens* claims should be dismissed. Even were the court to create a damages remedy in such a novel arena, Father Conroy nonetheless is entitled to qualified immunity because plaintiff has not adequately alleged that he violated a clearly established constitutional right. All individual-capacity claims against Father Conroy therefore should be dismissed.

1

## BACKGROUND

### I.   The U.S. House of Representatives and Applicable House Rules

The Constitution specifically entrusts to the U.S. House of Representatives the duty to "chuse their … Officers." U.S. CONST. art. 1, § 2, cl. 5. The Constitution also empowers the House to "determine the Rules of its Proceedings." U.S. CONST. art. 1, § 5, cl. 2. In the exercise of these constitutional duties, at the beginning of each new Congress, the House passes, by a majority vote, rules that govern the internal proceedings of the House. *See* Rules of the House of Representatives (114th Cong.) ("House Rules"), H.R. DOC. NO. 113-181 (2015).[1]

Under the House Rules, one of the Officers of the House is the Chaplain, elected by the Members. Rule II. The House Rules provide for the election of the Chaplain at the beginning of each session of Congress. *Id*. The House Rules require the Chaplain to "offer a prayer at the commencement of each day's sitting of the House." Rule II.5. The House Rules prescribe that the House's first "order of business … shall be … [p]rayer by the Chaplain." Rule XIV.1.

Since the late 1800s, the House has occasionally permitted volunteer religious leaders ("guest chaplains") to give the required prayer. *See* Asher C. Hinds, 1 Hinds' Precedents of the House of Representatives § 272, n.2 (1907).[2] The public is not otherwise allowed on the House floor during legislative sessions. Rule IV.1-.5 (only certain enumerated persons acting in official capacities and who possess official designations are admitted to the Hall of the House). Even House Members are not allowed to introduce or recognize individuals who are observing from the spectator gallery. Rule XVII.7.

---

[1] Reference is made to the current House Rules, although the cited House Rules were no different at the time of the events alleged in the Complaint.  *See* H.R. DOC. NO. 112-161 (2013).

[2] Courts may take judicial notice of historical or political facts and any other facts that are verifiable with certainty, including public records and government documents available from reliable sources. *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 67-68 (D.D.C. 2014).

## II.      Plaintiff's Allegations[3]

With respect to Father Conroy personally, the Complaint alleges as follows: Plaintiff

Daniel Barker is co-president and lifetime member of the Freedom From Religion Foundation, a

non-profit that promotes non-belief and works to keep state and church separate. Compl. ¶ 13.

Although plaintiff was ordained to the Christian ministry in 1975, after nineteen years in the

ministry, plaintiff "lost faith in faith" and became an atheist. *Id*. ¶¶ 14, 16. Plaintiff continues to

use his Christian ordination to perform weddings, although he no longer preaches the tenets of

his former religion. *Id*. ¶ 20. Plaintiff believes that there are no gods or other supernatural higher

powers and he opposes any governmental preferences towards religion. *Id*. ¶ 17.

Father Conroy serves as the Chaplain for the U.S. House of Representatives. *Id*. ¶ 24. The

House elected Father Conroy as Chaplain and swore him in to office on May 25, 2011. *Id*. ¶ 25.

The Chaplain's sole codified duty is to offer a prayer at the commencement of each day's sitting

of the House. *Id*. ¶ 52 (citing House Rule II.5). For many years, guest chaplains have been giving

opening invocations in the House. *Id*. ¶ 58. The Chaplain's Office approves guest chaplains,

who, on average, deliver invocations two times a week. *Id*. ¶¶ 56, 59. Typically, a sponsoring

representative introduces the guest chaplain and local media covers the congressional

introduction and the invocation that the guest chaplain delivers. *Id*. ¶¶ 61, 65. The introduction is

recorded in the Congressional Record. *Id*. ¶ 63.

Five weeks after the Supreme Court issued its decision in *Town of Greece v. Galloway*,

134 S. Ct. 1811 (2014), a case in which the Court upheld the prayer practice of a town's local

board, lawyers representing plaintiff visited the Capitol and met with Elisa Aglieco and Karen

---

[3] The facts in this section are taken from the Complaint and are assumed to be true for the
purposes of this motion only. *See Davis v. Billington,* 681 F.3d 377, 379 (D.C. Cir. 2012).

3

Bronson, employees of the House Chaplain's Office at the time. Compl. ¶ 34; *id*. Ex. F at 1. The

lawyers inquired about the possibility of a "nonreligious citizen" serving as guest chaplain and

delivering the "opening invocation" for the House. *Id*. Bronson and Aglieco explained that there

are no written requirements to serve as a guest chaplain, but the guest chaplain must be

sponsored by a Member of the House, must be ordained, and should address in the prayer a

"higher power," rather than address House members directly. *Id*. ¶ 35.

In February 2015, Representative Mark Pocan requested that plaintiff be given

consideration as a guest chaplain. *Id*. ¶ 37; *id*. Ex. A. In his written request, Representative Pocan

reported that plaintiff holds a certificate of ordination from the Standard Christian Center and

planned "for his invocation to be secular." *Id*. Ex. A. Representative Pocan stated that plaintiff

"intends to offer the House of Representatives a hopeful invocation focusing on leading a happy,

loving, moral and purpose-filled life." *Id*. At Ms. Aglieco's request, plaintiff also supplied his

contact information, biography, and Standard Christian Center ordination certificate. *Id*. ¶ 38.

Plaintiff's biography reported that he was ordained to the Christian ministry in 1975, but today

"he is co-President of the Freedom From Religion Foundation, an atheist, and a humanist

promoting the good news of freethought." *Id*. Ex. D. It also reported that plaintiff is an author,

composer, musician, and public speaker who has discussed a meaningful life without a god. *Id*.

According to the Complaint, after receiving Representative Pocan's letter, Father Conroy

approached Representative Pocan and suggested that he was dubious that an atheist could craft

an appropriate invocation. *Id*. ¶ 39. Father Conroy indicated that reviewing a draft copy of

plaintiff's invocation might allay his concerns. *Id*. ¶ 40. Plaintiff provided a draft of his proposed

invocation in June 2015. *Id*. ¶ 43. In December 2015, the Chaplain's Office denied plaintiff

permission to serve as guest chaplain. *Id*. ¶ 47.

Attorneys from the Freedom From Religion Foundation wrote a letter to Father Conroy, accusing him of discriminating against plaintiff based on plaintiff's religious identification. *Id.* Ex. F. at 1. The attorneys requested that the Office of the Chaplain immediately approve plaintiff as a guest chaplain. *Id.* at 5. In a letter signed by Father Conroy dated January 7, 2016, and addressed to Representative Pocan, Father Conroy explained that the House Rules require that each day that the House is in session must commence with a prayer. *Id.* Ex. C. Father Conroy noted that, in keeping with past practices, from time to time, he had invited guest chaplains to fulfill this responsibility by offering the prayer. He also explained that he permitted Members to recommend particular clergy for consideration as guest chaplains. The letter stated further that, leaving aside whether the secular invocation that plaintiff proposed to deliver was a prayer within the meaning of the House Rules and whether Father Conroy could even permit plaintiff to deliver such an invocation consistent with his responsibilities under the House Rules, plaintiff had provided an ordination certificate from 1975 that stated he was a Minister of Christ, but provided a biography that identified him as an atheist, who had outgrown his religious beliefs. Father Conroy observed that the information plaintiff provided indicated that the certificate was not legitimate for purposes of considering Representative Pocan's request that plaintiff be invited to offer the "opening invocation." *Id.* at 2 (quotation marks in original). Finally, Father Conroy clarified that he never requested draft remarks from plaintiff nor did he ever state that plaintiff must submit remarks in advance for approval. *Id.* at 2-3.

Plaintiff filed his Complaint on May 5, 2016. ECF No. 1. Plaintiff sues Father Conroy, Assistant to the Chaplain Elisa Aglieco, the Chaplain's Liaison to Staff Karen Bronson, and Speaker of the House Paul Ryan in their official capacities, along with the House of Representatives, alleging that the guest chaplain requirements and the refusal to permit plaintiff

the opportunity to give an opening invocation violated the Establishment Clause of the First

Amendment, the Due Process Clause of the Fifth Amendment, Article 6, Paragraph 6 of the

Constitution, and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb. Compl. ¶¶ 158-

200, Counts A-D. Plaintiff also brings *Bivens* claims against Father Conroy in his personal

capacity, alleging that Father Conroy discriminated against plaintiff for his religious choices in

violation of the First and Fifth Amendments. Compl. ¶¶ 201-206, Count E. Plaintiff seeks money

damages from Father Conroy personally.[4] He seeks declaratory, injunctive, and mandamus relief

from the official-capacity defendants.[5]

## **LEGAL STANDARD**

Dismissal is required under Federal Rule of Civil Procedure 12(b)(6) when a plaintiff

fails to plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible

---

[4] This Memorandum is submitted solely on behalf of Father Conroy in his individual capacity. The U.S. House of Representatives and official-capacity defendants are concurrently filing a separate motion to dismiss all claims asserted against them. To avoid duplication, this Memorandum focuses on the defenses unique to the individual-capacity claims. Certain defenses, however, are available to all defendants, regardless of the capacity in which defendants are sued or are otherwise dispositive of the Complaint in its entirety. Therefore, Father Conroy specifically incorporates, by reference, the arguments made in Part II (A-D) of the Memorandum in Support of the Official Defendants' Motion to Dismiss. ("Official Defs. Mem.").

[5] Although not specified in the Complaint, it appears that plaintiff's requests for injunctive, declaratory, and mandamus relief (Request For Relief ¶¶ a-h, Compl. ¶¶ 177, 193, 200) are sought from the official-capacity defendants only. *Compare* Counts A-D (seeking equitable relief) *with* Count E (seeking damages from Father Conroy personally). Seeking equitable relief only from the official-capacity defendants is appropriate because courts in this district and nationwide have made clear that "there is no basis for suing a government official for declaratory and injunctive relief in his or her individual or personal capacity." *Hatfill v. Gonzales*, 519 F. Supp. 2d 13, 26 (D.D.C. 2007). Moreover, courts nationwide and within this district have made clear that attorneys' fees are not recoverable in *Bivens* suits under 28 U.S.C. § 2412 or 42 U.S.C. § 1988. *See Unification Church v. INS*, 762 F.2d 1077, 1081 (D.C. Cir. 1985) (§ 1988 only applies to violations of the statutes listed therein); *GasPlus, LLC v. United States Dep't of Interior*, 593 F. Supp. 2d 80, 84, 88-89 (D.D.C. 2009) (fees in *Bivens* actions not recoverable under § 2412). To the extent that Request for Relief ¶ j is directed towards Father Conroy in his individual capacity, it therefore must be dismissed.

on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although the court must assume the truth of well-pleaded factual allegations in ruling on a motion to dismiss, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* Accordingly, a court need not "accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006) (internal quotation marks omitted). Similarly, a court need not accept as true "a legal conclusion couched as a factual allegation." *Id.* (internal quotation marks omitted).

As *Iqbal* teaches, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability," it has failed to state a claim. *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Thus, if the facts presented by the plaintiff do not "permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but not 'show[n]'–'that the pleader is entitled to relief,'" and dismissal should be granted. *Id.* at 679 (citing Fed. R. Civ. P. 8(a)(2)). Finally, even when the complaint contains detailed factual allegations, the complaint still must be dismissed when the allegations, taken as true, show the plaintiff is not entitled to relief. *See id.*

## **ARGUMENT**

The claims against Father Conroy in his individual capacity should be dismissed because special factors counsel hesitation in creating an implied damages remedy in this novel context. Even if it were appropriate for the court to create a nonstatutory damages remedy here, Father Conroy is entitled to qualified immunity.

I.   **Special Factors Counsel Against Creating the *Bivens* Remedy That Plaintiff Seeks Here.**

Plaintiff asks this court to create an implied damages remedy in a wholly new context, notwithstanding the presence of a host of special factors that counsel against doing so. Invoking *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), plaintiff seeks damages directly under the Constitution from Father Conroy for alleged violations of plaintiff's rights under the First and Fifth Amendments. Compl. ¶¶ 201-206. In *Bivens*, the Supreme Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Iqbal*, 556 U.S. at 675 (citation omitted). There, the Court held that Webster Bivens, the victim of an alleged Fourth Amendment violation, could pursue an implied right of action directly under that Amendment to recover damages in the absence of a statutory cause of action because there were "no special factors counseling hesitation in the absence of affirmative action by Congress." *Bivens*, 403 U.S. at 396.

Subsequently, the Supreme Court has made clear that a judicially created damages remedy for constitutional violations like that inferred in *Bivens* is "disfavored," *Iqbal*, 556 U.S. at 675, and "is not an automatic entitlement." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007). The Supreme Court therefore has extended *Bivens* only twice since *Bivens* itself was decided—the most recent occasion more than three decades ago—in both instances specifically determining that there were no such special factors. *See Davis v. Passman,* 442 U.S. 228 (1979) (implying a damages remedy under the Due Process Clause for congressional aide alleging sex discrimination in the workplace); *Carlson v. Green,* 446 U.S. 14 (1980) (implying a damages remedy under the Eighth Amendment for a prisoner against federal prison officials).

In the more than thirty-five years since *Carlson,* the Court "ha[s] consistently refused to extend *Bivens* liability." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001); *Minneci v. Pollard*, 132 S. Ct. 617, 622-623 (2012) (collecting cases). Indeed, the Supreme Court has "in most instances . . . found a *Bivens* remedy unjustified," *Wilkie*, 551 U.S. at 550, a view held consistently throughout the circuits. *Meshal v. Higginbotham,* 804 F.3d 417, 421 (D.C. Cir. 2015) (internal quotation marks omitted) (observing that "over time, the Court gradually retreated from *Bivens,* rejecting any automatic entitlement to the remedy…"); *Cioca v. Rumsfeld,* 720 F.3d 505, 509 (4th Cir. 2013) (citation and quotation marks omitted) (explaining that the strict limits on *Bivens* claims "exist in part because the Supreme Court has long counselled restraint in implying new remedies at law. Such restraint counsels that we review a plaintiff's invitation to imply a *Bivens* action . . . with skepticism."); *Vance v. Rumsfeld,* 701 F.3d 193, 198 (7th Cir. 2012) (en banc) ("Whatever presumption in favor of a *Bivens*-like remedy may once have existed has long since been abrogated."). As the Supreme Court noted, it has since "retreated from [its] previous willingness to imply a cause of action where Congress has not provided one." *Malesko*, 534 U.S. at 67 n.3. Accordingly, the D.C. Circuit has cautioned that "[t]he implication of a *Bivens* action … is not something to be undertaken lightly." *Doe v. Rumsfeld*, 683 F.3d 390, 394 (D.C. Cir. 2012).

Recognizing that such implied causes of action are disfavored, the Court has been especially vigilant in urging caution when a plaintiff seeks to extend *Bivens* "to any new context or new category of defendants." *Malesko*, 534 U.S. at 68; *Iqbal*, 556 U.S. at 675; *Schweiker v. Chilicky*, 487 U.S. 412, 421 (1988) ("Our more recent decisions have responded cautiously to suggestions that *Bivens* remedies be extended into new contexts."); *Meshal*, 804 F.3d at 421 (explaining that courts "have tread carefully before recognizing *Bivens* causes of action when

plaintiffs have invoked them in new contexts"); *Mirmehdi v. United States*, 689 F.3d 975, 980 (9th Cir. 2011) (noting that in the years since *Bivens*, the Supreme Court "has repeatedly rejected *Bivens* claims outside the context discussed in that specific case"); *Arar v. Ashcroft,* 585 F.3d 559, 571 (2d Cir. 2009) (en banc) (citation and internal quotation marks omitted) ("[T]he *Bivens* remedy is an extraordinary thing that should rarely if ever be applied in new contexts.").

### A. Plaintiff Seeks to Extend *Bivens* Liability Into a Novel Context.

In this case, plaintiff asks this court to extend *Bivens* liability into an entirely new context. For the purpose of analyzing a proposed *Bivens* claim, "context" means "a potentially recurring scenario that has similar legal and factual components." *Meshal*, 804 F.3d at 424 (quoting *Arar*, 585 F.3d at 572). Importantly, the Supreme Court has never recognized a First Amendment *Bivens* claim for religious discrimination. *Iqbal*, 556 U.S. at 675 (observing that, because the Court has been reluctant to extend *Bivens* liability to any new context, "[t]hat reluctance might well have disposed of [plaintiff's] First Amendment claim of religious discrimination" had the parties pressed the argument); *id*. (explaining that the Court has "declined to extend *Bivens* to a claim sounding in the First Amendment."); *Reichle v. Howards*, 132 S. Ct. 2088, 2093 n.4 (2012) (noting that "[w]e have never held that *Bivens* extends to First Amendment claims"). Recently, the Second Circuit refused to recognize a *Bivens* remedy under the Free Exercise Clause *solely* because the Supreme Court had never extended *Bivens* to a claim sounding in the First Amendment. *See Turkmen v. Hasty*, 789 F.3d 218, 236 (2d Cir. 2015), *petition for cert. filed*, No. 15-1358 (U.S. May 9, 2016); *accord Rezaq v. Fed. Bureau of Prisons*, No. 13cv990, 2016 WL 97763, at *9 (S.D. Ill. Jan. 8, 2016) (concluding that plaintiff's *Bivens* claim under the First Amendment "is not viable" because the Supreme Court has declined to extend *Bivens* to claims sounding in the First Amendment).

Not only has the Supreme Court indicated reticence in the First Amendment arena, no court has ever inferred a *Bivens* remedy in the context of legislative prayer. Nor are we aware of any court inferring a *Bivens* remedy in the context of the application of Congress' internal rules of proceedings or against an officer of either Chamber of Congress for the interpretation of those internal rules. Accordingly, plaintiff's claims here unquestionably would extend *Bivens* into a new context that, as explained below, is fraught with separation-of-powers concerns.

When faced with an invitation to extend *Bivens* to a new context or category of defendants, a court must engage in a two-step inquiry. *Wilkie*, 551 U.S. at 550. The court asks, first, whether there is an "alternative, existing process for protecting the [relevant] interest [which] amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Id.* (citing *Bush v. Lucas*, 462 U.S. 367, 378 (1983)). In the absence of an alternative existing process, the court engages in the next step of the analysis, in which it acts as a common-law tribunal weighing reasons for and against creating a new remedy. *Id.* In this second step, courts ask whether there are "any special factors counselling hesitation before authorizing a new kind of federal litigation." *Id.* (quoting *Bush*, 462 U.S. at 378); *see also Wilson v. Libby*, 535 F.3d 697, 704 (D.C. Cir. 2008) (citation and quotation marks omitted) (refusing to imply a remedy under the First and Fifth Amendments and noting that "[w]e have discretion in some circumstances to create a remedy against federal officials for constitutional violations, but we must decline to exercise that discretion where special factors counsel hesitation."). Thus, "a *Bivens* remedy should [not] be implied simply for want of any other means for challenging a constitutional deprivation in federal court." *Malesko*, 534 U.S. at 69. Rather, creation of a non-statutory remedy remains "a subject of judgment." *Wilkie*, 551 U.S.

at 550; *Kelley v. Fed. Bureau of Investigation*, 67 F. Supp. 3d 240, 270 (D.D.C. 2014)

(explaining that "such judicial discretion should be exercised carefully").

### B. Plaintiff's Claims Directly Implicate Numerous Special Factors.

Plaintiff's claims implicate no less than four separate special factors that should cause

this court to hesitate before implying a damages remedy in this new context. A wide range of

"special factors" may make it inappropriate to create a *Bivens* remedy in a particular context,

even where the plaintiff has no alternative remedy. *See Idaho v. Coeur d'Alene Tribe of Idaho*,

521 U.S. 261, 280 (1997) (opinion of Kennedy, J., joined by Rehnquist, C.J.) (citations omitted)

(noting that the "*Bivens* line[] of cases reflect[s] a sensitivity to varying contexts, and courts

should consider whether there are 'special factors counselling hesitation,' . . . before allowing a

suit to proceed under [that] theory. The range of concerns to be considered in answering this

inquiry is broad.").[6] Special factors that have counseled hesitation and thus foreclosed a *Bivens*

remedy include: separation-of-powers concerns, *Lebron v. Rumsfeld*, 670 F.3d 540, 549 (4th Cir.

2012); *Alvarez v. USICE*, 818 F.3d 1194, 1210-11 (11th Cir. 2016); the availability of alternative

remedies, *Malesko*, 534 U.S. at 67; administrability concerns, *Meshal*, 804 F.3d 427; *Lebron*,

670 F.3d at 553-54; and Congress' activity in a particular field suggesting that its inaction for a

particular type of claim or harm has not been inadvertent. *Chilicky*, 487 U.S. at 423; *Klay v.*

*Panetta*, 758 F.3d 369, 376 (D.C. Cir. 2014). All of these special factors are implicated in this

case. Although each factor, standing alone, may counsel hesitation, special factors in the

aggregate may also preclude a *Bivens* remedy. *See Chappell v. Wallace*, 462 U.S. 296, 304

---

[6] *See also Bivens*, 403 U.S. at 407 (Harlan, J., concurring) (stating that, in resolving "whether compensatory relief is 'necessary' or 'appropriate' to the vindication of the interest asserted," the Court "may take into account" a "range of policy considerations" that "is at least as broad as the range" that "a legislature would consider with respect to an express statutory authorization of a traditional remedy").

(1983) (concluding that factors "[t]aken together" "constitute[d] 'special factors'"); *Meshal*, 804 F.3d at 425 ("We do not here decide whether either factor alone would preclude a *Bivens* remedy, but both factors together do so."). At bottom, however, the "only relevant threshold—that a factor 'counsels hesitation'—is remarkably low." *Arar*, 585 F.3d at 574.

As demonstrated below, the special factors that this case presents (separately and collectively) weigh against inferring a damages remedy here.

**1. Plaintiff's Claims Raise Fundamental Separation-of-Powers Concerns**.

The separation-of-powers concerns inherent in this case counsel against inferring the damages remedy that plaintiff seeks. At core, whether to imply a remedy in general, and the special factors doctrine in particular, are separation-of-powers questions. *See Alvarez*, 818 F.3d at 1210 (explaining that one special factor is "the importance of demonstrating due respect for the Constitution's separation of powers"); *Lebron*, 670 F.3d at 548 (recognizing that "[p]reserving the constitutionally prescribed balance of powers is . . . [a] special factor counseling hesitation" in implying a *Bivens* remedy). And, when the Constitution commits exclusive authority to Congress or the Executive to regulate its own affairs in a given sphere, courts have generally declined on separation of powers grounds to intrude into that sphere with a judicially-crafted remedy under *Bivens*. *See Cioca v. Rumsfeld*, 720 F.3d 505, 509 (4th Cir. 2013) (citation and quotation marks omitted) (explaining that "[a]bstention from sanctioning a *Bivens* claim in the military context is, at its essence, a function of the separation of powers under the Constitution which delegates authority over military affairs to Congress and to the President as Commander in Chief. It contemplates no comparable role for the judiciary.").

The Constitution textually commits to the U.S. House of Representatives the exclusive authority to determine its rules of proceedings and to choose its officers. U.S. CONST. art. I, § 2,

cl. 5 ("The House of Representatives shall chuse their Speaker and other officers…"); U.S.

CONST. art. I, § 5, cl. 2 ("Each house may determine the Rules of its proceedings."). As part of

the House's exercise of its internal rulemaking authority, the House has determined that each

legislative session's first order of business shall be a "prayer," has elected a House Chaplain, and

has assigned to that Chaplain the duty to open the legislative session with a prayer. House Rules,

II, XIV. The House's decision to open its sessions with a prayer and its refusal to yield the time

set aside for prayer for some other set of secular remarks fall well within the sphere of matters

committed to the exclusive domain of the House. *See, e.g., United States v. Ballin*, 144 U.S. 1, 5

(1892) (explaining that while the House "may not by its rules ignore constitutional restraints or

violate fundamental rights … within these limitations" its rulemaking power is "absolute and

beyond the challenge of any other body or tribunal."); *Consumers Union of United States, Inc. v.

Periodical Correspondents Ass'n.*, 515 F.2d 1341, 1347 (D.C. Cir. 1975) (observing that

Congress' internal rules governing admission to press galleries involved a matter committed by

the Constitution to the Legislative Branch).

The House's concomitant decision to permit its Chaplain to invite a guest chaplain to

open the legislative session with the required prayer also is a judgment made pursuant to and in

execution of the powers conferred upon it in the Constitution. In other words, the House's

creation of the Chaplain's position, the promulgation of the long-standing internal House Rules

that the Chaplain open the session with a prayer, and the correlative decision of the Chaplain to

allow guest chaplains to fulfill such a role on a temporary basis all stem from the constitutionally

mandated power of the House to set its own rules of proceedings and all involve the internal

operations of a coordinate branch of government. Because the Constitution reserves such internal

rulemaking decisions for the Legislative Branch, plaintiff's *Bivens* claims squarely implicate

separation-of-powers concerns. And, when a case involves such concerns, a court should decline

to infer a damages remedy. *Alvarez*, 818 F.3d at 1210; *Lebron*, 670 F.3d at 548.

       The textually committed powers at issue in this case are not appreciably different from

the Constitutionally committed authority that has caused courts to hesitate in implying a *Bivens*

remedy against officials of the Executive Branch in the military context. In *Chappell v. Wallace*,

service members asserted *Bivens* claims against their superior officers, alleging racial

discrimination in violation of the equal protection component of the Fifth Amendment. 462 U.S.

296, 304-05 (1983). The Supreme Court recognized that the Constitution commits military

affairs to the Legislative and Executive Branches. *Id.* at 301-02 (citing U.S. CONST. art. I, § 8,

cls. 12-14 ("To raise and support armies"; "To provide and maintain a Navy"; and "To make

Rules for the Government and Regulation of the land and naval Forces.")). The Court explained

that the Constitution contemplated that Congress has plenary control over regulations,

procedures and remedies in the framework of the military establishment. *Id.* The Court observed

that Congress chose not to provide a damages remedy for claims by military personnel against

superior officers for constitutional violations and, thus, "[a]ny action to provide a judicial

response by way of such a remedy would be plainly inconsistent with Congress' authority in this

field." *Id.* at 304. Consequently, courts have repeatedly determined that as a result of these

separation-of-powers concerns and other special factors "no *Bivens* remedy is available for

injuries that 'arise out of or are in the course of activity incident to [military] service.'" *United*

*States v. Stanley*, 483 U.S. 669, 683 (1987); *see also id.* at 681-82 (explaining that "here we are

confronted with an explicit constitutional authorization for Congress '[t]o make Rules for the

Government and Regulation of the land and naval Forces'" and in part what is "distinctive" and

counsels hesitation in implying a remedy is the "specificity" of that grant of power).[7] The

constitutional commitment of internal rulemaking power to the House should warrant similar

hesitation in implying a *Bivens* remedy for the claims here.[8]

The Constitution's commitment of internal rulemaking to Congress distinguishes this

case from *Davis v. Passman*, 442 U.S. 228 (1979), in which the Supreme Court inferred a *Bivens*

remedy directly under the Fifth Amendment's equal protection component for a congressional

employee who alleged she had been the victim of gender discrimination by a former

Congressman. The Court noted that the only separation-of-powers concerns applicable to

plaintiff's particular claim challenging a Congressman's personnel decisions were coextensive

with the protections of the Speech or Debate Clause, an issue on which the en banc Fifth Circuit

had not passed, on which the Supreme Court expressed no view, and the resolution of which was

remanded to the Fifth Circuit. *Id.* at 233, 235 n.11, 246. In this case, however, the separation-of-

---

[7] *See also Doe*, 683 F.3d at 395-96 (determining that special factors precluded suit by government contractor who was subjected to military detention even though contractor was not a member of the military); *Cioca*, 720 F.3d at 515 (explaining that special factors counsel hesitation whenever "a complaint asserts injuries that stem from the relationship between the plaintiff and the plaintiff's service in the military"); *Heap v. Carter*, 112 F. Supp. 3d 402, 428-29 (E.D. Va. 2015) (concluding that special factors precluded a *Bivens* remedy for a humanist chaplain alleging that federal officials violated his Equal Protection and First Amendment rights in refusing to hire him as a Navy Chaplain, noting that "[a]s a consequence of the Constitution's specific delineation of the powers allotted among the branches of government in military affairs," courts have hesitated in implying a remedy).

[8] As demonstrated in the Official Defendants' Memorandum, the Speech or Debate Clause precludes judicial review of a House Officer's implementation of the House Rules governing the conduct of proceedings on the House floor during legislative sessions. This distinct separation-of-powers issue, coupled with the House's exclusive constitutional authority to determine its internal rules, further militates against creating a damages remedy. *Cf. Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 (D.C. Cir. 1985) ("Whether or not this is … a matter so entirely committed to the care of the political branches as to preclude our considering the issue at all, we think it at least requires the withholding of discretionary relief [under the APA].").

powers concerns derive not only generally from the Speech or Debate Clause, but from the Constitution's explicit commitment of internal rulemaking to the House, an issue not implicated by, or applicable to, Davis' employment claims.[9]

In short, because plaintiff's claims implicate core separation-of powers concerns, this court should refrain from implying a damages remedy.

### 2. Other Special Factors Counsel Against Inferring a *Bivens* Remedy.

Apart from the separation-of-powers concerns, plaintiff's claims directly implicate several additional special factors—all of which counsel against creating a *Bivens* remedy in this unchartered context.

**First**, this court should refrain from implying a damages remedy against Father Conroy in his personal capacity because, fundamentally, this is a case challenging a House rule. The Supreme Court has made clear that *Bivens* remedies "have never [been] considered a proper vehicle for altering an entity's policy." *Malesko*, 534 U.S. at 74. Accordingly, courts regularly look behind the asserted *Bivens* claims to determine whether the claims are simply a thinly-veiled attempt to challenge policy. *See Arar*, 585 F.3d at 574 ("Although this action is cast in terms of a claim for money damages against the defendants in their individual capacities, it operates as a constitutional challenge to policies promulgated by the executive. Our federal system of checks and balances provides means to consider allegedly unconstitutional executive

---

[9] Additionally, the Supreme Court has since significantly retreated from *Davis* and other early decisions which can be read to advocate an expansive recognition of *Bivens* claims. Moreover, following the passage of the Congressional Accountability Act, 2 U.S.C. § 1301, *et seq.*, numerous courts have refused to entertain *Bivens* discrimination claims against Congressional employees like that permitted to proceed under *Bivens* in *Davis. Packer v. U.S. Comm'n on Sec. & Cooperation in Europe*, 843 F. Supp. 2d 44, 48–49 (D.D.C. 2012) (noting that *Davis* predated the passage of the CAA and observing that its precedential value is limited in "today's statutory landscape"). Thus, not only is *Davis* distinguishable from the instant case, but it no longer represents the current state of *Bivens* jurisprudence.

policy, but a private action for money damages against individual policymakers is not one of

them."); *Lebron*, 670 F.3d at 552 ("One may agree or not agree with those policies … But the

forum for such debates is not the [*Bivens*] action pressed in the case at bar. The fact that

[plaintiff] disagrees with policies allegedly formulated or actions allegedly taken does not entitle

him to demand the blunt deterrent of money damages under *Bivens* to promote a different

outcome."); *Turkmen,* 789 F.3d at 267 (Raggi, C.J., concurring in part and dissenting in part)

("[P]laintiffs' constitutional challenges to an alleged executive policy … cannot pass the

stringent test for recognizing a *Bivens* action."). Similarly, plaintiff should not, by pleading

artifice, be permitted to evade the Supreme Court's clear holding that special factors preclude

damages suits against entities. *See FDIC v. Meyer*, 510 U.S. 471, 485-86 (1994).

When one looks behind plaintiff's *Bivens* claims, it is clear that, at bottom, what he

challenges is the House's Rule requiring that its legislative sessions open with a "prayer" instead

of the secular invocation that plaintiff proposed to give. *See Kurtz v. Baker*, 829 F.2d 1133, 1147

(D.C. Cir. 1987) (Ginsburg, J., dissenting) (observing that nontheist's claims of religious

discrimination against Congressional chaplains following chaplains' denial of his request to

serve as a guest chaplain in order to provide secular remarks "is inevitably an attack on

Congress' customary, opening-with-prayer observance" ). However, "[b]ecause *Bivens* has never

been approved as a *Monell*-like vehicle for challenging government policies," *Arar*, 585 F.3d at

579, this court should not countenance plaintiff's attempt to utilize *Bivens* for that purpose here.

There is simply no justification for implying a remedy against Father Conroy personally

when plaintiff's real grievance is with the House Rule. As the Supreme Court has explained, if a

plaintiff seeks to challenge policy, the proper means for doing so is to seek injunctive relief.[10] *Malesko,* 534 U.S. at 74 (emphasis added) (explaining that "*injunctive* relief has long been recognized as the proper means for preventing entities from acting unconstitutionally."). In contrast, in *Bivens*, because plaintiff challenged the conduct of line-level law enforcement officers (not any policy) and had no other remedy available to him (injunctive or otherwise), the Supreme Court decided to imply a damages remedy directly under the Fourth Amendment. *See generally Bivens*, 403 U.S. at 404, 410 (Harlan, J., concurring) (noting there is a presumed availability of equitable relief against invasions of constitutional interests and explaining that a justification for implying a private right of action under the Constitution in the first instance is that "[f]or people in Bivens' shoes, it is damages or nothing"); *see also Meyer*, 510 U.S. at 485 (observing that the Court had implied a cause of action against the officers in *Bivens* in part because direct action against the government was not available).

When plaintiffs have an avenue for seeking injunctive relief for their alleged harms, the Court has determined that an extension of a *Bivens* remedy is unwarranted. For example, in *Malesko*, the Supreme Court reiterated that it had extended *Bivens* only twice, in *Davis* and in *Carlson. Malesko*, 534 U.S. at 67. The Court explained that it had decided to infer a new damages remedy directly under the Constitution in *Davis* "chiefly because the plaintiff lacked any other remedy."[11] *Id.*; *see also Wilkie*, 551 U.S. at 555 (justifying the decision in *Davis* to

---

[10] Indeed, plaintiff has done so against the official-capacity defendants here and that request will rise and fall on its own basis, or lack thereof. Even if plaintiff can receive no relief for his alleged harms, however, that does not affect the special factors analysis. *See Meshal v. Higgenbotham*, 804 F.3d 417, 425 (D.C. Cir. 2015); *Wilson v. Libby*, 535 F.3d 697, 704-9 (D.C. Cir. 2008).

[11] In *Davis v. Passman*, because Passman no longer served as a Congressman, the Court recognized that equitable relief was not available to plaintiff. 442 U.S. at 231 n.4; *see also id.* at 245 (citation and internal quotation marks omitted) (noting that since Passman was no longer a congressman, "[f]or Davis, as for Bivens, it is damages or nothing.").

infer a remedy under the Constitution because plaintiff there "had no other remedy."). The Court

in *Malesko* went on to clarify that where such circumstances are not present (i.e., plaintiff has an

alternative remedy to pursue), the Court has "consistently rejected invitations to extend *Bivens*."

*Malesko,* 534 U.S. at 70. Because the plaintiff in *Malesko* could seek injunctive relief in federal

court for his alleged constitutional harms, the Court refused to imply a remedy directly under the

Constitution. *Id.* at 74 (explaining that plaintiff was not "in search of a remedy as in *Bivens* or

*Davis*"); *see also Stanley*, 483 U.S. at 683 (noting that, although special factors counseled against

inferring a damages remedy, that finding did not mean that all constitutional challenges by

military personnel were barred; traditional forms of relief such as seeking to halt a constitutional

violation were available to redress constitutional harms); *Heap v. Carter*, 112 F. Supp. 3d 402,

430 n.16 (E.D. Va. 2015) (refusing to imply a damages remedy for Humanist's equal protection

and First Amendment claims of religious discrimination against Navy officials for failing to hire

him as a Chaplain, but noting that the court could address constitutional violations through

plaintiff's requests for injunctive relief). Because plaintiff has a claim for injunctive relief for his

alleged harms, this court should refrain from creating a new, implied damages remedy here.

 **Second**, adjudication of this case is rife with practical concerns, which also militates

against implying a new damages remedy. Courts have refrained from creating a *Bivens* remedy

when a case presents claims replete with "administrability concerns." *See Meshal v.*

*Higgenbotham*, 804 F.3d 417, 427 (D.C. Cir. 2015) (detailing practical factors counseling

hesitation); *Alvarez v. USICE*, 818 F.3d 1194, 1210-11 (11th Cir. 2016) (same); *Lebron*, 670

F.3d 540, 552-53 (cataloging a series of administrability problems that caused the court

hesitation in implying a remedy and recognizing that this special factor "overlaps to some extent

with the dangers of intrusion into the constitutional responsibilities of others"). Here, in order to

evaluate plaintiff's claims, the court would have to wade into questions about how the House intends to open its legislative sessions, who should be permitted on the closed House floor, what the House's internal rule means by "prayer," what criteria the House should use to determine whom to invite to stand in the shoes of the elected Chaplain, and how to value the asserted injury in damages.[12] Courts have recognized, albeit not in cases in which a federal official's personal assets were at stake, that these kinds of concerns pervade the legislative prayer context. *See, e.g., Snyder v. Murray City Corp.*, 159 F.3d 1227, 1229 (10th Cir. 1998) (en banc) (reserving for another day "the very difficult issue of attempting to discern the line between a prayer and secular speech masquerading as a prayer"); *Simpson v. Chesterfield Cnty. Bd. of Supervisors*, 404 F.3d 276, 286-87 (4th Cir. 2005) (observing that "too much judicial fine-tuning of legislative prayer policies risks unwarranted interference in the internal operations of a coordinate branch"). These concerns further counsel hesitation in inferring a remedy here.

**Third**, when Congress has wanted to provide a remedy for individuals alleging religious discrimination by its personnel, it has done so. In 1995, Congress passed the Congressional Accountability Act, 2 U.S.C. § 1301, *et seq*. The CAA applies thirteen civil rights, labor, and workplace laws to the United States Congress and its Legislative Branch agencies. *Id*. § 1302(a). The CAA incorporates such laws as Title VII of the Civil Rights Act of 1964, which covers discrimination on the basis of religion. *Id*. § 1302(a)(2). The Act bars discriminatory practices, defines the remedies for violations, and establishes an Office of Compliance to administer

---

[12] In *Davis v. Passman*, the Supreme Court noted that practical concerns in that case were notably absent because "[r]elief in damages would be judicially manageable, for the case presents a focused remedial issue without difficult questions of valuation or causation." 442 U.S. 228, 245 (1979). The Court went on to observe that litigation under Title VII of the Civil Rights Act of 1964 had given federal courts "great experience evaluating claims for backpay due to illegal sex discrimination." *Id*. Here, in contrast, plaintiff was not seeking employment or any defined monetary benefit.

claims. *See id*. §§ 1311-1384. Although the CAA does not permit damages awards, courts have determined it to be a comprehensive remedial scheme for Congressional employees and job applicants, and a special factor precluding *Bivens* claims by covered individuals. *See Packer v. U.S. Comm'n on Sec. & Cooperation in Europe*, 843 F. Supp. 2d 44, 48–49 (D.D.C. 2012); *see also Hamilton-Hayyim v. Jackson*, No. 12cv6392, 2013 WL 3944288, at *11 (N.D. Ill. July 31, 2013) (finding CAA precluded plaintiff's *Bivens* action asserting racial and religious discrimination); *Hensley v. Office of Architect of the Capitol,* 806 F. Supp. 2d 86, 92–93 (D.D.C. 2011) (stating that CAA, like its antecedent Title VII, is "an adequate, comprehensive procedural and remedial scheme" barring a *Bivens* remedy); *Tull v. Office of Architect of the Capitol,* 806 F. Supp. 2d 80, 85–86 (D.D.C. 2011) (same) *Payne v. Meeks*, 200 F. Supp. 2d 200, 206 (E.D.N.Y. 2002) (holding that CAA barred First Amendment *Bivens* claim against Congressman because "Congress enacted the CAA against the background of the CSRA, its withholding from congressional employees of a remedy for constitutional violations cannot have been inadvertent"). Similarly, Congress passed the Religious Freedom Restoration Act, which governs substantial burdens on a person's exercise of religion. 42 U.S.C. § 2000bb, *et seq*.[13]

While plaintiff is not considered a "covered employee" under the CAA and cannot obtain relief under either statute for the harms he alleges here, Congress' activity in the field of religious discrimination is yet one more reason militating against providing an implied damages remedy. *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988) (internal quotation marks omitted) ("[T]he concept of special factors … has proved to include an appropriate judicial deference to indications that congressional inaction has not been inadvertent."). In *Klay*, for example, the

---

[13] RFRA expressly states that the statute shall not be construed to affect, interpret, or in any way address the Establishment Clause of the First Amendment. 42 U.S.C. § 2000bb-4.

D.C. Circuit reasoned that because Congress had "extensively engaged with the problem of sexual assault in the military but … [had] chosen not to create such a cause of action," it declined to recognize a new remedy for plaintiffs who alleged they were sexually assaulted. *Klay v. Panetta*, 758 F.3d 369, 376 (D.C. Cir. 2014) (noting that when Congress has "legislated pervasively on a particular topic but has not authorized the sort of suit that a plaintiff seeks to bring under *Bivens*," courts should hesitate to imply a remedy); *Turkmen v. Hasty*, 789 F.3d 218, 268, n.3 (2d Cir. 2015) (Raggi, C.J., concurring in part and dissenting in part) (concurring in majority's dismissal of plaintiff's Free Exercise challenge because not only has the Supreme Court declined to extend a *Bivens* remedy to First Amendment claims in any context, but Congress has also provided alternative relief under RFRA). That Congress chose to provide certain relief to only certain persons asserting religious discrimination by Legislative Branch personnel counsels against augmenting such decisions by way of a judicially-implied remedy.

In sum, when special factors demonstrate that the court should refrain from implying a *Bivens* remedy, the individual-capacity constitutional claims should be dismissed. *See Morrow v. United States*, 723 F. Supp. 2d 71, 78 (D.D.C. 2010) ("[T]he issue is not whether the Court has jurisdiction to entertain the plaintiff's *Bivens* claims, but whether the Court should dismiss the claims because a proper reading of *Bivens* prevents the Court from granting the plaintiff the relief that he is seeking"). Here, multiple special factors weigh against inferring an implied damages remedy in this new context. Accordingly, all claims against Father Conroy in his personal capacity should be dismissed.

## II.     The Speech or Debate Clause Precludes Judicial Review of Father Conroy's Implementation of Rules Governing Proceedings on the House Floor.

Even if a *Bivens* action were permitted here, Father Conroy is shielded by the Speech or Debate Clause as well as qualified immunity. Father Conroy does not separately address Speech

23

or Debate Clause immunity in this Memorandum because the arguments presented in the Official

Defendants' Motion to Dismiss apply equally to all claims against all defendants and because

qualified immunity easily disposes of the personal-capacity claims against Father Conroy. Father

Conroy specifically incorporates, by reference, the argument that plaintiff's suit is barred by the

Speech or Debate Clause of the Constitution, which is set forth in the Memorandum in Support

of the Official Defendants' Motion to Dismiss. *See* Official Defs.' Mem. Part II, B-C.

### III.   Qualified Immunity Bars Plaintiff's Individual-Capacity Claims Against Father Conroy.

Because plaintiff has not pleaded facts showing that Father Conroy violated a clearly

established constitutional right, plaintiff cannot overcome the qualified immunity bar.

### A.  The Framework for the Qualified Immunity Defense.

The doctrine of qualified immunity ensures that only conduct that unquestionably

violates the Constitution will subject officials to personal liability. *Harlow v. Fitzgerald,* 457

U.S. 800, 814-19 (1982). Qualified immunity shields public officials from the necessity of

defending against tort liability so long as their conduct does not violate clearly established rights

of which a reasonable official would have known. *See id.* at 818. Thus, when properly applied,

the doctrine provides "'ample room for mistaken judgments' by protecting 'all but the plainly

incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229

(1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)).

Because qualified immunity is "an immunity from suit rather than a mere defense to

liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court "repeatedly ha[s]

stressed" that courts should resolve the issue "at the earliest possible stage in litigation." *Hunter*,

502 U.S. at 227; *Simkins v. District of Columbia Gov't,* 108 F.3d 366, 370 (D.C. Cir. 1997).

Accordingly, if a plaintiff fails to state a claim sufficient to overcome immunity, the court should

dismiss the action at the outset without allowing discovery. *Mitchell,* 472 U.S. at 526; *Iqbal,* 556 U.S. at 672, 686; *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009).

      Qualified immunity shields federal officials from money damages unless a plaintiff "pleads facts showing:" (1) that the official violated a constitutional right, and (2) the right was clearly established at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). As part of the first prong of qualified immunity, a plaintiff must allege specific acts by which a defendant personally violated a plaintiff's constitutional rights. *See Iqbal*, 556 U.S. at 676. In evaluating the second prong, "[t]he contours of a right [must be] sufficiently clear that every reasonable official would have understood that what he [was] doing violate[d] that right." *al-Kidd*, 563 U.S. at 741 (internal quotation marks omitted). A court may decide which of the two prongs of the analysis to address first. *al-Kidd*, 563 U.S. at 735; *Bame v. Dillard*, 637 F.3d 380, 384 (D.C. Cir. 2011).

      Plaintiff's allegations in this case do not satisfy either prong. As shown below, plaintiff fails to plead sufficient facts establishing that Father Conroy violated his First or Fifth Amendment rights when he declined to invite him to serve as a guest chaplain. Even if it is determined that plaintiff has stated a constitutional claim, the right allegedly violated is not clearly established.

     **B.  Legislative Prayer Jurisprudence.**

      Although the practice of commencing a legislative session with a prayer dates back to the first Continental Congress, the Supreme Court was first presented with a challenge to a state's legislative chaplaincy in *Marsh v. Chambers*, 463 U.S. 783 (1983). There, a state legislator challenged the Nebraska state legislature's employment of a Presbyterian chaplain to deliver prayers at the beginning of its legislative sessions. *Id*. at 785. The Court determined that such a

practice did not violate the Establishment Clause. *Id*. at 794. In reaching its conclusion, the Court began by documenting the longstanding history of legislative prayer in Congress, dating back to the Continental Congress in 1774. *Id*. at 786-88. The Court observed that opening the legislative sessions with prayer was adopted as the official practice of both the Senate and House at the very same time that members of those bodies were drafting and approving the First Amendment. *Id*. As a result, it concluded that the Framers must not have believed that the practice violated the First Amendment. *Id*. at 790 ("It can hardly be thought that in the same week Members of the First Congress voted to appoint and to pay a chaplain for each House and also voted to approve the draft of the First Amendment for submission to the States, they intended the Establishment Clause of the Amendment to forbid what they had just declared acceptable."); *see also id*. at 788 ("Clearly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment, for the practice of opening sessions with prayer has continued without interruption ever since that early session of Congress."); *id*. at 786 ("From colonial times through the founding of the Republic and ever since, the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom.").

The *Marsh* Court therefore determined that "[t]o invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an 'establishment' of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country." *Id*. at 792. The Court quoted Justice Douglas, who had previously observed, "[w]e are a religious people whose institutions presuppose a Supreme Being." *Id*. (alterations in original). The Court noted that such a prayer serves to solemnize and "invoke Divine guidance" for the legislative body's own deliberations. *Id*.; *see also id*.

(concluding that the "Founding Fathers looked at invocations as 'conduct whose … effect … harmonize[d] with the tenets of some or all religions'" (quoting *McGowan v. Maryland*, 366 U.S. 420, 442 (1961) (alterations in original))). Based on evidence of the Framers' intent and because the opening of legislative sessions with the recitation of a prayer is deeply embedded in the history and tradition of this country, the Court concluded that the general practice of legislative prayer was compatible with the Establishment Clause.

With that backdrop, the Court then assessed whether the features of the Nebraska legislature's prayer practice violated the Establishment Clause. The Court determined that employing one clergyman from one denomination for sixteen years did not conflict with the Establishment Clause, "[a]bsent proof that the chaplain's reappointment stemmed from an impermissible motive." *Id*. at 793. The Court also concluded that the fact that the prayers were "in the Judeo-Christian tradition" should not be "of concern to judges" as long as there is no indication that the prayer opportunity has been exploited to "proselytize or advance any one, or to disparage any other, faith or belief." *Id*. at 794-95. The Court cautioned that courts in those circumstances should have no place embarking "on a sensitive evaluation" or "pars[ing] the content" of prayers. *Id*. at 795. Thus, the Court found that Nebraska's legislative prayer practice was constitutional. *Id*.

The Supreme Court and lower courts have characterized *Marsh* as grounded in historical tradition and not subject to the tests that courts typically use to analyze Establishment Clause questions. *Town of Greece v. Galloway*, 134 S. Ct. 1811, 1818 (2014) (noting that "*Marsh* is sometimes described as 'carving out an exception' to the Court's Establishment Clause jurisprudence" because it upheld legislative prayer without subjecting the practice to any of the tests that "'traditionally structure[]' this inquiry"). The Court in *Marsh* considered those tests

unnecessary because history supported the conclusion that legislative prayer is compatible with the Establishment Clause. *Id.*; *see also id.* at 1845 (Kagan, J., dissenting) (explaining that "under *Marsh*, legislative prayer has a distinctive constitutional warrant by virtue of tradition"); *McCreary County v. ACLU*, 545 U.S. 844, 859 n.10 (2005) (observing that legislative prayer is the "special instance[] [where it] found good reason to hold government action legitimate even where its manifest purpose was presumably religious."); *Newdow v. Bush*, 355 F. Supp. 2d 265, 283-86 (D.D.C. 2005) (recognizing "*Marsh* exception" to general Establishment Clause tests). As the Supreme Court later explained, *Marsh* "must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical foundation … *Marsh* stands for the proposition that it is not necessary to define the precise boundary of the Establishment Clause where history shows that the specific practice is permitted." *Town of Greece*, 134 S. Ct. at 1819.

Consequently, in legislative prayer cases, courts have recognized *Marsh* as the governing standard, rather than other tests used in Establishment Clause jurisprudence. *Simpson v. Chesterfield Cnty. Bd. of Supervisors*, 404 F.3d 276, 281 (4th Cir. 2005) ("*Marsh*, in short, has made legislative prayer a field of Establishment Clause jurisprudence with its own set of boundaries and guidelines."); *Snyder v. Murray City Corp.*, 159 F.3d 1227, 1232 (10th Cir. 1998) (en banc) (explaining that the "mainline body of Establishment Clause case law provides little guidance for our decision in this case. Our decision, instead, depends on our interpretation of the holding in *Marsh*"); *cf. Murray v. Buchanan*, 720 F.2d 689, 690 (D.C. Cir. 1983) (en banc) (per curiam) (perceiving "no tenable basis" for a claim challenging the funding of congressional chaplains to be "subject to further review" after *Marsh*).

More recently in *Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014), the Supreme Court was presented with a challenge to a local town board's practice of inviting clergy to open its meetings with a prayer. *Id*. at 1816. The Court began its analysis by reaffirming its prior holding in *Marsh*. The Court characterized *Marsh* as concluding that even though legislative prayer was "religious in nature" it nonetheless has long been understood to be compatible with the Establishment Clause. *Id*. at 1818. The Court reiterated that the "Framers considered legislative prayer a benign acknowledgment of religion's role in society." *Id*. at 1819; *see also id*. at 1823 (explaining that "[e]ven those who disagree as to religious doctrine may find common ground in the desire to show respect for the divine" through legislative prayer). Thus, the Court characterized the issue for resolution as whether the prayer practice in the town of Greece "fit[] within the tradition long followed in Congress…" *Id*. at 1819. In other words, just as in *Marsh*, the Court used as its baseline for analysis the legislative prayer practice in Congress.

With regard to the Town of Greece's practice, plaintiffs challenged the sectarian nature of the prayers and the setting of town board meetings as contrasted with the closed nature of Congress's proceedings. *Id*. at 1819-20. The Court concluded that legislative prayers need not be nonsectarian. *Id*. at 1823. It explained that the tradition reflected in *Marsh* "permits chaplains to ask their own God for blessings of peace, justice, and freedom that find appreciation among people of all faiths." *Id*. The Court reasoned that, when a prayer is given in the name of a specific deity or reflects beliefs specific to only certain creeds, it can still serve to solemnize the proceedings. As long as the practice over time is not "exploited to proselytize or advance any one, or to disparage any other, faith or belief," *id*. (quoting *Marsh*, 463 U.S. at 794-95), it does not run afoul of the Establishment Clause. *Id*. at 1823. The Court disagreed with the Court of Appeals' view that the Town of Greece had contravened the Establishment Clause by inviting a

predominantly Christian set of ministers to lead the prayer. *Id*. at 1824. The Court noted that the

town had made reasonable efforts to identify all of the congregations located within its borders.

*Id*. Because the town represented that it would permit anyone to give a prayer, whether minister

or layman, the Court did not have occasion to address or evaluate the constitutionality of

declining to invite a particular person to give the opening prayer. *Id*. at 1816. Instead, the Court

explained that as long as the town maintained a policy of nondiscrimination, it was not required

to search beyond its borders in an effort to achieve a religious balance. *Id*. at 1824.[14] The Court

determined that the town's prayer practice did not violate the First Amendment. *Id*. at 1828.

### C.  Plaintiff Fails to Plead Facts Stating a Claim for a Violation of His First Amendment Rights.

Plaintiff has failed to state a plausible constitutional claim against Father Conroy. As

noted above, courts have recognized that legislative prayer falls within its own category of

constitutional jurisprudence. *See Town of Greece*, 134 S. Ct. at 1818 (noting that legislative

prayer has not been subject to any of the formal tests that structure the Establishment Clause

inquiry); *Lund v. Rowan Cnty.*, – F.3d –, 2016 WL 4992499, at *6 (4th Cir. Sep. 21, 2016)

("Legislative prayer … has a unique status relative to the First Amendment that places it in a

different legal setting than other types of government conduct touching the Establishment

Clause."); *Simpson*, 404 F.3d at 281 (observing that "*Marsh*, in short, has made legislative prayer

a field of Establishment Clause jurisprudence with its own set of boundaries and guidelines");

*Snyder,* 159 F.3d at 1232 (same).

Marsh and *Town of Greece*, therefore, provide the relevant constitutional guideposts

---

[14] Justice Kennedy's opinion did not garner a majority with respect to the analysis of the setting of the town board proceedings, the second concern that plaintiffs raised with respect to the Town of Greece's prayer practice. *Id*. at 1825-28.

when it comes to evaluating legislative prayer.[15] As to the legislative prayer practice of

Congress, the D.C. Circuit has spoken clearly: in rejecting a challenge to the funding of

congressional chaplains, it explained that it perceived "no tenable basis for a claim that the very

congressional practice deliberately traced by the Court in *Marsh* should be subject to further

review." *Murray v. Buchanan*, 720 F.2d 689, 690 (D.C. Cir. 1983); *cf. Town of Greece*, 134 S.

Ct. at 1819-23 (using Congressional chaplaincy program as the baseline). The D.C. Circuit

explained that *Marsh* "with unmistakable clarity" determined that the practice of opening each

legislative session with a prayer by a chaplain paid by the state does not violate the

Establishment Clause. *Id*. It therefore remanded the case with instructions to dismiss the

complaint "for want of a substantial constitutional question." *Id*.

      With regard to the selection of a chaplain, *Marsh* explained that as long as the choice

does not stem from an "impermissible motive," the choice passes constitutional muster. *Marsh*,

463 U.S. at 793-94. It found no proof that the reappointment of a Presbyterian chaplain for

sixteen consecutive years (and, occasionally, other clergymen as substitutes during his absence)

---

[15] In the context of legislative prayer, courts routinely apply the same analysis to claims
irrespective of whether they are framed under the Establishment Clause or the Equal Protection
Clause. For instance, in a case in which a Wiccan priestess raised an equal protection clause
claim when the county board refused to add her to the list of religious leaders available to give an
invocation to the board, the Fourth Circuit determined that, in the legislative prayer context, her
claims under the Free Exercise, Free Speech, and Equal Protection Clause were all subject only
to the proscriptions of the Establishment Clause. *Simpson*, 404 F.3d at 280, 288; *see also Kurtz v.
Baker*, 829 F.2d 1133, 1147 n.3 (D.C. Cir. 1987) (Ginsburg, J., dissenting) (explaining that
"*Marsh* essentially affirmed that the historic practice of an opening prayer burdens no
'fundamental right' of non-theists. Thus Kurtz cannot salvage his failed first amendment claim
by cloaking it in a fifth amendment due process (equal protection component) mantle."); *cf.
Atheists of Florida, Inc. v. City of Lakeland, Fla*., 779 F. Supp. 2d 1330, 1342 (M.D. Fla. 2011),
*aff'd in part and rev'd in part on other grounds*, 713 F.3d 577 (11th Cir. 2013) (dismissing equal
protection clause claim of atheists challenging prayer practice because in the legislative prayer
context the analytical device is the Establishment Clause, noting that "recouching their true
claim" as "a different constitutional species therefore changes nothing")).

stemmed from an "impermissible motive." *Id.*; *Town of Greece*, 134 S. Ct. at 1824 (finding no constitutional infirmity with the town's practice of inviting ministers identified through efforts to locate the congregations within its borders, even though it resulted in a predominantly Christian set of prayer-givers, because as long as the town maintained a policy of nondiscrimination, it need not search beyond its borders). The Supreme Court has not addressed other legislative prayer challenges.

The D.C. Circuit addressed a challenge to Congressional chaplains' refusal to permit an atheist to serve as guest chaplain in *Kurtz v. Baker*, 829 F.2d 1133 (D.C. Cir. 1987). Kurtz, a nontheist, sued the chaplains for injunctive relief when he was not permitted to serve as guest chaplain in order to give a short statement reminding Congress of its moral responsibilities. *Id.* at 1134-35. Kurtz raised claims under the Establishment and Free Speech Clauses of the First Amendment and under the equal protection principles of the Due Process Clause of the Fifth Amendment. *Id.* at 1134. The D.C. Circuit noted that Kurtz claimed that the chaplains had denied him the benefit of addressing Congress because he did not believe in a deity. *Id.* at 1141-42. The majority explained, however, that both Chambers had rules requiring a "prayer" to open each day's legislative session. *Id.* at 1143. Thus, the court observed, "it would be unreasonable to imagine that they could have provided him with the actual opportunity to deliver non-religious remarks to either house of Congress during the time expressly set aside for prayer." *Id.* at 1142.[16] Because Kurtz could not plausibly allege that the chaplains had authority to satisfy his request, the injury alleged could not be deemed fairly traceable to the chaplains. *Id.; see also id.* at 1138 (stating, "[t]o believe that the two chaplains could have authorized appellant to address a non-

---

[16] *Id.* (taking judicial notice of "the fact that the opportunity to address either house is a privilege rarely extended to outsiders, and then only with the approval of the members of the respective houses.").

religious statement to the United States Senate and House of Representatives during periods explicitly reserved for prayer requires a suspension of ordinary common sense that this court need not indulge."). The majority dismissed the case on standing grounds. *Id.* at 1145.

Then-Judge Ruth Bader Ginsberg dissented, explaining that she would not have dismissed on standing grounds, but rather would have affirmed the district court's decision that "reached and definitively rejected Kurtz's claim of a constitutional right not to be excluded, because he is a non-theist, from the opportunity to speak in place of … a congressional chaplain." *Id.* at 1146 (Ginsburg, J., dissenting). Judge Ginsburg reasoned that because the rules provide for a prayer, the chaplains "have no warrant themselves to utter words that do not compose a prayer, and they have no commission from the House or Senate to engage others to extend remarks of a secular character." *Id.* She concluded that Kurtz's various claims were essentially an attack on Congress' customary "opening-with-prayer observance." *Id.* at 1147. But, as she explained, *Marsh* made clear that legislative prayer was a "religious observance" acceptable to the Framers, in which the prayer-giver invoked "Divine guidance." *Id.* Judge Ginsburg observed that *Marsh* "fits into a special nook—a narrow space tightly sealed off from otherwise applicable first amendment doctrine." *Id.* Judge Ginsburg therefore would have held that Kurtz had no tenable free speech, establishment clause or equal protection claim. *Id.; see also id.* at n.3 (reasoning that because *Marsh* upheld the practice of legislative prayer as burdening no fundamental right of nontheists, Kurtz could not "salvage his failed first amendment claim by cloaking it in a [equal protection] mantle.").

Although Kurtz's case was disposed of on standing grounds, the D.C. Circuit's observations illustrate the unsalvageable nature of plaintiff's claims here. Just as in *Kurtz*, plaintiff presented as a non-religious individual, who self-identified as an atheist, and sought to

give a secular invocation in the time reserved by the House for prayer. Compl. Exs. A, D.

Plaintiff provided a Christian ordination certificate from 1975, but his biography explicitly

reported that he was an atheist, who regularly spoke about life without God. *Id*. In short, plaintiff

made clear that he was not going to give a prayer in the time on the floor reserved exclusively for

prayer. *See Kurtz,* 829 F.2d at 1142-43 (noting that there was no indication that Congress had

authorized chaplains to "transform the period reserved for prayer" into a time in which "'non-

theistic' remarks could be delivered, however uplifting."). In other words, the allegations in the

Complaint demonstrate that plaintiff excluded himself, not that Father Conroy's decision to

decline to invite him stemmed from any impermissible motive.

Finally, in *Newdow v. Eagen*, an atheist challenged Congress's chaplaincy practice as

well as the chaplains' refusal to hire him as a legislative chaplain. 309 F. Supp. 2d 29 (D.D.C.

2004). Plaintiff contended that he had applied for the position of legislative chaplain for both the

Senate and the House but was denied the positions because of his religious beliefs. *Id*. at 32.

Plaintiff sought declaratory and injunctive relief. The district court noted that "because *Marsh*

held that a legislative body may employ a chaplain 'to invoke Divine guidance,' it follows that

Congress may limit the chaplain position to those who are willing to perform that task." *Id*. at 36

(quoting *Marsh*, 463 U.S. at 792). The district court therefore determined that plaintiff lacked

standing to pursue the employment claim because he failed to allege an infringement of a legally

protected interest. *Id*. The court came to this conclusion, in part, because it found that plaintiff's

beliefs "were incompatible with what he desires." *Id*. (quoting *Kurtz*, 829 F.2d at 1142). While

the court determined that plaintiff did have taxpayer standing to challenge the chaplaincy

program itself, it determined that controlling precedent doomed plaintiff's claim on the merits.

*Id*. at 39-40. The court pointed to *Marsh* as well as the D.C. Circuit's opinion in *Murray v.*

*Buchanan*, 720 F.2d 689, 690 (D.C. Cir. 1983). The court noted that the D.C. Circuit's dismissal of a challenge to the funding of the chaplaincy program for lack of a substantial constitutional question demonstrated its "view of the wholly insubstantial nature of the claims presented." *Newdow*, 309 F. Supp. 2d at 40. As a result, the district court dismissed Newdow's Establishment Clause claim on the merits. *Id*. at 41.

Outside of the Circuit, in the legislative prayer sphere, courts recognize that if this "genre of government religious activity" is permitted to exist, the government has to be able to choose (and exclude) certain people and to establish criteria for doing so. *Snyder*, 159 F.3d at 1233 (reasoning that "if *Marsh* allows a legislative body to select a speaker for its invocational prayers, then it also allows the legislative body to exclude other speakers…. The Establishment Clause and *Marsh* simply do not require that a legislative body ensure a kind of equal public access to a … program of invocational prayers."); *Jones v. Hamilton Cnty. Gov't, Tenn.,* 530 F. App'x 478, 488-89 (6th Cir. 2013) (noting that "[w]ithout the ability to establish basic criteria for selecting religious groups to participate in the prayer invocations, the Commission would be unable to ensure that speakers are members of bonafide religious organizations, as opposed to commercial entities or other groups with missions completely unrelated to the Commission's practice of solemnizing its meetings with an invocation."). That the Town of Greece made the policy choice to open its board meetings with invocations given by any town member, *Town of Greece,* 134 S. Ct. at 1824, in no way undermines these holdings.

Nothing in the Complaint demonstrates that Father Conroy acted with an impermissible motive or maintained a policy of discrimination. To the contrary, the Office of the Chaplain's request for an ordination certificate is an objective barometer to assess, in the first instance, if an individual is considered a religious leader or a member of a faith group qualified to lead a prayer.

*E.g., Coleman v. Hamilton Cnty., Tenn*, 104 F. Supp. 3d 877, 890 (E.D. Tenn. 2015) (explaining that "while legislative bodies cannot intentionally discriminate against particular faith systems, they can require that invocation givers have some religious credentials."); *id*. (noting that plaintiffs' "argument that the policy discriminates against each and every individual who is not an eligible member of the clergy affiliated with a bona fide religious assembly simply has no basis under current legislative prayer jurisprudence.").[17] Father Conroy did not need to make a judgment about plaintiff or his beliefs; rather, plaintiff himself provided information that made clear that he no longer practiced in the faith in which he was ordained and intended to give a secular invocation, Compl. Ex. D.

Nor can plaintiff credibly argue that the allegation that the Chaplain's Office required prayer-givers to address a higher power rather than directly address the Members of the House runs afoul of the Establishment Clause, given that the House Rule specifically requires a "prayer." The Supreme Court in *Marsh* found no establishment of religion notwithstanding the fact that it considered the prayer given before the legislative body an invocation of Divine guidance. *Marsh*, 463 U.S. at 792; *id*. at 810 (Brennan, J., dissenting) (stating that prayer is "fundamentally and necessarily religious"); *Snyder*, 159 F.2d at 1229 n.4 (assuming without deciding that plaintiff's proposed invocation was a prayer, but noting that if his invocation was not a prayer, "there would be no 'impermissible motive' in preventing [plaintiff] from reciting a non-prayer during a time permissibly reserved for legislative prayer. Thus, there would be no

---

[17] In evaluating a challenge to a county's exclusion of a plaintiff from the list of potential prayer-givers, the Fourth Circuit observed that a "chaplain by definition is a member of one denomination or faith." *Simpson v. Chesterfield Cnty. Bd. of Supervisors*, 404 F.3d 276, 285 (4th Cir. 2005). The court noted that a party challenging a legislative prayer practice cannot therefore "rely on the mere fact that the selecting authority chose a representative of a particular faith, because some adherent or representative of some faith will invariably give the invocation." *Id*.

Establishment Clause violation."); *Newdow*, 309 F. Supp. 2d at 36 (reasoning that "because *Marsh* held that a legislative body may employ a chaplain to invoke Divine guidance, it follows that Congress may limit the chaplain position to those who are willing to perform that task."); *Coleman*, 104 F. Supp. 3d at 889-90 (explaining that "[i]mplicit in the body of federal case law on legislative prayer … is the understanding the government may favor religion over nonreligion in this narrow circumstance. Prayer, by its very definition is religious in nature.").[18] It was therefore permissible for Father Conroy to decline to invite plaintiff to give the secular invocation that he proposed to give.

Although none of the out-of-circuit cases involved the interpretation or application of the House's Rule for prayer, these cases amply illustrate that Father Conroy was well within constitutional boundaries when he declined to invite plaintiff to give a secular invocation in the time that the House reserved for prayer. Consequently, plaintiff cannot state a claim for a violation of the First Amendment.

### D.  Plaintiff Fails to Plead Facts Stating an Equal Protection Claim.

Even if the court were to engage in a separate analysis under the Equal Protection component of the Fifth Amendment, rather than use the unitary analytical framework typically adopted by the courts in the legislative prayer context, plaintiff has not pleaded sufficient facts to state an equal protection claim against Father Conroy.

---

[18] The same analysis applies to the allegation in the Complaint that Father Conroy requested a draft of plaintiff's remarks (although in a document that plaintiff attached to the complaint, Father Conroy denies ever requesting such a draft). *See Snyder*, 159 F.3d at 1234 (noting that under *Marsh*, there is no "impermissible motive" when "a legislative body or its agent chooses to reject a government-sanctioned speaker because the tendered prayer falls outside the long-accepted genre of legislative prayer."). Rather than act with impermissible purpose, these allegations simply show that Father Conroy took steps to ensure that the time the House Rules set aside for prayer is used for prayer, given that the House floor is not otherwise open to the public for any other purpose.

As the Supreme Court has explained, in order to state a Fifth Amendment *Bivens* claim, a plaintiff "must plead and prove that the defendant acted with discriminatory purpose." *Iqbal*, 556 U.S. at 676, 682. As *Iqbal* teaches, purposeful discrimination in violation of the First or Fifth Amendment requires more than "intent as volition or intent as awareness of consequences." *Id.* at 676 (quoting *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979)). "It instead involves a decisionmaker's undertaking a course of action 'because of,' not merely 'in spite of,' [the action's] adverse effects upon an identifiable group." *Id.* at 676-77. Thus, "to state a [discrimination] claim based on a violation of a clearly established right, [plaintiff] must plead sufficient factual matter to show that [Father Conroy acted] . . . not for a neutral [] reason but for the purpose of discriminating [against him] on account of … religion[]…." *Id.* at 677.

Plaintiff's attribution of discriminatory animus to Father Conroy is not plausible under the facts and circumstances of this case. Plaintiff offers no allegations that Father Conroy held personal feelings of animosity or bias against plaintiff or the beliefs held by plaintiff. Nor are there any non-conclusory assertions establishing that any such personal animosity or bias was the basis for any of Father Conroy's actions. Instead, the facts that plaintiff pleads in his Complaint support the "obvious alternative explanation," *id.* at 682, that Father Conroy took the action he did because plaintiff presented as a nonreligious individual, who proffered a Christian ordination certificate notwithstanding his self-professed atheism, and proposed to give a secular invocation in the time on the House floor specifically reserved for a chaplain to give a prayer. Even in *Twombly*, where the Court acknowledged that the allegation of parallel conduct was *consistent* with an unlawful agreement, the Court nonetheless refused to find that it plausibly suggested an illicit accord because it was not only compatible with, but *more likely explained by* lawful, free market behavior. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567-68 (2007); *Iqbal*, 556 U.S. at

677 (explaining that a plaintiff must plead facts showing that the conduct at issue was not for a "neutral [] reason" but for the purpose of discriminating). Given the more plausible, "neutral [] reason" for Father Conroy's actions here, plaintiff has not nudged his claims of purposeful discrimination "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 677, 683 (quoting *Twombly*, 550 U.S. at 570); *see also id*. at 682 (citation and internal quotation marks omitted) ("On the facts respondent alleges, the arrests … were likely lawful and justified by … non-discriminatory intent …. As between that obvious alternative explanation for the arrests, and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion.").

Plaintiff also asserts that others were invited to serve as guest chaplains who were not ordained or did not invoke a higher power. Compl. ¶¶ 124-151.[19] However, the mere fact that others who were not ordained were permitted to serve as guest chaplains—or others ultimately did not explicitly invoke a higher power when it came time to give the prayer—says nothing, one way or the other, about the reason that plaintiff was not invited to give the secular invocation that he proposed. Courts within this circuit have required plaintiffs alleging that a government official took action because of a protected characteristic to plead facts that similarly situated individuals of another group were treated differently. *E.g., Jones v. Nat'l Council on Disability,* 66 F. Supp. 3d 94, 103 (D.D.C. 2014). Conversely, the dissimilar treatment of persons who are not similarly situated does not violate equal protection. *Id*. Here, with regard to each allegedly similarly

---

[19] Plaintiff identifies certain guest chaplains who served prior to May 2011, when Father Conroy became the House Chaplain. As the Supreme Court has made clear, however, a plaintiff must plead that a government official "through the official's *own individual actions*, has violated the Constitution." *Iqbal*, 556 U.S. at 676 (emphasis added). As a consequence, any guest chaplains selected by someone else or prior to Father Conroy's tenure have no bearing on the individual-capacity claims pleaded against Father Conroy.

situated person, it is clear that none actually are similarly situated because there is no allegation

that any of them proffered an ordination certificate to the Chaplain's Office for a faith they had

expressly rejected, requested to give a secular invocation, or presented themselves as

nonreligious. Accordingly, none of the individuals identified in the Complaint can be considered

similarly situated.

***

In sum, plaintiff's Complaint does not allege sufficient facts to make out a valid First

Amendment or equal protection claim against Father Conroy. Because plaintiff cannot show that

he has suffered a deprivation of a constitutional right, his constitutional claims fail at step one of

the qualified immunity analysis and should be dismissed. *See Saucier v. Katz*, 533 U.S. 194, 201

(2001) (explaining that if no constitutional right is violated, "there is no necessity for further

inquiries concerning qualified immunity").

### E. To the Extent Plaintiff Has Alleged the Violation of a Constitutional Right, the Right Was Not Clearly Established.

Although this court can – and should – dismiss the individual-capacity claims against

Father Conroy because plaintiff has failed to meet the first prong of the qualified immunity

analysis, even if plaintiff's allegations could be construed as stating a violation of the First or

Fifth Amendment, plaintiff cannot meet his burden under the second prong.

A constitutional right is clearly established when "at the time of the challenged conduct,

'[t]he contours of [a] right [are] sufficiently clear' that *every* 'reasonable official would have

understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741

(2011) (emphasis added) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In other

words, qualified immunity applies unless existing precedent shows that the unlawfulness of a

defendant's conduct is "beyond debate." *al-Kidd,* 563 U.S. at 741. A court looks to cases from

40

the Supreme Court, the D.C. Circuit Court of Appeals, and other courts "exhibiting a consensus view" if there is one. *Bame v. Dillard*, 637 F.3d 380, 384 (D.C. Cir. 2011); *see also Plumhoff v. Rickard*, 134 S. Ct. 2012, 2024 (2014) (requiring a robust consensus of cases of persuasive authority). The Supreme Court has repeatedly admonished courts that have defined the right at issue at a high level of generality. *al-Kidd,* 563 U.S. at 742. Rather, the contours of the right must be "sufficiently definite," so "that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff*, 134 S. Ct. at 2023; *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam) (emphasis added) (internal quotation marks omitted) (explaining that qualified immunity hinges on whether the right was "clearly established" in the "particularized" sense such that it would have been "clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*.").

By their very nature, Establishment Clause cases involve highly context-specific assessments. *See e.g*., *Lynch v. Donnelly*, 465 U.S. 668, 678 (1984) (explaining that "[t]he inquiry calls for line-drawing; no fixed, per se rule can be framed."); *Board of Ed. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 720 (1994) (O'Connor, J., concurring) (observing that "[t]here are different categories of Establishment Clause cases, which may call for different approaches"); *Pelphrey v. Cobb Cnty., Ga.*, 547 F.3d 1263, 1268-69 (11th Cir. 2008) (citation and internal quotation marks omitted) ("Establishment Clause challenges are not decided by bright-line rules, but on a case-by-case basis with the result turning on specific facts."). Moreover, courts recognize that legislative prayer is a narrow field of law with its own jurisprudence. Even within this "special nook"—as then-Judge Ginsburg aptly described it— there is no clear consensus on many facets of the analysis. *See e.g., Newdow v. Bush*, 355 F.

41

Supp. 2d 265, 289-90 (D.D.C. 2005) (observing that "Establishment Clause jurisprudence, including cases interpreting *Marsh*, remains complex and unresolved.").

The House's legislative prayer practice has long been recognized as consistent with the Establishment Clause of the Constitution. No precedent would have put a reasonable chaplain on notice that it would be unlawful to decline to invite plaintiff to serve as guest chaplain where he presented as a nonreligious individual, who proffered a Christian ordination certificate notwithstanding his self-professed atheism, and proposed to give a secular invocation in the time on the House floor specifically reserved for a chaplain to give a prayer.[20] The one case presenting the issue, *Kurtz v. Baker*, 829 F.2d 1133 (D.C. Cir. 1987), was dismissed on standing grounds. Even so, as described above, in reaching its standing decision, the D.C. Circuit recognized that Congressional chaplains could not permit a nonreligious individual to give secular remarks during the time Congress' Rules provided for prayer. *Id*. at 1142. In sum, plaintiff can point to no authority putting it "beyond debate," *al-Kidd,* 563 U.S. at 741, that it was unconstitutional to decline to invite plaintiff under the circumstances alleged here. To the contrary, this case law demonstrates the propriety of Father Conroy's actions.

Outside of the Circuit, cases applying the "impermissible motive" test of *Marsh* to the selection (or exclusion) of certain prayer-givers under local legislative prayer practices do not demonstrate a consensus view on what "impermissible motive" actually means. But under any of the Circuits' formulations of the test, Father Conroy's actions under the circumstances were well within constitutional bounds. The only case that we could locate in which the court found a local

---

[20] As described above, *Marsh* involved a challenge to the 16-year tenure of a Presbyterian chaplain. *Town of Greece* involved a challenge to the Town's selection procedures that resulted in a disproportionate number of Christian chaplains being invited to give the invocation. Neither case was squarely presented with a plaintiff challenging an entity's decision not to invite an individual to serve as a prayer-giver, which is what is at issue here.

entity's exclusion of prayer-givers constitutionally infirm was in *Pelphrey v. Cobb Cnty., Ga.*, 547 F.3d 1263, 1279 (11th Cir. 2008). There, a county planning commission compiled a list of religious organizations in the county from the Yellow Pages. *Id.* at 1267. The phone book, however, had lines crossed through certain subcategories of religious organizations, including those labeled as Islamic, Jehovah's Witnesses, Jewish, and Latter Day Saints. *Id.* No clergy from those faiths were asked to provide the invocation during a two-year period. *Id.* at 1267-68. Although the planning commission's practice later changed to invite clergy from all religious sects, the Eleventh Circuit determined that the categorical exclusion of certain faiths because of their beliefs violated the impermissible motive standard of *Marsh*. *Id.* at 1281-82; *see also id.* (interpreting *Marsh* to prohibit the selection of speakers based on an "impermissible motive" to prefer certain beliefs over others, but explaining that the "impermissible motive" standard "does not require that all faiths be allowed the opportunity to pray. The standard instead prohibits purposeful discrimination.").[21]

In contrast, in *Simpson*, the Fourth Circuit upheld a county's rejection of a self-described Wiccan spiritual leader as a potential prayer-giver. *Simpson v. Chesterfield Cnty. Bd. of Supervisors*, 404 F.3d 276, 278-80 (4th Cir. 2005). There, the board's policy was to commence its sessions with a non-sectarian invocation, led by religious leaders invited from congregations

---

[21] The Tenth Circuit, sitting en banc, similarly recognized that the constitutional restriction on the selection of a prayer-giver is the "impermissible motive" test of *Marsh*. *Snyder v. Murray City Corp.*, 159 F.3d 1227, 1234 (10th Cir. 1998) (en banc). The Tenth Circuit, however, interpreted the test differently than the Eleventh Circuit in *Pelphrey*. The Tenth Circuit noted that *Marsh* "implicitly indicated that the particular motive that is 'impermissible' in this context is a motive in selecting the prayer-giver either to 'proselytize' a particular faith or to 'disparage' another faith, or to establish a particular religion as the sanctioned or official religion of the legislative body." *Id.* (citing *Marsh*, 463 U.S. at 793-95). It thus upheld a city's refusal to permit a plaintiff from giving his tendered prayer, finding that there is no "impermissible motive" when the tendered prayer "falls outside the long-accepted genre of legislative prayer." *Id.*

within the county. *Id*. at 279. The board rejected plaintiff's request to be added to the list of potential prayer-givers, explaining that its non-sectarian invocations were traditionally made "to a divinity that is consistent with the Judeo-Christian tradition"—a divinity, the board said, that would not be invoked by plaintiff. *Id*. at 280. Plaintiff argued that the board's practice was impermissible because in moving beyond *Marsh's* use of a single Presbyterian minister, the board had not also chosen to open its prayer practice to faiths other than those following the monotheistic traditions. *Id*. at 286. The Fourth Circuit explained, however, that "neither *Marsh* nor our case law bars this approach in the legislative invocation context." *Id*. Instead, the court recognized that the board had opened up its door to a wide pool of clergy and was therefore more inclusive than the retention of a single Presbyterian chaplain upheld in *Marsh*. *Id*. It concluded, therefore, that the board's prayer practice did not violate the Establishment Clause. *Id*. at 288; *see also id*. (concurrently dismissing plaintiff's Free Exercise, Free Speech and Equal Protection Clause claims because the legislative prayer practice was subject to a "unitary" analysis).

These decisions illustrate that courts have interpreted the key language in *Marsh* differently, which only serves to demonstrate that the law is not clearly established. However, none of these cases even intimate that the actions that Father Conroy took are constitutionally infirm. To the contrary, the reasoning in each of these cases demonstrates that Father Conroy's actions fall well within the boundaries of constitutional behavior. Because plaintiff cannot meet his burden of alleging any constitutional violation by Father Conroy—let alone a clearly established violation—Father Conroy is entitled to qualified immunity.

## CONCLUSION

For the reasons stated above, the constitutional claims asserted against Father Conroy in his individual capacity should be dismissed.

Dated:  September 30, 2016                    Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
Civil Division

KALI N. BRACEY
Deputy Assistant Attorney General

C. SALVATORE D'ALESSIO
Acting Director, Torts Branch

ANDREA W. MCCARTHY
Senior Trial Counsel, Torts Branch

*/s/ Sarah E. Whitman*
SARAH E. WHITMAN
MA Bar 657726, under LCvR 83.2(e)
Trial Attorney
Torts Branch, Civil Division
United States Department of Justice
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-0089
Facsimile: (202) 616-4314
Email: Sarah.Whitman@usdoj.gov

*Counsel for Defendant Patrick Conroy in his
individual capacity*

45

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 30th day of September, 2016, I electronically filed the

foregoing document with the Clerk of the Court using the CM/ECF system, which sent

notification of such filing to all counsel of record in this case.

*/s/ Sarah E. Whitman*
SARAH E. WHITMAN

46