**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DANIEL BARKER, ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | Case No. 1:16-cv-00850-RMC |
| ) | |
| HOUSE OF REPRESENTATIVES CHAPLAIN ) | |
| PATRICK CONROY, ASSISTANT TO THE ) | |
| CHAPLAIN ELISA AGLIECO, CHAPLAIN'S ) | |
| LIAISON TO STAFF KAREN BRONSON, ) | |
| PAUL RYAN, SPEAKER OF THE HOUSE OF ) | |
| REPRESENTATIVES IN HIS OFFICIAL ) | |
| CAPACITY, THE UNITED STATES HOUSE OF ) | |
| REPRESENTATIVES, ) | |
| ) | |
| *Defendants*. ) | |
| ) | |

**MOTION OF THE OFFICIAL DEFENDANTS TO DISMISS THE COMPLAINT**

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure and

Local Civil Rule 7, Defendants the United States House of Representatives, and Speaker of the

House Paul Ryan, Chaplain of the House Fr. Patrick J. Conroy, Elisa Aglieco, and Karen

Bronson, all in their official capacities, respectfully move the Court to dismiss Plaintiff Daniel

Barker's Complaint (May 4, 2016) (ECF No. 1). For all the reasons set forth in the

accompanying Memorandum, this Complaint should be dismissed with prejudice and without

leave to amend. A proposed order is submitted herewith.

1

Respectfully submitted,

*/s/ Thomas G. Hungar*
THOMAS G. HUNGAR
  *General Counsel*
ELENI M. ROUMEL
  *Assistant General Counsel*
KIMBERLY HAMM
  *Assistant General Counsel*
SARAH K. CURRAN
  *Attorney*

OFFICE OF GENERAL COUNSEL,
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C.  20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)
Thomas.Hungar@mail.house.gov

*Counsel for the United States House of*
*Representatives; and Speaker of the House Paul*
*Ryan, Chaplain of the House Fr. Patrick J. Conroy,*
*Elisa Aglieco, and Karen Bronson, all in their*
*official capacities*

September 30, 2016

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| DANIEL BARKER, | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 1:16-cv-00850-RMC |
| | ) | |
| HOUSE OF REPRESENTATIVES CHAPLAIN | ) | |
| PATRICK CONROY, ASSISTANT TO THE | ) | |
| CHAPLAIN ELISA AGLIECO, CHAPLAIN'S | ) | |
| LIAISON TO STAFF KAREN BRONSON, | ) | |
| PAUL RYAN, SPEAKER OF THE HOUSE OF | ) | |
| REPRESENTATIVES IN HIS OFFICIAL | ) | |
| CAPACITY, THE UNITED STATES HOUSE OF | ) | |
| REPRESENTATIVES, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF THE**
**OFFICIAL DEFENDANTS' MOTION TO DISMISS**

Thomas G. Hungar, *General Counsel*
Eleni M. Roumel, *Assistant General Counsel*
Kimberly Hamm, *Assistant General Counsel*
Sarah K. Curran, *Attorney*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)
Email: Thomas.Hungar@mail.house.gov

*Counsel for the United States House of*
*Representatives; and Speaker of the House Paul*
*Ryan, Chaplain of the House Fr. Patrick J. Conroy,*
*Elisa Aglieco, and Karen Bronson, all in their*
*official capacities*

September 30, 2016

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 3

I.   The History of Congressional Prayer…………………………………………………....3

II.  Plaintiff's Complaint…………………………………………………………………....6

ARGUMENT ..................................................................................................................... 8

I.   Plaintiff Lacks Standing to Bring His Claims.................................................... 8

    A.   Plaintiff Has Not Alleged, and Cannot Establish,
        an Article III Injury in Fact. ...................................................................... 9

    B.   Defendants Did Not Cause Plaintiff's Alleged Injury. .............................. 12

    C.   Plaintiff's Alleged Injury Cannot Be Redressed by
        a Decision Favorable to Him. .................................................................. 15

II.  Plaintiff's Claims Raise Non-Justiciable Political Questions. ........................... 17

    A.   Rulemaking Authority is Textually Committed
        to the House Alone.................................................................................. 18

    B.   The Speech or Debate Clause Precludes Judicial Review
        of a House Officer's Implementation of House Rules
        Governing the Conduct of Proceedings on the House Floor
        During Legislative Sessions.................................................................... 20

    C.   The Rulemaking Clause and the Speech or Debate Clause
        Reflect a Constitutional Commitment of Authority to the
        House to Determine Who May Address the House During
        a Legislative Session. .............................................................................. 23

    D.   The Court's Consideration of Plaintiff's Claims Would
        Demonstrate a Lack of Respect for a Co-Equal Branch .......................... 27

III.  Plaintiff's Complaint Fails to State a Claim. .................................................. 30

    A.   Plaintiff's Constitutional Claims Against the House Are Barred by Sovereign
        Immunity................................................................................................. 30

B.   Plaintiff Fails to State a Claim Under the Establishment Clause or the Equal Protection Clause Because It Is Constitutionally Permissible to Limit Legislative Prayer to Persons Willing to Perform a Prayer. ..................................... 30

C.   Plaintiff Fails to State a Claim Under the Religious Freedom Restoration Act. ........................................................................................ 38

D.   Plaintiff Fails to State a Claim Under the Religious Test Clause. ........................... 38

CONCLUSION ................................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*Advanced Mgmt. Tech., Inc. v. FAA*,
    211 F.3d 633 (D.C. Cir. 2000)……………….........................................................11

*Anderson v. Laird*,
    316 F. Supp. 1081 (D.D.C. 1970)……...........................................................45

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)……………...........................................................30

\*  *Baker v. Carr*,
    369 U.S. 186 (1962)……………….......................................17, 18, 20, 29

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)………...........................................................30

*Bender v. Williamsport Area Sch. Dist.*,
    475 U.S. 534 (1986)……………….........................................................8

*Bogan v. Scott-Harris*,
    523 U.S. 44 (1988)………..........................................................23

*Bowen v. Roy*,
    476 U.S. 693 (1986)..........................................................40

*Branch Ministries v. Rossotti*,
    40 F. Supp. 2d 15 (D.D.C. 1999)…………......................................................43

*Brown v. Hansen*,
    973 F.2d 1118 (3d Cir. 1992)………...........................................................29

*Brown & Williamson Tobacco Corp. v. Williams*,
    51 F.3d 408 (D.C. Cir. 1995)……………….................................................22

*Burwell v. Hobby Lobby Stores, Inc.*,
    134 S. Ct. 2751 (2014)………...........................................................42

*Cable News Network v. Anderson*,
    723 F. Supp. 835 (D.D.C. 1989)……...........................................................27

*Christoffel v. United States*,
    338 U.S. 84 (1949)……………...........................................................15

*City of Waukesha v. EPA*,
    320 F.3d 228 (D.C. Cir. 2003)………………………........................................................8

*Clapper v. Amnesty Int'l USA*,
    133 S. Ct. 1138 (2013)……………………………………………………11

\* *Consumers Union of the U.S., Inc. v. Periodical Correspondents' Ass'n*,
    515 F.2d 1341 (D.C. Cir. 1975)…………................................................ *passim*

*Davis v. Passman*,
    442 U.S. 228 (1979)………...................................................................20

*Doe v. McMillan*,
    412 U.S. 306 (1973)…………...........................................................21, 22

\* *Eastland v. U.S. Servicemen's Fund*,
    421 U.S. 491 (1975)…………..........................................20, 21, 22, 23, 25

*El-Shifa Pharm. Indus. Co. v. United States*,
    607 F.3d 836 (D.C. Cir. 2010)……………………………………………17

*Emp't Div. Dept. of Human Res.of Oregon v. Smith*,
    494 U.S. 872 (1990)……………………………………………………38

*Fla. Audubon Soc'y v. Bentsen*,
    94 F.3d 658 (D.C. Cir. 1996)……………………………………………13

*Freedom From Religion Found., Inc. v. Ayers*,
    748 F. Supp. 2d 982 (W.D. Wisc.. 2010)…………………….................6

*Freedom From Religion Found., Inc. v. Lew*,
    773 F.3d 815 (7th Cir. 2014)……………………......................................6

*Freedom From Religion Found., Inc. v. Nicholson*,
    536 F.3d 730 (7th Cir. 2008)……………………......................................6

*Freedom From Religion Found., Inc. v. Obama*,
    641 F.3d 803 (7th Cir. 2011)……………………......................................6

*Freedom From Religion Found., Inc. v. Weber*,
    No. 13-35770, 628 F. App'x 952 (9th Cir. 2015)……………………..........6

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)……………………......................................9

*Gaylor v. United States*,
    74 F.3d 214 (10th Cir. 1996)……………………....................................6

*Gillette v. United States*,
    401 U.S. 437 (1971)………...................................................................42

*Gravel v. United States*,
 408 U.S. 606 (1972)…………....................................................................21, 22, 25

*Grocery Mfrs. Ass'n v. EPA*,
 693 F.3d 169 (D.C. Cir. 2012)……………………....................................................9

*Haase v. Sessions*,
 835 F.2d 902 (1987)……………………………………….............................................8

*Harrington v. Bush*,
 553 F.2d 190 (D.C. Cir. 1977)………....................................................................28

*Hartman v. Stone*,
 68 F.3d 973 (6th Cir. 1995)………… ....................................................................38

*Heap v. Carter*,
 112 F. Supp. 3d 402 (E.D. Va. 2015)……… ...................................................42, 41, 45

*Hein v. Freedom From Religion Found., Inc.*,
 551 U.S. 587 (2007)…………………………….....................................................6

*Helstoski v. Meanor*,
 442 U.S. 500 (1979)………….............................................................................21

*Henderson v. Kennedy*,
 253 F.3d 12 (D.C. Cir. 2001)…………….........................................................39, 40, 43

*Holt v. Hobbs*,
 135 S. Ct. 853 (2015)…………….......................................................................39

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
 478 U.S. 221 (1986)…………............................................................................17

*Johnson v. Comm'n on Presidential Debates*,
 No. 15 – 1880 2016 WL 4468153 (D.D.C. August 24, 2016)….......................................12

*Johnson v. Robison*,
 415 U.S. 361 (1974)…………............................................................................42

*Kaemmerling v. Lappin*,
 553 F.3d 669 (D.C. Cir. 2008)………….........................................................39, 40, 41, 42

*Keener v. Congress*,
 467 F.2d 952 (5th Cir. 1972).. .........................................................................31

*Kilbourn v. Thompson*,
 103 U.S. 168 (1880)…………............................................................................21

\* *Kurtz v. Baker,*
    829 F.2d 1133 (D.C. Cir. 1987) ............................................................................... *passim*

*Larsen v. U.S. Navy,*
    346 F. Supp. 2d 122 (D.D.C. 2004)............. .................................................................38

*Lee v. Weisman,*
    505 U.S. 577 (1992)............. ......................................................................................36

*Liberman v. Committee on Judiciary, U.S. House of Representatives,*
    51 F. App'x 825 (10th Cir. 2002).. ............................................................................31

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992)............. ...............................................................................8, 9, 10

*Mahoney v. Doe,*
    642 F.3d 1112 (D.C. Cir. 2011)............. .................................................................40, 43

*Mahoney v. U.S. Marshals Svc.,*
    454 F. Supp. 2d 21 (D.D.C. 2006)......... ...............................................................40-41

\* *Marsh v. Chambers,*
    463 U.S. 783 (1983) ................................................................................... *passim*

*Marshall Field & Co. v. Clark,*
    143 U.S. 649 (1892)............. .....................................................................................18

*Massachusetts v. EPA,*
    549 U.S. 497 (2007)............. .....................................................................................18

*Meese v. Keene,*
    481 U.S. 465 (1987)............. .....................................................................................10

*Metzenbaum  v. Fed'l Energy Regulatory Comm'n,*
    675 F.2d 1282 (D.C. Cir. 1982)… ..............................................................................28

*MINPECO, S.A. v. Conticommodity Servs., Inc.*
    844 F.2d 856 (D.C. Cir. 1988).. ................................................................................22

\* *Murray v. Buchanan,*
    720 F.2d 689 (D.C. Cir. 1983)............. .................................................................2, 33

*Murray v. Morton,*
    720 F. Supp. 144 (D.D.C. 1981)............. ...................................................................33

*Newdow v. Eagen,*
    309 F. Supp. 2d 29 (D.D.C. 2004)...................... ...............................11, 33, 37, 41

*Nixon v. United States*,
 506 U.S. 224 (1993)…………….......................................................18

*Orta Rivera v. Congress*,
 338 F. Supp. 2d 272 (D.P.R. 2004)………….....................................16

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
 460 U.S. 37 (1983)........................................................................31

*Pettingell v. Exec. Comm. Of Corresps.*,
 No. CIV.A. 85-2742, 1986 WL 8569 (D.D.C. March 31, 1986)....................................27

*Raines v. Byrd*,
 521 U.S. 811 (1997)………………….......................................................9

*Rangel v. Boehner*,
 20 F. Supp. 3d 148 (D.D.C. 2013)……………………........................... 22-23

*Sandza v. Barclays Bank PLC*,
 151 F. Supp. 3d 94 (D.D.C. 2015)…............................................12

*Schreibman v. Holmes*,
 203 F.3d 53 (D.C. Cir. 1999)…………..............................................27

*Schreibman v. Holmes*,
 No. Civ.A.1:96CV01287, 1997 WL 527341 (D.D.C. Aug. 18, 1997)………….............26

*Sherbert v. Verner*,
 374 U.S. 398 (1963)…………...........................................................42

*Singh v. McHugh*,
 No. 14-1906, 2016 WL 2770874 (D.D.C. May 13, 2016)…..........................................42

*Spokeo, Inc. v. Robins*,
 136 S. Ct. 1540 (2016)……………………….........................................8, 9

*Steel Co. v. Citizens for a Better Env't*,
 523 U.S. 83 (1998)……………………….............................................12

*Tenney v. Brandhove*,
 341 U.S. 367 (1951)………...............................................................20

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*,
 450 U.S. 707 (1981)………...........................................................41, 42

*Torcaso v. Watkins*,
 367 U.S. 488 (1961)…................................................................44

\* *Town of Greece, N.Y. v. Galloway*,
   134 S. Ct. 1811 (2014) ..................................................................................... *passim*

*Trimble v. Johnson*,
   173 F. Supp. 651 (D.D.C. 1959)……………….....................................................16, 31

*United States v. Ballin*,
   144 U.S. 1 (1892)…………..................................................................15, 18, 19

*United States v. Germaine*,
   99 U.S. 508 (1878)……….........................................................................44

*United States v. Helstoski* (*"Helstoski I"*),
   442 U.S. 477 (1979)……………….............................................................21, 22

*United States v. Johnson*,
   383 U.S. 169 (1966)……….....................................................................20, 21, 22

*United States v. Mitchell*,
   445 U.S. 535 (1980)………......................................................................30

*United States v. Munoz-Flores*,
   495 U.S. 385 (1990)……………...............................................................17

*United States v. Rayburn House Office Bldg.*,
   497 F.3d 654 (D.C. Cir. 2007)……….....................................................22

*United States v. Rostenkowski*,
   59 F.3d 1291 (D.C. Cir. 1995)………….................................................20

*U.S. Term Limits, Inc. v. Thornton*,
   514 U.S. 779 (1995)…………..................................................................44

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
   454 U.S. 464 .....................................................................................9

*Vander Jagt v. O'Neill*,
   699 F.2d 1166 (D.C. Cir. 1983)…………..............................................28, 29

*Walker v. Jones*,
   733 F.2d 923 (D.C. Cir. 1984)………......................................................18

*Wilderness Soc'y v. Norton*,
   434 F.3d 584 (D.C. Cir. 2006) .............................................................15

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972)...............................................................................42

**U.S. Constitution, Statutes, and House Rules**

U.S. Const. art. I, § 2, cl. 5……………………………………..............................................10

U.S. Const. art. I, § 5……….................................................................................................2, 15

U.S. Const. art. I, § 5, cl. 2...................................................................................................1, 18

U.S. Const. art. I, § 6, cl. 1...................................................................................................20, 27

U.S. Const. art. III, § 2 .........................................................................................................17

U.S. Const. art. VI, § 3, cl. 2.................................................................................................44

28 U.S.C. § 1331…….............................................................................................................31

Act of Sept. 22, 1789, ch. 17, 1 Stat. 70……………………………… ..................................4

Religious Freedom Restoration Act, 42 U.S.C. § 2000bb…..................................................38, 39

Rules of the House of Representatives (114th Cong.), II.3 .....................................................14

Rules of the House of Representatives (114th Cong.), II.5 ......................................1, 13, 18, 37

Rules of the House of Representatives (114th Cong.), XIV.1 ...............................1, 13, 14, 18, 37

Rules of the House of Representatives (114th Cong.), XXIII .....................................................39

**Legislative Authorities**

146 Cong. Rec. H7579 (daily ed. Sept. 14, 2000)……………… ................................................5

147 Cong. Rec. H2389 (daily ed. May 22, 2001)……………......................................................5

159 Cong. Rec. H5182 (daily ed. July 31, 2013)…………….....................................................5

159 Cong. Rec. H3024 (daily ed. June 4, 2013) ……….............................................................5

160 Cong. Rec. H5540 (daily ed. June 19, 2014)……..............................................................5

161 Cong. Rec. H4015 (daily ed. June 10, 2015)…………….. ..................................................5

161 Cong. Rec. H4602 (daily ed. June 24, 2015)…………….....................................................5

1 Journal of the Continental Congress (1774)……………… ......................................................3

2 Journal of the Continental Congress (1775)…………………….. ...........................................3

27 Journal of the Continental Congress (1784)……………………...........................................3

5 Journal of the Continental Congress (1776)……………………...........................................3

6 Journal of the Continental Congress (1776)……………...........................................3

Asher C. Hinds, 1 Hinds' Precedents of the House of
    Representatives § 272 (1907)……………....................................................4

Asher C. Hinds, 5 Hinds' Precedents of the House of
    Representatives §§ 7283 - 7310 (1907)……………….....................................28

Cong. Globe, 34th Cong., 1st Sess. (1856)………………………...........................................4

Cong. Globe, 35th Cong., 1st Sess. (1857)………………………...........................................4

Cong. Globe, 36th Cong., 1st Sess. (1859)………………………...........................................4

Cong. Globe, 36th Cong., 1st Sess. (1860)………………………...........................................4

H. Journal, 1st Cong., 1st Sess. (1789)…………………………...........................................3, 4

H.R. Doc. No. 113-181, at §§ 665, 869 (2015)……………....................................................5

H. Res. 5 (114th Cong.) (2015) …………………………………………..................10, 13, 14

S. Journal, 1st Cong., 1st Sess. (1789)…………………………...........................................3, 4

S. Rep. No. 103-111 (1993), as reprinted in 1993 U.S.C.C.A.N. 1892……………......................38

## Other Authorities

Brief for Freedom from Religion Foundation as Amicus Curiae Supporting
    Respondents, *Town of Greece, N.Y. v. Galloway*,
    No. 12-696, 134 S.Ct. 1811 (2014)..............................................................6-7

N.Y. Times, June 2, 2016, at A5........................................................................12

Paul Horwitz, Religious Tests in the Mirror,
    15 Wm. & Mary Bill of Rts. J. 75 (2006)…....................................................44

Vasan Kesavan, The Very Faithless Elector?,
    104 W. Va. L.R. 123 (2001)….........................................................44

Wash. Post, June 6, 2015, at A7… ........................................................................12

**INTRODUCTION**

This case arises out of the U.S. House of Representatives' unbroken tradition of commencing the legislative day with a prayer – a religious invocation of a higher power – for the benefit of its Members. The House's legislative prayer practice has long been recognized as consistent with the Establishment Clause of the Constitution. It also has long been required by the House in Rules adopted pursuant to the House's exclusive constitutional authority to "determine the Rules of its Proceedings," U.S. Const. art. I, § 5, cl. 2. These Rules, which require a "prayer" as the first order of business at each day's sitting of the House, *see* Rules of the U.S. House of Representatives ("Rules") (114th Cong.), II.5, XIV.1, are no mere formality or historical relic. They reflect not only the institution's interest in solemnizing the day's legislative proceedings, but also the considered judgment of House Members regarding the continued necessity and vitality of the prayer practice, as reflected in their readoption of the prayer requirement at the start of each new Congress. Rules reflecting this historical practice have been continuously adopted without regard to majority party affiliation.

Typically, the House Chaplain, a Member-elected Officer of the House, gives the opening prayer required by House Rules. The current Chaplain, Father Patrick J. Conroy, at times allows visiting religious leaders to give the required prayer. Fr. Conroy declined to permit Plaintiff in this action, an atheist, to deliver the opening prayer. Plaintiff claims that this decision was "discriminatory" because it was based on his lack of religious belief. Plaintiff fails to recognize that he has "excluded himself" from the prayer opportunity, because he "will not pray and yet asks to participate in [the House's] moment of prayer." *Kurtz v. Baker*, 829 F.2d 1133, 1142 (D.C. Cir. 1987).

Three reasons warrant dismissal of Plaintiff's case. *First*, Plaintiff lacks Article III standing. In *Kurtz v. Baker*, the D.C. Circuit held that a secular humanist lacked standing to

challenge the refusal of the House and Senate Chaplains to allow him to deliver non-religious remarks during the time set aside for prayer, because in view of the "prayer" requirement the Chaplains had no power to grant such a request. *Id.* at 1142-44.  Plaintiff's claims suffer from precisely the same fatal flaw.

*Second,* Plaintiff's claims are non-justiciable.  Because Plaintiff challenges the Chaplain's interpretation of House Rules, which require the Chaplain to commence the legislative day with a prayer, the suit represents an impermissible challenge to the internal rulemaking power of the House, which power is vested solely in the House.  U.S. Const. art. I, § 5.  The suit is therefore barred by the Speech or Debate Clause of the Constitution.  *See Consumers Union of U.S., Inc. v. Periodical Correspondents' Ass'n*, 515 F.2d 1341, 1351 (D.C. Cir. 1975).

*Third*, Plaintiff has failed to state a claim.  The Supreme Court held in *Marsh v. Chambers*, 463 U.S. 783 (1983), and reaffirmed in *Town of Greece, N.Y. v. Galloway*, 134 S. Ct. 1811 (2014), that legislative prayer, while religious in nature, "has long been understood as compatible with the Establishment Clause," *id.* at 1818.  Neither *Town of Greece* nor *Marsh* supports Plaintiff's claim that a legislative body is obligated to provide a forum for nonreligious speech during the time set aside for prayer.  To the contrary, the D.C. Circuit concluded that an atheist taxpayer's Establishment Clause challenge to Congressional chaplaincies "retain[ed] no vitality" after *Marsh*.  *Murray v. Buchanan*, 720 F.2d 689, 690 (D.C. Cir. 1983) (en banc) (per curiam).  Plaintiff also has failed to state a colorable Religious Freedom Restoration Act claim (because, among other reasons, his beliefs have not been substantially burdened) or a violation of the Religious Test Clause of the Constitution (because guest chaplains are not officers of the federal government).

## BACKGROUND

### I.   The History of Congressional Prayer.

The first Continental Congress met on September 5, 1774, and the following day,

resolved that Reverend Jacob Duché, an Episcopalian clergyman, should open the next day's

meeting with prayer.  1 Journal of the Continental Congress ("Journals") 26 (1774).  Reverend

Duché did so, marking September 7, 1774, as the first recitation of a legislative prayer in the

Continental Congress.  *Id.* at 27.  On May 10, 1775, the first day of the new session of the

Continental Congress, Reverend Duché was again invited to say an opening prayer the following

day, which he did.  2 Journals 12, 13 (1775).

When Continental Congress delegates met in July 1776 to proclaim the Declaration of

Independence, they changed the nature of the chaplaincy from that of invited minister to that of

officer.  Reverend Duché was "appointed chaplain to Congress" and was requested to open each

day's session.  5 Journals 530 (1776).  Following his resignation, the Continental Congress

elected two new chaplains on December 23, 1776.  6 Journals 886-87, 1034 (1776).  In 1784, the

delegates decided that the elections for these offices should be held on an annual basis.  27

Journals 683 (1784).

The inclusion of chaplains among Congressional officers continued upon the convening

of the First Congress in April 1789.  On April 7 and 9, within days of securing the initial

quorum, both the House and Senate formed committees to confer on conference rules and

determine the manner in which chaplains would be selected.  H. Journal, 1st Cong., 1st Sess.

("H. Journal") 11-12 (1789); S. Journal, 1st Cong., 1st Sess. ("S. Journal") 10 (1789).  The

committees reached agreement, and the first House and Senate chaplains were elected on May 1

and April 25, 1789, respectively.  H. Journal 26; S. Journal 16.  By September 22, 1789, the

House and Senate passed the first statutory authority for the compensation of Members and

officers, including each Chaplain.  Act of Sept. 22, 1789, ch. 17, § 4, 1 Stat. 70.  Just three days

later, the House and Senate reached agreement on the Amendments to the Constitution, including

the First Amendment, which they would send to the states for ratification.  H. Journal 121; S.

Journal 88.  "Clearly the men who wrote the First Amendment Religion Clause did not view paid

legislative chaplains and opening prayers as a violation of that Amendment, for the practice of

opening sessions with prayer has continued without interruption ever since that early session of

Congress."  *Marsh*, 463 U.S. at 788.

The original procedure was that "two Chaplains, of different denominations, be appointed

to Congress, for the present session; the Senate to appoint one, and give notice thereof to the

House of Representatives, who shall, thereupon appoint the other; which Chaplains shall

commence their services in the Houses that appoint them, but shall interchange weekly."  H.

Journal 16; *see also* S. Journal 12.  On February 21, 1856, the practice of joint chaplains for

Congress was abandoned, in favor of each house electing its own chaplain.  *See* Cong. Globe,

34th Cong., 1st Sess. 486 (1856).  In the late 1850s, both houses of Congress experimented with

local volunteer clergy to deliver the opening prayer, rather than elected chaplains.  (One primary

reason for the change was the "electioneering," not among the chaplains but among their

supporters in Congress.  *See, e.g.,* Cong. Globe, 35th Cong., 1st Sess. 13-14 (1857)).  The

experiment was quickly abandoned because of dissatisfaction with the use of rotating volunteers,

*see, e.g.*, Cong. Globe, 36th Cong., 1st Sess. 97-98 (1859), and both houses returned to the

election and appointment of chaplains as officers.  *See id.* at 162 (1859), 1016 (1860).  However,

the occasional use of volunteer clergy invited by the House Chaplain continued.  *See* Asher C.

Hinds, 1 Hinds' Precedents of the House of Representatives § 272, n.2 (1907).[1]

---

[1] In more recent times, guest chaplains representing a variety of monotheistic and non-

(*Continued . . .* )

4

The historic practice of opening the legislative day with a prayer is currently reflected in two House Rules:

- Rule II.5 (Other Officers and Officials):  "The Chaplain shall offer a prayer at the commencement of each day's sitting of the House."

- Rule XIV.1 (Order and Priority of Business):  "The daily order of business (unless varied by the application of other rules and except for the disposition of matters of higher precedence) shall be as follows:  First. Prayer by the Chaplain."

See H.R. Doc. No. 113-181, at §§ 665, 869 (2015).[2]  The House formally adopted a Rule requiring the opening of the legislative day with a prayer in 1880, "but the sessions of the House were opened with prayer from the first, and the Chaplain was an officer of the House before the adoption of the [1880] rule."  Id. at § 665.

Based upon the "unbroken history" of Congressional chaplains opening legislative sessions with prayer, the Supreme Court in Marsh v. Chambers upheld the constitutionality of Nebraska's legislative chaplaincy.  463 U.S. at 792.  "To invoke Divine guidance on a public body entrusted with making the laws," the Court concluded, "is not, in these circumstances, an 'establishment' of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country."  Id.

---

monotheistic faiths have opened House legislative sessions with prayer, thus "acknowledg[ing] our growing diversity not by proscribing sectarian content but by welcoming ministers of many creeds," Town of Greece, 134 S. Ct. at 1820-21.  See, e.g., 161 Cong. Rec. H4602 (daily ed. June 24, 2015) (Doctor Chandra Bhanu Satpathy, Shri Sai Cultural & Community Center) (Compl. ¶ 133); 161 Cong. Rec. H4015 (daily ed. June 10, 2015) (Rabbi Claudio Kogan, Temple Emanuel); 160 Cong. Rec. H5540 (daily ed. June 19, 2014) (Mr. Rajan Zed, Universal Society of Hinduism) (Compl. ¶ 130); 159 Cong. Rec. H5182 (daily ed. July 31, 2013) (Imam Talib Shaleef, Masjid Muhammad); 159 Cong. Rec. H3024 (daily ed. June 4, 2013) (Mr. Satguru Bodhinatha Veylanswami, Kauai Aadheenam Hindu Monastery); 147 Cong. Rec. H2389 (daily ed. May 22, 2001) (Gurudev Shree Chitiabhanuji, Founder, Jain Meditation International Center); 146 Cong. Rec. H7579 (daily ed. Sept. 14, 2000) (Priest Venkatachalapathi Samuldrala, Shiva Hindu Temple).

[2] See also Rules of the U.S. House of Representatives (114th Cong.), available at http://clerk.house.gov/legislative/house-rules.pdf.

In 2014, the Supreme Court again recognized the constitutional legitimacy of legislative prayer, and rejected an Establishment Clause challenge brought in the context of monthly town board meetings which opened with prayers by local volunteer clergy. *Town of Greece*, 134 S. Ct. at 1811. In *Town of Greece*, the Court rejected respondents' argument that legislative prayer must be nonsectarian, drawing on the long history of Congressional prayer as entirely consistent with the First Amendment. *Id.* at 1820-22; *see also id.* at 1823 ("Our tradition assumes that adult citizens, firm in their own beliefs, can tolerate and perhaps appreciate a ceremonial prayer delivered by a person of a different faith."). The Court also rejected the assertion that the Establishment Clause was offended by the predominantly Christian nature of the board meeting prayers, and concluded that court-imposed judgments about the number or frequency of religious faiths that should be represented by guest ministers would be an impermissible "form of government entanglement with religion." *Id.* at 1824.

## II. Plaintiff's Complaint.

In 2014, several weeks after the Supreme Court decision in *Town of Greece*, lawyers from the Freedom From Religion Foundation traveled to the U.S. Capitol office of Fr. Conroy "to inquire about a nonreligious citizen serving as guest chaplain." Compl. ¶ 34. The Freedom From Religion Foundation is a frequent Establishment Clause litigant[3] that "has worked to end prayers at legislative meetings throughout its history." Brief for Freedom From Religion Foundation as Amicus Curiae Supporting Respondents at 1, *Town of Greece*, 134 S. Ct. 1811

---

[3] *See, e.g.*, *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587 (2007); *Freedom From Religion Found., Inc. v. Weber*, No. 13-35770, 628 F. App'x 952 (9th Cir. 2015); *Freedom From Religion Found., Inc. v. Lew*, 773 F.3d 815 (7th Cir. 2014); *Freedom From Religion Found., Inc. v. Obama*, 641 F.3d 803 (7th Cir. 2011); *Freedom From Religion Found., Inc. v. Nicholson*, 536 F.3d 730 (7th Cir. 2008); *Gaylor v. United States*, 74 F.3d 214 (10th Cir. 1996); *Freedom From Religion Found., Inc. v. Ayers*, 748 F. Supp. 2d 982 (W.D. Wisc. 2010).

(No. 12-696).  Fr. Conroy's staff spoke with the Foundation's lawyers and, according to the allegations of the Complaint, explained that guest chaplains were permitted to give an opening prayer if (i) they are sponsored by a Member of the House, (ii) they are ordained, and (iii) their prayer addresses a "higher power."  Compl. ¶ 35.[4]

Several months later, the Honorable Mark Pocan, U.S. Representative for the 2nd Congressional district of Wisconsin, requested that Plaintiff Daniel Barker, co-president of the Freedom From Religion Foundation and a self-described "atheist," Compl. ¶ 16, "be given consideration as a guest chaplain" and be allowed to deliver a "secular" "invocation" during the time set aside for morning prayer.  Compl. Ex. A.  Plaintiff had, many years earlier, been an ordained Christian minister but had "lost faith in faith" and disavowed his religious beliefs. Compl. ¶ 16.  Eventually, Fr. Conroy declined to select Mr. Barker as a guest chaplain, explaining that Plaintiff's proffered ordination certificate was not adequate because he had disavowed his religious faith.  Compl. Ex. C.  Fr. Conroy also noted that the House Rules require a "prayer" whereas Rep. Pocan's request indicated that Mr. Barker would deliver a "secular invocation."  Compl. Ex. C.

On May 5, 2016 (the National Day of Prayer), Plaintiff filed this suit against Fr. Conroy, two members of Fr. Conroy's staff, and Speaker Paul Ryan, all in their official capacities.[5] While Plaintiff includes the U.S. House of Representatives as a defendant in the Complaint's caption, and references the House as a "Defendant" in the Complaint, he also describes the United States of America as a defendant.  *See* Compl. ¶ 33.

---

[4] The facts set forth in this memorandum are drawn from Plaintiff's Complaint.  By accepting the factual allegations in the Complaint for purposes of this motion, Defendants do not concede the veracity of those allegations.

[5] Plaintiff also has sued Fr. Conroy in his personal capacity in a *Bivens*-type claim.  With respect to the personal-capacity claim only, Fr. Conroy is represented by the U.S. Department of Justice.

In his Complaint, Plaintiff claims that Fr. Conroy's failure to allow him, as an atheist, to give the opening prayer was "discriminatory," and he challenges the "rules and practice" on which Fr. Conroy based his decision.  Compl. ¶ 5.  Plaintiff, among other things, seeks from this Court:  (i) a declaration that barring atheists and nonreligious individuals from delivering the opening prayer is a violation of the Constitution and the Religious Freedom Restoration Act; (ii) a declaration that guest chaplains cannot be required to invoke "a supernatural higher power," (iii) injunctive relief that would bar Fr. Conroy from selecting a guest chaplain to give the opening prayer on the basis of inherently religious qualifications; and (iv) an order approving Plaintiff's "appointment to the post of guest chaplain" and requiring Fr. Conroy to "schedule [Plaintiff] to give an invocation as soon as possible."  Compl. V.

## ARGUMENT

### I.     Plaintiff Lacks Standing to Bring His Claims.

"[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  If Plaintiff lacks standing, the Court lacks subject matter jurisdiction.  *See, e.g.*, *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) (lack of standing constitutes a defect in court's subject matter jurisdiction); *Haase v. Sessions*, 835 F.2d 902, 906 (1987) ("[D]efect of standing is a defect in subject matter jurisdiction.").  "The Constitution confers limited authority on each branch of the Federal Government. . . . In order to remain faithful to this tripartite structure, the power of the Federal Judiciary may not be permitted to intrude upon the powers given to the other branches." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

Plaintiff, as "the party invoking federal jurisdiction, bears the burden of establishing [the] existence [of standing]."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998); *accord Lujan*, 504 U.S. at 561; *City of Waukesha v. EPA*, 320 F.3d 228, 233 (D.C. Cir. 2003).

To discharge this burden, Plaintiff must establish three elements:

> *First*, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. *Second*, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. *Third*, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560-61 (emphases added; quotation marks, citations, ellipsis, and brackets omitted); *accord Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 174 (D.C. Cir. 2012). Here, because "reaching the merits of [this] dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government" was inappropriate, Plaintiff must satisfy an "*especially rigorous*" inquiry into those three standing elements. *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997) (emphasis added); *see Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 473-74 (1982). Plaintiff has not established any of the three.

### A. Plaintiff Has Not Alleged, and Cannot Establish, an Article III Injury in Fact.

Plaintiff's Complaint fails out of the gate because he has not alleged facts sufficient to establish that he suffered an Article III injury in fact. *See Spokeo*, 136 S. Ct. at 1547 ("[I]njury in fact[ is] the first and foremost of standing's three elements." (citation and punctuation omitted)). The harm Plaintiff alleges is not "concrete and particularized," and instead is "conjectural or hypothetical." *Lujan*, 504 U.S. at 560-61.

Plaintiff's alleged harm is not one of monetary injury – he does not allege, because he cannot, that the House's guest chaplains receive any related monetary benefit. Plaintiff's alleged

harm is also not one of employment injury – he does not allege, because he similarly cannot, that he was denied employment with the House; he was neither seeking nor nominated for the office of House Chaplain, and he cannot credibly claim that guest chaplains are House employees. *Cf.* H. Res. 5, 114th Cong. (Members vote on employment of House Officers, such as the Chaplain); U.S. Const. art. I, § 2, cl. 5 ("The House of Representatives shall chuse their Speaker and other Officers"); *but see* Compl. ¶ 197 ("[B]y assuming the House Chaplain's duties, the guest chaplain is also an 'office or public trust under the United States.'"). Plaintiff's claim is also not one of reputational injury, as his Complaint does not identify any reputational harm that he has allegedly endured.

Rather, Plaintiff's alleged injury in fact is far more attenuated. He claims that he was harmed because he suffered deprivation of an unspecified, and speculative, potential reputational enhancement. *See* Compl. ¶ 68 ("Chaplain Conroy's denial prevents [Plaintiff] from receiving the prestige and status that comes with giving an invocation before the U.S. House."); *see also* Compl. ¶ 108 ("But for Chaplain Conroy's denial, [Plaintiff] would have served as guest chaplain, delivered an opening invocation of the House, and received all the concomitant benefits and notoriety of that position."); Compl. ¶ 168 (guest chaplains receive "a significant honor and benefit"); Compl. ¶ 181 (Plaintiff is forgoing the "government benefit and opportunity" of being a guest chaplain). But the speculative possibility of "notoriety" is not a legally cognizable injury under Article III, no matter how personally fulfilling it may have been for Plaintiff to deliver a secular invocation to the House.

Even assuming that reputational enhancement is akin to reputational injury, claims of reputational injury, like all other Article III injury claims, must be "concrete and particularized." *Lujan*, 504 U.S. at 560; *see also, e.g.*, *Meese v. Keene*, 481 U.S. 465, 473-74 (1987) (finding

Article III injury where "appellee submitted detailed affidavits . . . supporting the conclusion that his exhibition of films that ha[d] been classified as 'political propaganda' by the Department of Justice would substantially harm his chances for reelection and would adversely affect his reputation in the community").  Reputational injury claims that are vague or speculative like Plaintiff's will not suffice.  *See, e.g.*, *Advanced Mgmt. Tech., Inc. v. FAA,* 211 F.3d 633, 636-37 (D.C. Cir. 2000) ("Standing cannot be inferred argumentatively but rather must affirmatively appear in the record. . . . Charitably, the [alleged] injury is 'speculative' – the ultimate label for injuries too implausible to support standing.").

As noted, Plaintiff claims only that his reputation would have been enhanced in some amorphous manner had he been permitted to provide a non-theistic invocation before the House as a guest chaplain, in violation of longstanding House Rules.  *See* Compl. ¶¶ 68, 107-08, 168. Indeed, Plaintiff claims that Fr. Conroy's decision not to permit such a secular invocation deprived Plaintiff of an unspecified "honor and benefit" and unidentified "concomitant benefits and notoriety" that may have led to reputational enhancement.  Compl. ¶¶ 108, 168.  Plaintiff's claim is hypothetical and conjectural.  Even if Plaintiff's claim that he was deprived of a potential reputational enhancement could be conceived of as an "injury" in some sense, it is well established "allegations of *possible* future injury are not sufficient" to confer standing.  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (citations and brackets omitted); *see also Newdow v. Eagen*, 309 F. Supp. 2d 29, 37 (D.D.C. 2004) (a "threat of future stigmatic injury is too speculative to qualify as an injury in fact").

Indeed, if anything, Plaintiff has derived more "notoriety" from the *denial* of Rep. Pocan's guest chaplain request than he could have hoped to gain from delivering a brief secular invocation.  Plaintiff has used the denial and this lawsuit to elevate the status and funding of his

11

organization, Freedom From Religion Foundation, by soliciting donations via advertisements referencing this lawsuit in major newspapers, such as *The New York Times* and *The Washington Post*.[6]  Thus, even if the loss of a speculative hope of "notoriety" were a cognizable Article III injury – which it is not – Plaintiff's claim would still fail, because he has failed to (and could not plausibly) allege that he would have achieved greater notoriety from allowance of Rep. Pocan's request than he has achieved from its denial.  For all these reasons, Plaintiff has failed to allege a judicially cognizable injury.

### B. Defendants Did Not Cause Plaintiff's Alleged Injury.

The second element of the standing analysis requires "a fairly traceable connection between [the] injury and the complained-of conduct of the defendant."  *Steel Co.*, 523 U.S. at 103 (citation omitted).  This causation or traceability element is also lacking here.

As an initial matter, Plaintiff attributes the denial of Rep. Pocan's request solely to Fr. Conroy (or to the "Chaplain's Office," which is not a named defendant), so he has failed to allege any causal connection between his purported injury and any other defendant.  *See* Compl. ¶¶ 24-33 (identifying defendants), Compl. ¶¶ 47, 68, 107-108 (references to alleged harm caused by "Chaplain" or "Chaplain's Office").  For example, Plaintiff does not even mention the Speaker of the House, except in his description of the parties, and makes no attempt to link the Speaker to the denial of which he complains.  Compl. ¶¶ 28-29.  Nor does Plaintiff tie his alleged harm in any way to Defendants the U.S. House of Representatives, Elisa Aglieco, or Karen Bronson.  *See generally* Compl. ¶¶ 26, 27, 32, 34, 35, 38 (sole references in Complaint to such

---

[6] *See, e.g.,* N.Y. Times, June 2, 2016, at A5, *available at* https://ffrf.org/news/news-releases/item/26776-new-york-times-features-ffrf-ad and https://ffrf.org/images/FFRFNYT AdNoPrayer.jpg; Wash. Post, June 5, 2016, at A7.  The Court may take judicial notice of publicly available newspaper advertisements.  *See Johnson v. Comm'n on Presidential Debates*, No. 15-1580, 2016 WL 4468153, at *4 (D.D.C. Aug 24, 2016); *Sandza v. Barclays Bank PLC*, 151 F. Supp. 3d 94, 113 (D.D.C. 2015).

Defendants; no tie to harm).  Accordingly, the Complaint should be dismissed as against

Defendants Elisa Aglieco, Karen Bronson, Speaker Paul Ryan, and the U.S. House of

Representatives for failure to allege causation.[7]

Plaintiff's claims against the Chaplain fail to satisfy the traceability requirement for a

more basic reason:  the House Rules do not permit a non-Member to deliver a secular invocation,

but instead require the legislative day to begin with a "prayer."  *See* House Rules II.5, XIV.1.

The Chaplain, who does not have the right to cast a vote (let alone 218 votes) in the House, lacks

the power to modify House Rules.  Such a change generally occurs only upon a vote of the

House's Members.  *See, e.g.*, H. Res. 5, 114th Cong.  Further, Plaintiff's causal-nexus theory

layers speculation on speculation, comprising nothing more than a hypothetical chain of events

insufficient to establish causation:  If Fr. Conroy had decided to ignore House Rules by allowing

a guest chaplain to deliver an opening secular invocation instead of a prayer, in violation of

Rules II.5 and XIV.1; and if the Chaplain had approved Rep. Pocan's request for Plaintiff to be

the one to deliver that secular invocation in violation of Rules II.5 and XIV.1; and if the House

Sergeant-at-Arms had decided to disregard House custom, as well as Rule II.3 (regarding

Sergeant-at-Arms duties) and Rule IV (regarding use and admittance to the Hall of the House);

then perhaps Plaintiff could have delivered in its entirety the secular invocation of his choosing

on the floor of the House.  *See, e.g.*, Compl. ¶ 168.  But as the D.C. Circuit has held, Article III

standing cannot be premised on such an improbable chain of speculation.  *See Kurtz*, 829 F.3d at

1143; *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996).

In *Kurtz v. Baker*, the D.C. Circuit rejected a virtually identical claim by a secular

humanist who wished to serve as a Congressional chaplain, holding that the alleged causal

---

[7] *See infra* note 11 (Defendant Aglieco).

connection between the House and Senate Chaplains' denial of his request and his purported injury was too attenuated to confer Article III standing:

> It is true that *if* a chaplain decided to ignore the limits to his authority, and *if* he decided to smuggle Kurtz into his house's chamber, appellant *might* have a chance to attain his goal of addressing the Senate or the House before his purpose was discovered.  But Article III requires a chain of causation less ephemeral than a coin tossed into a wishing well.

829 F.2d at 1143.  As the D.C. Circuit explained, "appellant has failed to show in any 'concretely demonstrable way' that but for his exclusion from the chaplains' 'guest speaker' programs, there is a 'substantial probability' he would have been able to address a *non*-prayer to one or both houses of Congress."  *Id*. at 1144.

As in *Kurtz*, even if Fr. Conroy had agreed to invite Plaintiff to be a guest chaplain, "it would be unreasonable to imagine that [the Chaplain] could have provided him with the actual opportunity to deliver non-religious remarks to [the House] during the time expressly set aside for prayer."  *Id.* at 1142.  Indeed, the D.C. Circuit recognized that it could not "seriously entertain" an allegation that a Congressional chaplain had authority to grant a person floor privileges to make non-theistic remarks, citing House Rules that would prohibit the Chaplain from "transform[ing] the period reserved for prayer into . . . an 'opening ceremony' in which 'non-theistic' remarks could be delivered, however uplifting."  *Id.* at 1142-43 (quotation marks omitted).  Just as in *Kurtz*, the House Rules applicable here provide that the House must open its legislative day with a "prayer."  House Rule XIV.1; H. Res. 5, 114th Cong.  Accordingly, under *Kurtz*, Plaintiff cannot allege causation in any "concretely demonstrable way," and thus cannot establish Article III standing.  829 F.2d at 1144.

**C.  Plaintiff's Alleged Injury Cannot Be Redressed by a Decision Favorable to Him.**

Plaintiff's claim also must fail for lack of redressability.  "The redressability inquiry poses a simple question:  If plaintiffs secured the relief they sought, would it redress their injury?"  *Wilderness Soc'y v. Norton*, 434 F.3d 584, 590 (D.C. Cir. 2006) (quotation marks, ellipsis, and brackets omitted).  The answer here is "no," because the relief that Plaintiff demands is unavailable to remedy the injury he claims to have suffered.

Plaintiff seeks the following relief against the official Defendants, all of which would require that this Court violate principles of separation of powers:  (i) declaratory relief requiring that the House permit atheist guest chaplains to give a secular invocation, instead of a prayer, in violation of House Rules; (ii) an injunction against any action by Defendants barring atheist guest chaplains from providing the House's opening prayer, and instead mandating that all guest chaplains be permitted to provide secular invocations, in violation of House Rules; and (iii) a mandamus order requiring Fr. Conroy to approve Plaintiff as a guest chaplain and schedule Plaintiff to provide such a secular invocation, in contravention of House Rules.  *See* Compl. V. In substance, Plaintiff asks this Court to order all of the Members of the House to ignore or change the House Rule, first enacted in 1880, mandating that the legislative day begin with a prayer.  Plaintiff's purported injury cannot be redressed, as the Court does not have such power.

Because the Constitution vests sole authority in the House to make rules governing its proceedings, the federal courts lack authority to second-guess the House's exercise of that authority.  *See infra* Part II.  The Constitution's Rulemaking Clause confers exclusive power on the House to determine its own rules.  *See* U.S. Const. art. I, § 5 ("Each House may determine the Rules of its Proceedings."); *United States v. Ballin*, 144 U.S. 1, 5 (1892) (Congress's authority to determine its own rules is "absolute and beyond the challenge of any other body or tribunal"); *see also Christoffel v. United States*, 338 U.S. 84, 89 (1949) ("Congressional practice

in the transaction of ordinary legislative business is of course none of our concern . . . ."); *Consumers Union*, 515 F.2d at 1351 (Congress's "execution of internal rules" is "legislative.").

As a matter of the separation of powers, the judiciary simply "has no authority to order Congress to take action on matters specifically delegated to Congress by the Constitution." *Orta Rivera v. Congress*, 338 F. Supp. 2d 272, 279 (D.P.R. 2004); *see also Trimble v. Johnson*, 173 F. Supp. 651, 653 (D.D.C. 1959) ("[T]he Federal courts may not issue an injunction or a writ of mandamus against the Congress."). Similarly, Plaintiff cannot establish redressability because the relief he seeks against defendant House of Representatives is barred by sovereign immunity and his claims against the Speaker of the House, the Chaplain, and the Chaplain's staff are barred by the Speech or Debate Clause, U.S. Const. art. I, § 6, cl. 1. *See infra* Part II (political question doctrine and Speech or Debate Clause bar relief), III.A (sovereign immunity bars relief against House of Representatives).

Accordingly, Plaintiff cannot obtain a judicial decree ordering any of the defendants to propose or enact a House Rules change, dictating how the House and its Officers and employees must interpret the House's longstanding "prayer" requirement, or compelling the House to permit a non-Member to appear on the floor of the House to give a secular invocation – in essence, a speech – in contravention of House Rules and House practice and procedure. Such relief falls outside the ambit of the federal judicial power. *See infra* Part II.

As the Supreme Court recently reaffirmed, the House's legislative prayer practice (and thus its Rule mandating that the legislative day begin with a prayer) is constitutional:

> [L]egislative prayer … has long been understood as compatible with the Establishment Clause. As practiced by Congress since the framing of the Constitution, legislative prayer lends gravity to public business, reminds lawmakers to transcend petty differences in pursuit of a higher purpose, and expresses a common aspiration to a just and peaceful society.

*Town of Greece*, 134 S. Ct. at 1818.  If the independence of the legislative branch is to have any meaning, the federal courts cannot substitute their determination for that of the House regarding the content of its Rules or the identity of non-Members permitted to enter the floor of the House to address the House.  Plaintiff's attempt to inject the judiciary into these internal House affairs asks the Court to do more than it is empowered to do.  *See infra* Part II (Rulemaking Clause bars relief).  The relief that Plaintiff seeks against the Defendants is constitutionally unavailable, so Plaintiff cannot establish redressability.

## II.    Plaintiff's Claims Raise Non-Justiciable Political Questions.

Plaintiff challenges the "rules and practices" that led Fr. Conroy to decline to allow him to give a secular invocation on the House floor during the time reserved for prayer.  Compl. ¶ 5.  Because this suit challenges the House's implementation and interpretation of House Rules promulgated pursuant to the Rulemaking Clause of the Constitution to govern the proceedings of the House, it is non-justiciable and the Complaint should be dismissed.

The political question doctrine is "essentially a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 217 (1962).  The doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986); *see also United States v. Munoz-Flores*, 495 U.S. 385, 394 (1990) ("doctrine is designed to restrain the Judiciary from inappropriate interference in the business of the other branches of Government").  "That some governmental actions are beyond the reach of the courts reflects the Constitution's limitation of the 'judicial power of the United States' to 'cases' or 'controversies.'"  *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 840 (D.C. Cir. 2010) (quoting U.S. Const. art. III, § 2). "It is

therefore familiar learning that no justiciable 'controversy' exists when parties seek adjudication

of a political question . . . ." *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007) (citation omitted).

A controversy is nonjusticiable when (i) there is "a textually demonstrable constitutional

commitment of the issue to a coordinate political department" or (ii) there exists "the

impossibility of a court's undertaking independent resolution without expressing lack of the

respect due coordinate branches of government." *Baker*, 369 U.S. at 217; *see also Nixon v.*

*United States*, 506 U.S. 224, 228 (1993).   The political question doctrine precludes this Court

from considering the merits of Plaintiff's claims because the Rulemaking Clause and Speech or

Debate Clause, discussed below, reflect a textual commitment to the House of the sole authority

to regulate its proceedings (here, by deciding who will be permitted to address the House during

its legislative sessions), and because judicial review of the House's internal proceedings would

manifest a profound disrespect for the Legislative Branch of the federal government.

## A.  Rulemaking Authority is Textually Committed to the House Alone.

The authority to promulgate rules and regulations is expressly conferred on the House by

the Rulemaking Clause.   U.S. Const. art. I, § 5, cl. 2 ("Each House may determine the Rules of

its Proceedings . . . .").   The Rulemaking Clause constitutes a "broad grant of authority,"

*Consumers Union*, 515 F.2d at 1343, that sits "[a]t the very core of our constitutional separation

of powers," *Walker v. Jones*, 733 F.2d 923, 938 (D.C. Cir. 1984) (MacKinnon, J., concurring in

part and dissenting in part).   Rules and regulations promulgated pursuant to the Rulemaking

Clause are, within constitutional limits, "absolute and beyond the challenge of any other body."

*Ballin*, 144 U.S. at 5; *see also Marshall Field & Co. v. Clark*, 143 U.S. 649, 672-73 (1892)

(declining to look behind House enrollment of bill to determine whether House followed internal

rules in doing so).   The House has exercised its Rulemaking authority by adopting Rules

requiring the legislative day to start with a "prayer."   House Rules II.5, XIV.1.   Those Rules

reflect the historical precedent, dating back to the First Continental Congress, of an opening *religious* invocation.  *See Town of Greece*, 134 S. Ct. at 1823 (Rev. Jacob Duché prayer on September 7, 1774).

Here, Plaintiff challenges Fr. Conroy's decision to decline to allow an atheist to deliver a "secular" "invocation."  *See* Compl. Ex. A.  Specifically, he challenges the "rule, tradition, or practice" on which that decision is based, Compl. ¶ 157, and seeks injunctive relief that would compel Defendants to acquiesce to the delivery of a secular invocation by an atheist, Compl. V at (d), (e).  It is plain that Plaintiff cannot directly attack the Rules requiring a prayer.  While the House's Rules may not "ignore constitutional restraints or violate fundamental rights," *Ballin*, 144 U.S. at 5, a rule requiring a legislative "prayer" does not do so.  *See Marsh*, 463 U.S. at 787-88, 791-92, 794 (discussing history of Congressional prayer); *see also id.* at 788-90 & n.11 (describing state legislatures' prayer rules) and *infra* Part III.B.

Instead, Plaintiff challenges the interpretation of those Rules, asserting that a "prayer" under House Rules cannot constitutionally be limited to remarks that address a "supernatural higher power."  *See* Compl. ¶ 157; *see also* Compl. V at (b).  Yet the Supreme Court again has disagreed with Plaintiff's view.  As the *Marsh* Court concluded, "[t]o invoke *Divine* guidance on a public body entrusted with making the laws is not, in these circumstances, an 'establishment' of religion or a step toward establishment . . . ."  463 U.S. at 792 (emphasis added).

Plaintiff's suit is, at bottom, an attempt to obtain judicial review of the House's exercise of its exclusive constitutional authority to adopt, implement, and interpret its own rules to govern its proceedings.  Because the House Rules requiring a "prayer" are plainly constitutional, Plaintiff's suit must fail for lack of jurisdiction.  His demand that these Rules be interpreted in a manner inconsistent with their plain meaning, and devoid of their historical context, assumes that

the Court is empowered to convert this desire to reality.  The judicial branch may not, however, substitute its own judgment for that of the House in interpreting and implementing constitutionally-permissible Rules.  "[I]n that circumstance the court would be effectively making the Rules – a power that the Rulemaking Clause reserves to each House alone."  *United States v. Rostenkowski*, 59 F.3d 1291, 1306-07 (D.C. Cir. 1995).

### B.  The Speech or Debate Clause Precludes Judicial Review of a House Officer's Implementation of House Rules Governing the Conduct of Proceedings on the House Floor During Legislative Sessions.

Plaintiff's views about the propriety of the Fr. Conroy's interpretation of House Rules are of no import because, as the D.C. Circuit has held, "the execution of internal rules [of the House] is so identified with the legislative process" that a suit challenging House Rules as incompatible with the First Amendment is barred by the Speech or Debate Clause of the Constitution. *Consumers Union*, 515 F.2d at 1351.

The Speech or Debate Clause is "a paradigm example of 'a textually demonstrable constitutional commitment of [an] issue to a coordinate political department.'"  *Davis v. Passman*, 442 U.S. 228, 235 n.11 (1979) (quoting *Baker*, 369 U.S. at 217).  Under the Speech or Debate Clause, "for any Speech or Debate in either House, [Members] shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1.  The Clause is rooted in the epic struggle for parliamentary independence in 16th- and 17th-century England.  *See United States v. Johnson*, 383 U.S. 169, 178 (1966); *Tenney v. Brandhove*, 341 U.S. 367, 372 (1951).  As a result of the English experience, "[f]reedom of speech and action in the legislature was taken as a matter of course" by the Founders, and reflected in the Speech or Debate Clause.  *Tenney*, 341 U.S. at 372. "The purpose of the Clause is to insure that the legislative function the Constitution allocates to Congress may be performed independently."  *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502 (1975).  Accordingly, its "'central role' . . . is to 'prevent intimidation of legislators by the

Executive and accountability before a possibly hostile judiciary.'" *Id.* (quoting *Johnson*, 383 U.S. at 181; *Gravel v. United States*, 408 U.S. 606, 617 (1972)).  "In the American governmental structure the clause serves the additional function of reinforcing the separation of powers so deliberately established by the Founders."  *Johnson*, 383 U.S. at 178; *see also United States v. Helstoski*, 442 U.S. 477, 491 (1979) ("*Helstoski I*").

Because the Clause's "guarantees . . . are vitally important to our system of government," they "are entitled to be treated by the courts with the sensitivity that such important values require."  *Helstoski v. Meanor*, 442 U.S. 500, 506 (1979).  As a result, the Supreme Court has mandated "[w]ithout exception [that the courts] read the Speech or Debate Clause broadly to effectuate its purposes," *Eastland*, 421 U.S. at 501; *see also Doe v. McMillan*, 412 U.S. 306, 311 (1973); *Gravel*, 408 U.S. at 624; *Johnson*, 383 U.S. at 179; *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880).

The protections afforded by the Speech or Debate Clause apply to all activities "within the 'legislative sphere,'" *McMillan*, 412 U.S. at 312 (quoting *Gravel*, 408 U.S. at 624-25), which includes all activities that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation *or with respect to other matters which the Constitution places within the jurisdiction of either House*."  *Eastland*, 421 U.S. at 504 (quoting *Gravel*, 408 U.S. at 625) (emphasis added).  Importantly for purposes of this case, these "other matters which the Constitution places within the jurisdiction of either House" include actions taken pursuant to the Rulemaking Clause, U.S. Const. art. I, § 5, cl. 2.  *See, e.g.*, *Consumers Union*, 515 F.2d at 1351 (concluding that denial of Congressional press accreditation under regulations promulgated pursuant to Rulemaking Clause was one of the "'other matters

21

which the Constitution places within the jurisdiction of either House'" (quoting *Gravel*, 408 U.S. at 625)).

The Speech or Debate Clause affords three broad protections.  Most importantly for purposes of this case, the Clause provides an immunity from suits that are predicated on conduct that falls within the "legislative sphere even though the[] conduct, if performed in other than legislative contexts, would . . . be unconstitutional or otherwise contrary to criminal or civil statutes." *McMillan*, 412 U.S. at 312-13 (quotation marks and citation omitted).[8]

The Clause's protections apply "not only to a Member but also to his aides insofar as the conduct of the latter would be a protected legislative act if performed by the Member himself." *Gravel*, 408 U.S. at 618; *see also Eastland*, 421 U.S. at 507; *cf. MINPECO*, 844 F.2d at 862 (D.C. Cir. 1988).  In particular, the Clause confers immunity on a House Officer when performing legislative acts.  *See, e.g., Consumers Union*, 515 F.2d at 1345 n.8 ("If performing legislative acts, the Sergeants at Arms would have immunity . . . .").

Plaintiff's allegation of "discrimination" in violation of the Establishment Clause, *see* Compl. ¶¶ 174-75, does not vitiate the immunity conferred by the Speech or Debate Clause.  "An act does not lose its legislative character simply because a plaintiff alleges that it violated . . . the Constitution.  Such is the nature of absolute immunity, which is – in a word – absolute." *Rangel*

---

[8] The Clause also provides (i) a non-disclosure privilege which protects Members from having their legislative materials seized, and from being compelled to testify about their legislative activities or to produce legislative records, *see, e.g.*, *Helstoski I*, 442 U.S. at 484-86; *Gravel*, 408 U.S. at 615-16; *United States v. Rayburn House Office Bldg.*, 497 F.3d 654, 660 (D.C. Cir. 2007), *cert. denied*, 128 S. Ct. 1738 (2008); *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 420-21 (D.C. Cir. 1995); *MINPECO, S.A. v. Conticommodity Servs., Inc.*, 844 F.2d 856, 859-61 (D.C. Cir. 1988); and (ii) a non-evidentiary use privilege that bars civil plaintiffs and prosecutors from using "information as to a [protected] act" to advance their cases against those to whom the Clause applies, *see, e.g.*, *Helstoski I*, 442 U.S. at 489-90; *Johnson*, 383 U.S. at 173.

*v. Boehner*, 785 F.3d 19, 24 (D.C. Cir. 2015) (citing *Bogan v. Scott-Harris*, 523 U.S. 44, 54-55

(1988); *Eastland*, 421 U.S. at 508-09); *see also Eastland*, 421 U.S. at 508 ("[I]n determining the

legitimacy of a congressional act we do not look to the motives alleged to have prompted it[.] ").

### C. The Rulemaking Clause and the Speech or Debate Clause Reflect a Constitutional Commitment of Authority to the House to Determine Who May Address the House During a Legislative Session.

Plaintiff alleges that he met the Chaplain's internal requirements to act as a guest

chaplain, that he was erroneously rejected in violation of those requirements, and that he is

therefore entitled to a court order compelling Defendants to grant him floor privileges, so that he

can deliver a secular invocation during the time expressly reserved by House Rules for prayer.

*See* Compl. ¶¶ 92-106; 158.  Plaintiff's claims are foreclosed by the Circuit's decision in

*Consumers Union*.  515 F.2d at 1350-51.

In *Consumers Union*, the D.C. Circuit held that the Rulemaking and Speech or Debate

Clauses, taken together, rendered nonjusticiable a challenge to the application of Congressional

rules regarding admission to the Periodical Press Galleries.  515 F.2d at 1351.  Consumer

Reports, a monthly publication of Consumers Union of America, and its Washington

representative had applied for admission to the Periodical Press Galleries.  The application was

rejected by the Executive Committee of Correspondents (the "Executive Committee"), the body

charged with the responsibility of acting upon such applications under the House and Senate

Rules, on the ground that Consumer Reports was not an "independent" publication within the

meaning of the press gallery rules.  *Id.* at 1345.  Consumers Union then brought claims under the

First and Fifth Amendments.  In particular, Consumers Union alleged that the Executive

Committee had interpreted and applied the "Rules Governing Periodical Press Galleries"

(hereafter, "Press Gallery Rules") in a "discriminatory, arbitrary, capricious, and unreasonable"

manner, thereby violating Consumers Union's rights to due process and equal protection.  *Id.* at

1346.

The D.C. Circuit began its analysis by noting that the Rulemaking Clause constitutes a

"broad grant of authority" under which "each House has exercised power to extend to those

members of the press determined eligible, and otherwise to deny, admission to the floors and

galleries of Congress."  *Id.* at 1343.  The Press Gallery Rules, promulgated in the exercise of that

constitutional authority, performed a legislative function by "assur[ing] that the Periodical Press

Galleries, within space limitations, will be used by bona fide reporters who will not abuse the

privilege of accreditation by importuning Members on behalf of private interests or causes to

which lobbying or advocacy groups are committed."  *Id.* at 1347.  In light of the House's broad

rulemaking authority, the court concluded, "[t]he manner of assuring independence of those

accredited from such groups or interests is for the Congress to determine as a matter of

constitutional power."  *Id.*

Ultimately, however, the court determined that it had no occasion to resolve the merits of

Consumers Union's constitutional claims, because the Speech or Debate Clause rendered those

claims nonjusticiable.  The court reasoned that the Executive Committee was "acting by virtue of

an express delegation of authority as aides or assistants of Congress," performing duties which

"[f]or many years the Congress itself had directly controlled."  *Id.* at 1350.  Consequently, the

Committee was entitled to the protection of the Speech or Debate Clause to the same extent as a

Member of Congress would have been in like circumstances.  *Id.*  Even though the Committee

had not "engaged in the consideration and passage or rejection of proposed legislation," it was

performing a legislative act (and was therefore immune under the Speech or Debate Clause)

because it was "enforcing internal rules of Congress validly enacted under authority specifically

24

granted to Congress and within the scope of authority appropriately delegated by it." *Id*. As the court explained, the "execution of internal rules" falls within the category of "legislative acts" because it is a "'matter[] which the Constitution places within the jurisdiction of either House.'" *Id*. at 1351 (quoting *Gravel*, 408 U.S. at 625). Accordingly, the case was nonjusticiable, because the Committee's acts "were within the spheres of legislative power committed to the Congress and the legislative immunity granted by the Constitution." *Id.* at 1351.

Plaintiff's claims are nonjusticiable for precisely the same reasons. Just as in *Consumers Union*, Plaintiff seeks to challenge the House's "execution of internal rules" regarding "'matters which the Constitution places within the jurisdiction of either House,'" *id*. at 1351 – namely, the conduct of the House's own legislative proceedings and the determination of which individuals will be permitted to enter the well of the House and ascend the rostrum to address the Members while the House is in session. As a matter of law, such determinations by the House and its officers constitute "legislative acts" that are absolutely immune from judicial review under the Speech or Debate Clause. As *Consumers Union* makes clear, the fact that legislative prayer is not itself "the consideration and passage or rejection of proposed legislation," *id*. at 1350, does not deprive the defendants of the immunities conferred by the Clause, because the Supreme Court has consistently held that the Clause's protections extend to those matters that "the Constitution places within the jurisdiction" of the House. *Eastland*, 421 U.S. at 504 (quoting *Gravel*, 408 U.S. at 625).

Indeed, the practice of legislative prayer (including the determination of the prayer-giver) is a legislative act not only because the adoption and implementation of House Rules and the determination of who may address the House during its sessions are inherently legislative acts under *Gravel*, *Eastland*, and *Consumers Union*, but also because legislative prayer is itself a

legislative function conducted for the benefit of the legislators as an established part of and aid to the legislative process.  As the Supreme Court explained in *Town of Greece*, "[t]he principal audience for these invocations is not, indeed, the public but lawmakers themselves, who may find that a moment of prayer or quiet reflection *sets the mind to a higher purpose and thereby eases the task of governing*."  134 S. Ct. at 1825 (emphasis added); *see also id.* at 1823 (referring to legislative prayer's "place at the opening of legislative sessions, where it is meant to lend gravity to the occasion"); *id.* at 1847 (Kagan, J. dissenting) (citations omitted) (legislative prayer as performed in Congress and state legislatures "'is a matter of internal daily procedure directed only at the legislative membership'" and "'concerns an internal decision of the . . . Legislature as to the daily procedure by which it conducts its own affairs'").  Just as in *Consumers Union*, therefore, Plaintiff's claims are nonjusticiable.  Defendants' alleged actions "were within the spheres of legislative power committed to the Congress and the legislative immunity granted by the Constitution," and are therefore not subject to judicial review.  *Consumers Union*, 515 F.2d at 1351.

Courts have consistently dismissed suits by plaintiffs seeking special access to House proceedings or floor privileges, such as Plaintiff's suit here, following the D.C. Circuit's decision in *Consumers Union*.  For example, in *Schreibman v. Holmes*, No. CIV.A. 96-CV-01287, 1997 WL 527341 (D.D.C. Aug. 18, 1997), the plaintiff argued that he had met the criteria set forth in the Press Gallery Rules, but the Executive Committee rejected his application.  The district court declined to second-guess the Committee's application of its rules, and held that the Committee was immune from suit under *Consumers Union*.[9]  The Circuit agreed, concluding that "[t]he

---

[9] The district court also noted that "Mr. Schreibman does not allege that the defendants were acting outside the scope of their authority, nor does he allege that they rejected his application in bad faith."  *Id.* at *4.  Here, Fr. Conroy was clearly acting with the scope of his authority under

(*Continued . . .* )

Executive Committee of Correspondents enjoys immunity under the Speech or Debate Clause, U.S. Const. art. I, § 6, cl. 1, because making decisions about whom to admit to congressional galleries is a legislative function." *Schreibman v. Holmes*, 203 F.3d 53, 53 (D.C. Cir. 1999) (per curiam); *see also Pettingell v. Exec. Comm. of Corresps.*, No. CIV.A. 85-2742, 1986 WL 8569, at *2 (D.D.C. Mar. 31, 1986) (rejecting challenge to House's press accreditation determination under House Rules; "[i]t is not for the Courts to require a rule more to the plaintiff's wishes. . . . [P]laintiff's argument that the Court might require or even suggest a different rule governing the subject matter of this case is beyond the power of the Court, nor should the Court intervene in such delicate matters.").

Similarly, in *Cable News Network v. Anderson*, CNN and other networks sought to enjoin House officials from enforcing a House Rule that required committee hearings to be closed to television cameras at the request of a witness under subpoena.  723 F. Supp. 835, 835 (D.D.C. 1989).  The court held that the action was barred by the Speech or Debate Clause.  As the court explained, "[t]he opinion of this Court, or for that matter, the opinion of a singular member of the House of Representatives, as to the wisdom of the Rule is of no importance, for the Rule has not been amended, repealed, or revoked as of this date." *Id.* at 841.

*Consumers Union* and its progeny thus compel dismissal of Plaintiff's claims as nonjusticiable.

**D.  The Court's Consideration of Plaintiff's Claims Would Demonstrate a Lack of Respect for a Co-Equal Branch.**

"In deference to the fundamental constitutional principle of separation of powers, the judiciary must take special care to avoid intruding into a constitutionally delineated prerogative

---

House Rules, and in light of the long history of legislative prayer, his actions, as a matter of law, were not in "bad faith."

of the Legislative Branch." *Harrington v. Bush*, 553 F.2d 190, 214 (D.C. Cir. 1977).

Adjudication of Plaintiff's claims would, in contravention of our system of separated powers,

intrude on the House's enactment and interpretation of its Rules. It would require the legislative

branch to cede control of its constitutionally-derived internal procedures and conduct of

legislative sessions to the judicial branch. It would enmesh the Court in second-guessing the

House's exercise of control over admission to its legislative chamber.[10] "Merely to state what is

sought is to make plain that [plaintiff] propose[s] nothing less than a revolution in the judiciary's

relationship to the political branches." *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1181 (D.C. Cir.

1983) (Bork, J., concurring). As the D.C. Circuit has recognized, courts "must assume that the

House acted in the belief that its conduct was permitted by its rules, and deference rather than

disrespect is due that judgment." *Metzenbaum v. Fed'l Energy Regulatory Comm'n*, 675 F.2d

1282, 1287-88 (D.C. Cir. 1982) (rejecting claim that law was passed in violation of House Rules

as non-justiciable political question under Rulemaking Clause and prudential considerations).

The impropriety of Plaintiff's proposed judicial intrusion into the House's internal

matters applies with equal force whether the proposed judicial remedy would be directed to the

House as an institution or the individual Defendants in their official capacities. For example, in

*Vander Jagt*, the D.C. Circuit dismissed a suit in which Members of the House complained that

the majority party unfairly allocated Committee seats. 699 F.2d at 1177. While the Circuit

declined to dismiss the case on political question grounds, it concluded that it should exercise its

remedial discretion to withhold equitable and declaratory relief, because "we simply believe it

---

[10] From the earliest days of the Republic, the House has exercised sole authority to control admission to its legislative chambers, determining who was entitled to admission and on what conditions. *See Consumers Union*, 515 F.2d at 1343-44; Asher C. Hinds, 5 Hinds' Precedents of the House of Representatives §§ 7283-7310 (1907).

would be . . . a startlingly unattractive idea, given our respect for a coequal branch of government," to enter an order directing the Speaker of the House in the manner in which House Rules should be interpreted and implemented. *Id.* at 1176-77 (internal quotation and citation omitted).

This Court should similarly decline Plaintiff's invitation to intrude into the House's internal matters. *See Brown v. Hansen*, 973 F.2d 1118, 1122 (3d Cir. 1992) (per curiam) ("Absent a clear command from some external source of law, we cannot interfere with the internal workings of the Virgin Islands Legislature 'without expressing lack of the respect due coordinate branches of government.'" (quoting *Baker*, 369 U.S. at 217)). Plaintiff seeks injunctive relief that would precipitate a constitutional clash between the Legislative and Judicial Branches by purporting to compel the House to violate its own Rules requiring a prayer, and to disregard its own Rules and practices regarding access to the House floor. *See* Compl. V. That constitutional crisis would be compounded by the relief requested with respect to Fr. Conroy and Speaker Ryan, which would direct them to engage in *ultra vires* acts in violation of House Rules and precedent. And the requested relief would be meaningless insofar as Defendant Bronson is concerned, because she has no authority to invite a guest chaplain to deliver the opening prayer.[11] The constitutional infirmities of the suit are manifest, and judicial respect for the separation of powers compels dismissal of Plaintiff's claims.

---

[11] Defendant Aglieco is no longer employed by the House. A notification pursuant to Fed. R. Civ. P. 25(d) is being filed concurrently with this memorandum seeking Ms. Aglieco's dismissal from this suit.

### III.    Plaintiff's Complaint Fails to State a Claim.

Even if Plaintiff had standing and had asserted justiciable claims – neither of which is true here – dismissal would still be required, because Plaintiff's Complaint fails plausibly to allege the elements of any valid claim for relief.

To withstand a Rule 12(b)(6) motion, Plaintiff is obliged to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

> [A] plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, *see* 5 [Charles Alan] Wright & [Arthur R.] Miller, Federal Practice and Procedure § 1216 . . . (3d ed. 2004) ("[T]he pleading must contain something more than a statement of facts that merely creates a suspicion of a legally cognizable right of action") . . . .

*Id.* at 555 (citation, brackets, and ellipses omitted); *see also, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." (quotation marks omitted)).  Plaintiff's Complaint falls far short of this standard, and he fails to plead facts sufficient to raise any plausible claims for relief.

### A.    Plaintiff's Constitutional Claims Against the House Are Barred By Sovereign Immunity.

As an initial matter, Plaintiff cannot proceed on any constitutional claims against the House, because it is immune from suit.  As a general rule, the United States and its governmental components may not be sued without its consent.  *See United States v. Mitchell*, 445 U.S. 535, 539 (1980).  Consent "cannot be implied" and must be "unequivocally expressed" by Congress. *Id.* (citation omitted).  There has been no waiver of sovereign immunity by the House or the

United States.  *See Liverman v. Comm. on Judiciary, U.S. House of Representatives*, 51 F. App'x 825, 828 (10th Cir. 2002) (sovereign immunity barred suit against House Committee; 28 U.S.C. § 1331, which provides for federal court jurisdiction of civil actions "arising under the Constitution" was not a waiver of the House's sovereign immunity); *Keener v. Congress*, 467 F.2d 952, 952 (5th Cir.1972) (per curiam) (sovereign immunity barred suit against Congress for mandamus); *Trimble*, 173 F. Supp. at 653 ("[T]he Federal courts may not issue an injunction or a writ of mandamus against the Congress.").  Plaintiff's constitutional claims against the House must be dismissed.

    **B.  Plaintiff Fails to State a Claim Under the Establishment Clause or the Equal Protection Clause Because It Is Constitutionally Permissible to Limit Legislative Prayer to Persons Willing to Perform a Prayer.**

    With respect to the remaining Defendants, Plaintiff claims that the Establishment Clause requires them to allow atheists the opportunity to deliver to Members of the House a secular statement during the portion of the House's legislative session that is dedicated for prayer under Rules adopted by the House.  Plaintiff's Establishment Clause claim is barred by the Supreme Court's decision in *Marsh v. Chambers*, which upheld the constitutionality of legislative chaplaincies; the en banc D.C. Circuit's decision in *Murray v. Buchanan*, which dismissed for want of a substantial federal question an Establishment Clause challenge to the Congressional chaplaincies; and the Supreme Court's decision in *Town of Greece, N.Y. v. Galloway*, which affirmed *Marsh* and extended its holding to guests delivering prayers at legislative sessions generally.  Plaintiff's due process claim, based upon the same alleged discriminatory conduct as his Establishment Clause claim, *see* Compl.¶¶ 169-77, must fail for the same reasons.[12]

---

[12] Because under controlling precedent no fundamental right of Plaintiff has been infringed, he cannot prevail on his Fifth Amendment due process claim.  *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 54 (1983) (where plaintiffs did not have a First Amendment right

(*Continued . . .* )

In *Marsh*, the Supreme Court upheld the Nebraska state legislature's chaplaincy program, relying heavily upon our Nation's "deeply embedded . . . history and tradition" of legislative prayer. 463 U.S. at 786. The Court traced, from "colonial times through the founding of the Republic and ever since," the coexistence of legislative prayer and "the principles of disestablishment and religious freedom." *Id.* These historical circumstances "shed[] light not only on what the draftsmen intended the Establishment Clause to mean, but also on how they thought that Clause applied to the practice authorized by the First Congress – their actions reveal their intent." *Id.* at 790. Such a "unique history" led the Court "to accept the interpretation of the First Amendment draftsmen who saw no real threat to the Establishment Clause arising from a practice" of legislative prayer. *Id.* at 791. Accordingly, the Court concluded:

> In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society. To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an "establishment" of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country.

*Id.* at 792. The *Marsh* Court was unmoved by the fact that the legislative practice at issue had resulted in exclusively Judeo-Christian prayers. *Id.* at 793, 794-95. "The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." *Id.*

---

to access an interschool mail system, the denial of such access did not impinge upon a fundamental interest: "We have rejected this contention when cast as a First Amendment argument, and it fares no better in equal protection garb."); *Kurtz*, 829 F.2d at 1147 & n.3 (Ginsburg, J., dissenting) ("*Marsh* essentially affirmed that the historic practice of an opening prayer burdens no 'fundamental right' of non-theists. Thus Kurtz cannot salvage his failed first amendment claim by cloaking it in a fifth amendment due process (equal protection component) mantle." (citation omitted)).

at 794-95.  The Court recognized that it would be inappropriate for judges "to embark on a sensitive evaluation or to parse the content of a particular prayer." *Id.* at 795.

Shortly after the Supreme Court issued its decision in *Marsh,* the D.C. Circuit en banc reached a similar conclusion in *Murray v. Buchanan*, in which two federal taxpayers who did not believe in a Supreme Being had challenged the constitutionality of the use of appropriated funds for Congressional chaplains' salaries.[13]  The unanimous en banc court held:

> We are . . . persuaded that the complaint in this action retains no vitality. The Supreme Court's decision in *Marsh* v. *Chambers* is dispositive of appellants' challenge to the public funding of congressional chaplains. The Court answered the question presented in *Marsh* with remarkable clarity:  The "practice of opening each legislative day with a prayer by a chaplain paid by the State [does not] violate[] the Establishment Clause of the First Amendment."

720 F.2d at 690 (quoting *Marsh*, 463 U.S. at 784).  Because the D.C. Circuit saw "no tenable basis for a claim that the very congressional practice deliberately traced by the Court in *Marsh* should be subject to further review," the court dismissed the plaintiffs' appeal and remanded with instructions to dismiss the complaint for want of a substantial constitutional question.  *Id.*; *see also Newdow*, 309 F. Supp. 2d at 40 (observing that the Circuit's "dismissal for lack of a substantial constitutional question [in *Murray*] demonstrates [its] view of the wholly insubstantial nature of the claims presented.").

Several years later, the D.C. Circuit again rejected a challenge to Congressional chaplaincies and the practice of Congressional prayer, under circumstances nearly identical to those presented here.  In *Kurtz v. Baker*, a secular humanist challenged the refusal of the House and Senate chaplains "to invite non-believers to deliver secular remarks . . . during the period

---

[13] *See Murray v. Morton*, 505 F. Supp. 144, 145 (D.D.C. 1981), *vacated and dismissed*, *Murray v. Buchanan*, 720 F.2d 689.

each house reserved for morning prayer." 829 F.2d at 1134.  As discussed above, the Circuit

dismissed the case for lack of standing (which compels the same result here), but then-Judge

Ginsburg dissented from the standing disposition, setting forth a "less complex resolution" of the

case – namely, dismissal for failure to state a claim.  *Id.* at 1147-48.  Judge Ginsburg recognized

that a request like Plaintiff's (to deliver secular remarks on the House floor) is "an attack on

Congress' customary, opening-with-prayer observance," which "is not subject to constitutional

assault" in light of Supreme Court precedent.  As she explained, "[b]ecause of the 'unique'

historical roots of prayer to open the legislature's day, and the status of prayer in that context,

unadorned by surrounding ceremony, as 'part of the fabric of our society,'" binding Supreme

Court precedent made clear that the plaintiff had "no tenable free speech, establishment clause,

or due process claim to advance." *Id.* (citing *Marsh*, 493 U.S. at 791-92).

In 2014, the Supreme Court affirmed its holding in *Marsh*, recognizing that "legislative

prayer, while religious in nature, has long been understood as compatible with the Establishment

Clause." *Town of Greece*, 134 S. Ct. at 1818.  The Court extended its ruling in *Marsh* to a town

board's practice of opening meetings with invocations performed by guest clergy from the local

community.  In so holding, the Court "reject[ed] the suggestion that legislative prayer must be

nonsectarian," given our Nation's continuous history of Congressional prayer. *Id.* at 1823.

While Plaintiff does not directly claim that the House Rules mandating prayer are

unconstitutional, Plaintiff suggests that Fr. Conroy must, under the Establishment Clause,

interpret those Rules to mean that people who do not subscribe to any religious faith and do not

believe in a higher power must be given equal opportunity to deliver remarks on the House floor

during the time set aside for prayer.[14]  Plaintiff purports to rely on *Town of Greece* by

---

[14] In other words, Plaintiff indirectly attacks House Rules as unconstitutional by implying that

(*Continued . . .* )

34

characterizing that decision as "uph[olding] the legislative prayer exception to state-church separation largely because the town involved 'at no point excluded or denied an opportunity to a would-be prayer giver' and 'maintained that a minister or layperson of any persuasion, including an atheist, could give the invocation.'"  Compl. ¶ 1.

As an initial matter, in light of the long unbroken tradition of Congressional prayer, the Court in *Town of Greece* expressly rejected Plaintiff's characterization of legislative prayer as an "exception" to its Establishment Clause jurisprudence.  "*Marsh* must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical foundation . . . . *Marsh* stands for the proposition that it is not necessary to define the precise boundary of the Establishment Clause where history shows that the specific practice is permitted."  *Id.* at 1819.

Plaintiff also errs in contending that the Court in *Town of Greece* relied "largely" on the fact that the town maintained that a "layperson of any persuasion" could deliver an invocation, a rationale that would have been directly inconsistent with *Marsh v. Chambers*, which upheld a state legislature's employment of the same chaplain from a single Christian denomination for a period of 16 years.  *See Marsh*, 463 U.S. at 793.  Instead, the *Town of Greece* Court expressly disagreed with the reasoning of the lower court, which had concluded that the town's practice of selecting a guest speaker violated the Establishment Clause because it had the effect of producing overwhelmingly Christian prayers.  *See* 134 S. Ct. at 1824.  The Court rejected the contention that the town had to look beyond its borders to ensure a broader range of religious viewpoints during the opening prayer, characterizing that view as requiring "'wholly

---

the term "prayer" must be interpreted in a manner inconsistent with its plain meaning and historical definition.

inappropriate judgments about the number of religions [it] should sponsor and the relative frequency with which it should sponsor each,' a form of government entanglement with religion that is far more troublesome that the current approach." *Id.* at 1824 (quoting *Lee v. Weisman*, 505 U.S. 577, 617 (1992)).

Plaintiff cannot establish a constitutional violation under the *Marsh* test reaffirmed in *Town of Greece*, because he fails to allege facts demonstrating any "pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose," such as prayers that "denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion." 134 S. Ct. at 1823, 1824. Plaintiff appears to equate mere exclusion of atheists with "denigration" or "an impermissible government purpose," but exclusion and denigration are not the same thing.[15] Indeed, if mere exclusion of atheists were sufficient to violate the *Marsh* test, the Court would have had to reach a different result in *Marsh* itself.

The Supreme Court has noted with approval that Congress "acknowledges our growing diversity not by proscribing sectarian content but by welcoming ministers of many creeds." *Id.* at 1820-21. The Court expressly "reject[ed] the suggestion that legislative prayer must be nonsectarian," *id.* at 1823, explaining that "[a]n insistence on nonsectarian or ecumenical prayer as a single, fixed standard is not consistent with the tradition of legislative prayer" and that "our history and tradition have shown that prayer in this limited context [i.e., legislative prayer] could 'coexis[t] with the principles of disestablishment and religious freedom." *Id.* at 1820 (citing

---

[15] Plaintiff devotes much of his Complaint to allegations of discrimination against "minority religions," but he plainly lacks standing to assert the rights of persons who subscribe to such faiths, given his admission that he believes "there are no gods or other supernatural powers." Compl. ¶ 16. Contrary to the assumptions undergirding Plaintiff's arguments, moreover, the Supreme Court has rejected any notion of quotas in selecting guest prayer-givers. *See Town of Greece*, 134 S. Ct. at 1824. In addition, the House's guest chaplains are not limited to Christians or any other particular faith. *See, e.g., infra* note 1.

*Marsh*, 463 U.S. at 786).   There can be no "impermissible government purpose" in excluding atheists in light of decades of Establishment Clause jurisprudence upholding legislative prayer. In any event, in light of Plaintiff's atheist beliefs, "it could be argued [that Plaintiff] has excluded himself" from the ability to deliver a prayer because he is "cling[ing] to beliefs that are incompatible with what he desires."  *Kurtz*, 829 F.2d at 1142.  As the court recognized in *Newdow*, "because *Marsh* held that a legislative body may employ a chaplain to 'invoke Divine guidance,' it follows that Congress may limit the chaplain position to those who are willing to perform that task." 309 F. Supp. at 36 (quoting *Marsh*, 463 U.S. at 792).

Plaintiff observes, quite correctly, that "nonreligious speakers are perfectly capable of solemnizing proceedings by delivering an opening invocation at government meetings," Compl. ¶ 87.  But Plaintiff's assertion that "[t]here is nothing inherent in atheism . . . that would prohibit [its] leaders from performing the duties of guest chaplain," Compl. ¶ 79, is flatly wrong in the context of Congressional prayer.  The "duties" of the guest chaplain are to perform the Chaplain's role, as set forth in the Rules, of commencing the legislative day with a "prayer." House Rules XIV.1, II.5.  As then-Judge Ginsburg observed in *Kurtz*, "[t]he congressional chaplains have no warrant themselves to utter words that do not compose a prayer, and they have no commission from the House or Senate to engage others to extend remarks of a secular nature."  829 F.2d at 1146.

As discussed earlier, this Court does not have jurisdiction to reimagine House Rules in the manner Plaintiff desires.  Moreover, even if the Court did have jurisdiction, the Establishment Clause would not support Plaintiff's claims.  Because Plaintiff's Establishment Clause challenge to the requirement that prayer-givers address a higher power – a requirement inherent in the very concept of "prayer" as mandated by House Rules – is foreclosed by the prior

decisions of the Supreme Court and the D.C. Circuit en banc, his Establishment Clause claim should be dismissed.

### C.  Plaintiff Fails to State a Claim Under the Religious Freedom Restoration Act.

The Religious Freedom Restoration Act ("RFRA") was enacted "[t]o assure that all Americans are free to follow their faiths free from governmental interference."  S. Rep. No. 103-111, at 4 (1993), as reprinted in 1993 U.S.C.C.A.N. 1892, 1897.  Congress enacted RFRA following the Supreme Court's decision in *Emp't Div. Dept. of Human Res.of Oregon v. Smith*, 494 U.S. 872, 878-79 (1990), which held that individuals must comply with neutral laws of general applicability, even if compliance was contrary to their religion.  Because *Smith* "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion," 42 U.S.C. § 2000bb(a)(4), Congress enacted RFRA to protect *bona fide* exercises of religion.  *See* 42 U.S.C. §§ 2000bb, 2000bb-1(a).  RFRA generally prohibits the government from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability."  42 U.S.C. § 2000bb-1(a).

As a threshold matter, even assuming that atheism is a "religion" subject to RFRA protection, RFRA is inapplicable because Plaintiff does not allege that his purportedly religious exercise has been burdened by a neutral and generally applicable law.  Instead, he claims that the inherently religious requirements of serving as a guest chaplain are intentionally discriminatory. *See* Compl. ¶¶ 113-17.  As a result, he has pled no colorable RFRA claim.  *See Larsen v. U.S. Navy*, 346 F. Supp. 2d 122, 136 (D.D.C. 2004) (dismissing claim under RFRA because statute was inapplicable to claim alleging intentional discrimination in the selection of navy chaplains), *vacated and remanded on other grounds*, 525 F.3d 1 (D.C. Cir. 2008); *see also Hartmann v. Stone*, 68 F.3d 973, 978 (6th Cir. 1995) ("if the regulations are not neutral and generally applicable, we need not address [RFRA]").

\*           \*           \*

Even if RFRA applied here, Plaintiff's claim would still fail because he has failed to properly allege that his exercise of religion has been "substantially burdened" by the government.  42 U.S.C. § 2000bb-1(a).  A plaintiff may demonstrate a substantial burden by alleging either that the regulation at issue (1) "force[d] [the plaintiff] to engage in conduct that [his] religion forbids," *Henderson v. Kennedy*, 253 F.3d 12, 16 (D.C. Cir. 2001), (2) "prevents [him] from engaging in conduct [his] religion requires," *id.*, or (3) forced him "to choose between following the precepts of [his] religion and forfeiting benefits," *Kaemmerling*, 553 F.3d at 678.  Although Plaintiff attempts to proceed under each of these theories, his allegations are insufficient.

      1.    <u>Plaintiff fails to demonstrate a substantial burden because he is not forced to engage in conduct his religion forbids.</u>

Plaintiff alleges that he has suffered a substantial burden on his religious exercise because the Defendants are requiring him "to convert to a different religion," "maintain religious activity in the church that originally ordained him," and "craft an invocation to a supernatural higher power," Compl. ¶¶ 181-83.  In other words, Plaintiff alleges that he is being "forced . . . to engage in conduct that [his] religion forbids." *Henderson*, 253 F.3d at 16.

Even assuming that atheism is a "religion," Plaintiff's claim fails because Defendants are not forcing Plaintiff to engage in any conduct, let alone conduct inconsistent with his religion. Unlike generally applicable laws requiring individuals to avoid consumption of certain substances or prison regulations requiring prisoners to maintain certain grooming standards, neither the House Rules nor the guest chaplain requirements are directed at Plaintiff.  *See* House Rule XXIII (requiring Members, officers, and employees of the House to comply with the House Rules); *cf. Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015) (prison grooming policies preventing

plaintiff-inmate to grow a beard as required by his religion imposed a substantial burden).

Accordingly, the guest chaplain requirements do not compel Plaintiff to "modify his religious

behavior in any way," *Kaemmerling*, 553 F.3d at 679, and instead are merely standards used by

Fr. Conroy to ensure that guest chaplains comply with the House Rules as part of the internal

operation of the House.  Plaintiff merely alleges that the Defendants are "act[ing] in ways that

violate [plaintiff's] religious beliefs," allegations which are insufficient to establish a RFRA

claim.  *See id.* (dismissing RFRA claim because plaintiff failed to identify any conduct of his

own that was forbidden or required by the government); *Bowen v. Roy*, 476 U.S. 693, 699 (1986)

(government is not required "to conduct its own internal affairs in ways that comport with the

religious beliefs of particular citizens").  Plaintiff is free to practice his chosen belief system,

actions he concedes he continues to do.  Compl. ¶¶ 13, 18-19.

    2.    <u>Plaintiff fails to demonstrate a substantial burden because he is not prohibited from engaging in conduct his religion requires.</u>

Although Plaintiff has not been permitted to appear on the House floor to provide a

secular invocation, this is insufficient to establish a substantial burden because Plaintiff has not

alleged that appearing on the House floor to provide an invocation is "conduct [his] religion

requires." *Henderson*, 253 F.3d at 16.  In *Henderson*, the court held that a regulation prohibiting

t-shirt sales on the national mall did not substantially burden individuals seeking to share their

religious message because the plaintiffs did not allege "that selling t-shirts in that particular area

of the District of Columbia is central to the exercise of their religion." *Id.* at 312.  Similarly, in

*Mahoney v. Doe*, a regulation prohibiting chalk on the sidewalk in front of the White House did

not impose a substantial burden because the plaintiff did not allege that his religion required

"chalk [as] the exclusive medium through which [he] could express his religious views."  642

F.3d 1112, 1120-21 (D.C. Cir. 2011); *see also Mahoney v. U.S. Marshals Svc.*, 454 F. Supp. 2d

21, 38 (D.D.C. 2006) (no substantial burden imposed by government restrictions prohibiting speech in front of church because plaintiffs did not allege that religion compelled such speech at that particular location and time); *Heap v. Carter*, 112 F. Supp. 3d 402, 422 (E.D. Va. 2015) (no substantial burden imposed by ordination requirement of Navy chaplains because plaintiff failed to show that "becoming a Humanist Navy chaplain is dictated by the tenets of Humanism or that by not becoming a Navy chaplain he is somehow in violation of the tenets of Humanism"). Plaintiff cannot establish a substantial burden for the same reasons:  He has not alleged that serving as a guest chaplain is conduct required by his belief system.

<blockquote>

3.    <u>Plaintiff fails to demonstrate a substantial burden because he does not face substantial pressure to choose between either forgoing a government benefit or acting inconsistently with his religion.</u>

</blockquote>

Plaintiff also alleges that he is being "forced . . . to either act in opposition to his sincerely held beliefs or forgo a government benefit and opportunity."  Compl. ¶¶ 181, 184-85. To establish a substantial burden under this theory, Plaintiff must demonstrate that he is being forced to forfeit an "important benefit" and that the risk of forgoing the benefit imposes "substantial pressure on [him] to modify his [religious] behavior."  *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 717-18 (1981) (plaintiff forced to choose between forgoing unemployment benefits or acting inconsistently with his religion); *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008).

As an initial matter, Plaintiff has not adequately alleged that he was denied an "important benefit."  Given Plaintiff's "belief that the practice of legislative chaplains violates the Constitution, he cannot also claim that he suffered injury to a legally cognizable interest" when he was denied the opportunity to serve as a guest chaplain, because his "beliefs are 'incompatible with what he desires.'"  *Newdow*, 309 F. Supp. 2d at 36 (quoting *Kurtz*, 829 F.2d at 1142).

Moreover, as shown in Part I.A., *supra*, the speculative loss of a potential opportunity for enhanced "notoriety" does not involve a cognizable injury, let alone an "important benefit."

Even if Plaintiff could demonstrate that he was denied a government benefit, he has also failed to allege facts establishing that forgoing this opportunity imposed "substantial pressure" on him to act in violation of his beliefs.  Substantial pressure exists when the plaintiff risks criminal penalties or incarceration, *Wisconsin v. Yoder*, 406 U.S. 205, 208 (1972); *Gillette v. United States*, 401 U.S. 437, 461 (1971), millions of dollars in monetary penalties, *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2777 (2014), or losing a benefit flowing from an "otherwise available public program" such as valuable unemployment benefits, *Thomas*, 450 U.S. at 718, *Sherbert v. Verner*, 374 U.S. 398, 403 (1963), or paid federal employment, *Singh v. McHugh*, No. 14-1906, 2016 WL 2770874 (D.D.C. May 13, 2016) (plaintiff forced to choose between position in the Reserve Officers' Training Corps and acting inconsistently with his religion).  Not every benefit forgone, however, is of a sufficient "order or magnitude" to give rise to substantial pressure.  *Johnson v. Robison*, 415 U.S. 361, 385–86 (1974) (forgoing veterans' educational benefits imposed only "incidental burden upon [plaintiff's] free exercise of religion" and thus was not sufficient in "order or magnitude" to be actionable); *Kammerling*, 553 F.3d at 678 ("an inconsequential or *de minimis* burden on religious practice" is insufficient).

Here, Plaintiff alleges that he is faced with either acting in violation of his beliefs or forgoing the "honor[]," "recogni[tion]," "welcome[]," and "special tribute" of serving as a guest chaplain.  Compl. ¶¶ 16, 64.  This incidental burden is clearly not of a sufficient "order or magnitude" to impose substantial pressure; Plaintiff is not required to make any choice that risks anything equivalent to incarceration, millions of dollars in fines, or the loss of income or employment.  *See Johnson*, 415 U.S. at 385–86 (no substantial burden because plaintiff not

42

required "to make any choice comparable to that required of the petitioners in *Gillette* [i.e. modify religious practice or face incarceration]").

        4.    <u>Plaintiff fails to demonstrate a substantial burden because he has alternative means of conveying his message.</u>

Even if a regulation forbids a plaintiff from acting, there is no substantial burden if the regulation "prohibits only one of a multitude of means of conveying [plaintiff's] religious message." *Mahoney v. Doe*, 642 F.3d at 1121 (no substantial burden because plaintiff able to spread message through other means and in other locations); *Henderson*, 253 F.3d at 16 (availability of alternative locations in which to exercise one's religion relevant in determining whether burden is substantial).

If the requirements for guest chaplains have any effect on Plaintiff's conduct, it is only that they prevent Plaintiff from expressing his secular views in one very limited capacity – addressing Members of Congress as a guest chaplain on the House floor.  The guest chaplain opportunity prohibits "only one of a multitude of means" for Plaintiff to convey his message and, therefore, does not impose a substantial burden.  *See Mahoney v. Doe*, 642 F.3d at 1121; *Henderson*, 253 F.3d at 16.[16]

**D.  Plaintiff Fails to State a Claim Under the Religious Test Clause.**

Plaintiff alleges that the requirement that guest chaplains be ordained and address a "supernatural higher power" amounts to a "religious test" in violation of the Religious Test

---

[16] Because Plaintiff failed to establish a *prima facie* case, Defendants are not required to demonstrate that the guest chaplain opportunity serves a compelling interest through the least restrictive means.  *Branch Ministries v. Rossotti*, 40 F. Supp. 2d 15, 24 (D.D.C. 1999), *aff'd*, 211 F.3d 137 (D.C. Cir. 2000) ("If, and only if, plaintiffs can demonstrate a substantial burden, then the government has the burden under RFRA of establishing that the revocation serves a compelling governmental interest and that revocation is the least restrictive means of accomplishing that compelling interest.").

Clause, which states that "no religious Test shall ever be required as a Qualification to any

Office or public Trust under the United States." U.S. Const. art. VI, § 3, cl. 2; *see* Compl.

¶¶ 195-96. Plaintiff's allegations do not state a claim for violation of the Religious Test Clause.

      As an initial matter, Plaintiff cannot establish that the guest chaplain position is "an

Office or public Trust under the United States." U.S. Const. art. VI, § 3, cl. 2. As Plaintiff

recognizes, nothing more than "honor[]" or "recognition" is bestowed upon a guest chaplain.

*See* Compl. ¶¶ 61-64. The performance of this duty, which lasts only a few minutes at most and

which confers no authority or emolument, does not elevate the guest chaplain to an office of the

United States. *See United States v. Germaine*, 99 U.S. 508, 511-12 (1878) (concluding that the

phrase "officer of the United States" "embraces the ideas of tenure, duration, emolument, and

duties . . . that . . . [are] continuing and permanent, not occasional or temporary").[17]

      Additionally, Plaintiff fails to state a claim under the Religious Test Clause because he

does not allege that he was required, as a condition of serving as guest chaplain, to swear an oath

of any kind, let alone swear an oath subscribing to a particular set of religious doctrines or

beliefs. *See Torcaso v. Watkins*, 367 U.S. 488, 490-91 (1961) (noting purpose of Religious Test

Clause was to eliminate "religious tests oaths"); Paul Horwitz, Religious Tests in the Mirror, 15

Wm. & Mary Bill of Rts. J. 75, 104-05, 114 (2006) (analyzing history and purpose of Clause and

concluding it was "meant specifically to apply to any imposed oath, or its formal equivalent, that

---

[17] While there is no accepted definition of "public trust" under the Religious Test Clause, it is inconceivable that a member of the public, invited by a government official to volunteer for a fleeting task, would be considered a holder of the public trust. *See generally U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 903 (1995) (Thomas, J., dissenting) (concluding that "public trust" refers to "Senators and Representatives"); Vasan Kesavan, The Very Faithless Elector?, 104 W. Va. L. R. 123,133 & n.45 (2001) (opining that "public trust" refers to Senators, Representatives, and Electors).

would require the oath-taker to swear to a religious belief . . . as an absolute condition of public office"); Compl. ¶¶ 195-96.

Instead, Plaintiff seeks to expand the prohibition to include not only religious oaths, but any reference to religion as a selection criteria.  No court has accepted such a broad reading of the Clause.  To the contrary, Plaintiff's strained reading of the Clause has been rejected, and should be rejected here as well.  *See Heap*, 112 F. Supp. 3d at 426 (requirement that Navy chaplains be endorsed by an ecclesiastical organization did not violate Religious Test Clause because plaintiff not required to profess belief in any particular religious group).

It is well established that the House may, consistent with the Constitution, appoint a Chaplain and require him to offer a religious "prayer" invoking a supreme being.  *See supra* Part III.B.  Plaintiff's attempt to use the Religious Test Clause as a basis for an indirect attack on Congressional prayer must fail for the same reasons that the House Chaplain may, consistent with the Constitution, offer a prayer.  *See, e.g.*, *Anderson v. Laird*, 316 F. Supp. 1081, 1093 (D.D.C. 1970) ("The Court having determined that there is no violation of the Establishment Clause . . ., it necessarily follows that there can be no violation of the test oath prohibition."), *rev'd on other grounds*, 466 F.2d 283 (D.C. Cir. 1972).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be granted, and Plaintiff's claims should be dismissed without leave to amend and with prejudice.

Respectfully submitted,

*/s/ Thomas G. Hungar*
THOMAS G. HUNGAR
   *General Counsel*
ELENI M. ROUMEL
   *Assistant General Counsel*
KIMBERLY HAMM
   *Assistant General Counsel*
SARAH K. CURRAN
   *Attorney*

OFFICE OF GENERAL COUNSEL,
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C.  20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)
Thomas.Hungar@mail.house.gov

*Counsel for the United States House of
Representatives; and Speaker of the House Paul
Ryan, Chaplain of the House Fr. Patrick J. Conroy,
Elisa Aglieco, and Karen Bronson, all in their
official capacities*

September 30, 2016

**CERTIFICATE OF SERVICE**

I certify that on September 30, 2016, I filed the foregoing document by the U.S. District

Court for the District of Columbia's CM/ECF system.


*/s/ Sarah K. Curran*
Sarah K. Curran