# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **DANIEL BARKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 16-850 (RMC)** |
| | ) | |
| **PATRICK CONROY, Chaplain, U.S.** | ) | |
| **House of Representatives,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

_____ )

## MEMORANDUM OPINION

Since the Continental Congress met in 1774, the States' representatives to the federal government have employed, and paid, clergy who perform as chaplains and offer a daily prayer before each session begins. Daniel Barker, an atheist and co-President of the Freedom from Religion Foundation, challenges the modern practice in the House of Representatives, whereby he was denied the opportunity to be a guest chaplain and to deliver a secular invocation in lieu of a prayer. Mr. Barker asserts that the Supreme Court's decision in *Town of Greece, New York v. Galloway*, 134 S. Ct. 1811 (2014) requires his inclusion as a guest chaplain. His interpretation of *Town of Greece* is flawed. The legislative prayer practice of the House of Representatives is consistent with the decisions of the Supreme Court and this Circuit, as well as the Rules of the House. Mr. Barker has failed to state a claim on which he is entitled to relief. The Court also finds that extending *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) to this context is unwarranted. The Complaint will be dismissed.

## I. BACKGROUND

The U.S. House of Representatives (House) commences each legislative day with a prayer, a tradition that originated during the first Continental Congress and continues today.

*See* Motion of the Official Defendants to Dismiss the Complaint [Dkt. 16] at 3-5 (Official

Capacity MTD) (describing the history of legislative prayer); *see also Marsh v. Chambers*, 463

U.S. 783, 788 (1983).  A "prayer" is required under the House Rules and is consistent with the

Establishment Clause.   *See* U.S.  Const. art. I § 5, cl. 2 ("Each House may determine the rules of

its proceedings, . . ."); *see also* H.R. Doc. No. 114-192, § 665, Rule II, cl. 5 ("The Chaplain shall

offer a prayer at the commencement of each day's sitting of the House."); H.R. Doc. No. 114-

192, § 869, Rule XIV, cl. 1 (finding the House's first "order of business . . . shall be . . . Prayer

by the Chaplain"); *Marsh*, 463 U.S. at 791.  Current House Chaplain and a Defendant in this

case, Father Patrick J. Conroy, is a Roman Catholic priest.  *See* Compl. [Dkt. 1] ¶ 25.  The House

Chaplain, an Officer of the House elected by members, typically delivers the opening prayer, but

guest chaplains have given opening prayers since 1948, although there are no written rules

instructing this practice.  *See id.* ¶¶ 55-58; *see also* IDA A.  BRUDNICK, Cong. Research Serv.,

R41807, HOUSE AND SENATE CHAPLAINS: AN OVERVIEW 1 (2011).  Between 2000 and 2015,

39% of opening prayers were made by guest chaplains.  *See* Compl. ¶¶ 71-72.  A guest chaplain

is either invited by Fr. Conroy or sponsored by a member of the House.  *See id.* ¶ 60.

Daniel Barker is an American atheist activist and co-President of the Freedom

From Religion Foundation (FFRF).  *See id.* ¶¶ 13, 16.  FFRF is a legal and political advocacy

group for non-theists, and a frequent Establishment Clause litigant.  *See id.* ¶ 13; *see also*

Official Capacity MTD at 6.  On behalf of Mr. Barker, FFRF members visited Defendants Elisa

Aglieco, Fr. Conroy's assistant, and Karen Bronson, Chaplain's Liaison to Staff, to inquire about

"a nonreligious citizen" delivering an "opening invocation at the House."  Compl. ¶ 34.  Fr.

Conroy's staff explained that guest chaplains are permitted to give the opening prayer if (1) they

are sponsored by a House Member, (2) they are ordained, and (3) their prayer addresses a "higher power." *Id*. ¶ 35.

Mr. Barker alleges that he satisfied these requirements. *See id*. ¶ 36. Mr. Barker's representative in the House, Mark Pocan, sponsored him by asking Fr. Conroy to grant Mr. Barker permission to deliver the morning invocation. *See id*. ¶ 37. Two days later, upon Ms. Aglieco's request, Mr. Barker provided his contact information, biography, and ordination certificate for review. *See id*. ¶ 38. Mr. Barker explained that he was ordained a Christian minister in 1975, but "lost faith in faith," and disavowed religious beliefs in 1994. *Id*. ¶¶ 14, 16. Mr. Barker maintains his ordination, using it to perform marriages, but no longer preaches the tenets of Christianity. *See id*. ¶ 20. Mr. Barker also alleges that in a draft of his proposed invocation that he provided to Fr. Conroy, he addressed a "higher power," though not a god or supernatural power. *Id*. ¶ 105.

Fr. Conroy denied Mr. Barker's request to conduct the opening prayer in December 2015 because he is "ordained in a denomination in which he no longer practices" and "is not a religious clergyman [because he had] parted with his religious beliefs." *Id*. ¶¶ 111, 115; *see also* Official Capacity MTD at 7.

Mr. Barker filed suit on May 5, 2016, against Fr. Conroy, Ms. Aglieco, Ms. Bronson, Speaker of the House Paul Ryan, all in their official capacities, and the House and United States of America. *See* Compl. Mr. Barker's Complaint also includes a claim against Fr. Conroy in his individual capacity under *Bivens*. *See id*. ¶¶ 201-06. Mr. Barker alleges that the requirements expressed by Fr. Conroy's staff were a pretext for excluding and discriminating against him because the same requirements are not enforced against other potential guest chaplains. *See id*. ¶¶ 118-19. Mr. Barker challenges the denial of an opportunity to deliver an

invocation as a guest chaplain and the requirements imposed on him but not others as violations

of the Establishment, Due Process, and Religious Test Clauses of the Constitution, and the

Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb *et seq*. *See id.* ¶¶ 157-

200.

Mr. Barker seeks: (1) a declaration that barring atheists and nonreligious

individuals from delivering the opening prayer to the House of Representatives violates the

Constitution and the RFRA; (2) a declaration that guest chaplains cannot be required to invoke

"a supernatural higher power"; (3) injunctive relief barring Fr. Conroy from selecting a guest

chaplain on the basis of inherently religious qualifications; and (4) an order approving Mr.

Barker as guest chaplain. *Id.* at Section V; *see also* Official Capacity MTD at 8.

Defendants jointly filed a Motion to Dismiss the official capacity claims on

September 30, 2016, contending that Mr. Barker does not have Article III standing, his claim is

non-justiciable, and he has failed to state a claim.[1]  *See* Official Capacity MTD at 2.  Mr. Barker

filed a Memorandum in Opposition of Defendants' Motion to Dismiss on November 14, 2016,

*see* Memorandum in Opposition of the Official Defendants' Motion to Dismiss [Dkt. 18]

(Official Capacity Opp'n), to which Defendants replied.  *See* Reply Memorandum in Support of

the Official Defendants' Motion to Dismiss [Dkt. 21] (Official Capacity Reply).  Additionally,

Fr. Conroy filed a separate motion to dismiss the individual *Bivens* claim against him.  *See*

Defendant Patrick Conroy's Motion to Dismiss All Individual-Capacity Claims [Dkt. 14]

(Conroy MTD).  Mr. Barker opposed, *see* Memorandum Opposing Defendant Patrick Conroy's

Motion to Dismiss All Individual-Capacity Claims [Dkt. 19] (Conroy Opp'n), and Fr. Conroy

---

[1] This Court granted Defendants' Motion to Dismiss all claims against Ms. Aglieco on
November 15, 2016, because she is no longer employed by the House.  *See* 11/15/16 Minute
Order.

replied.  *See* Reply Memorandum in Support of Defendant Patrick Conroy's Motion to Dismiss All Individual-Capacity Claims [Dkt. 20] (Conroy Reply).

## II.  LEGAL STANDARD

### A.  Standing

Standing is one feature of the Constitution's case-or-controversy limitation on federal judicial authority.  *See* U.S. Const. art. III, § 2 ("The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . . [and] to Controversies."); *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2663 (2015).

Standing turns on whether a plaintiff "alleged such a personal stake in the outcome of the controversy" as to meet federal court jurisdiction and justiciability requirements. *Baker v. Carr*, 369 U.S. 186, 204 (1962).  To have Article III standing, a plaintiff must establish that:  (1) he has "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) the injury is fairly traceable to the defendants' actions; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *United States v. Windsor*, 133 S. Ct. 2675, 2685-86 (2013) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-62 (1992)).  Plaintiff bears the burden of establishing his standing because he is the party invoking federal jurisdiction.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998).

Where a party's standing is challenged in a motion to dismiss, a reviewing court "must construe the complaint in favor of the complaining party."  *Kurtz v. Baker*, 829 F.2d 1133, 1138 (D.C. Cir. 1987) (*Kurtz II*) (citing *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

### B. Motion to Dismiss – Fed. R. Civ. P. 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) requires a complaint to be sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Although a complaint does not need to include detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* The facts alleged "must be enough to raise a right to relief above the speculative level." *Id.* A complaint must contain sufficient factual matter to state a claim for relief that is "plausible on its face." *Id.* at 570. When a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged, then the claim has facial plausibility. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A court must treat the complaint's factual allegations as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555. But a court need not accept as true legal conclusions set forth in a complaint. *Iqbal*, 556 U.S. at 678.

In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007). Generally, when a court relies upon matters outside the pleadings, a motion to dismiss must be treated as one for summary judgment and disposed of pursuant to Rule 56. *See* Fed. R. Civ. P. 12(d). "However, where a document is referred to in the complaint and is central to the plaintiff's claim, such a document attached to the motion

papers may be considered without converting the motion to one for summary judgment." *Nat'l Shopmen Pension Fund v. Disa*, 583 F. Supp. 2d 95, 99 (D.D.C. 2008).

### C. Precedent on Legislative Prayer

One starts with *Marsh v. Chambers*, 463 U.S. 783 (1983), which addressed a challenge by a state legislator to the century-old practice of the Nebraska legislature of opening each session with a prayer by a chaplain paid with public funds. The Supreme Court held that the practice did not violate the Establishment Clause even though a single clergyman had offered the prayers for many years and they were all in the Judeo-Christian tradition. *See id*. at 795. The Court's analysis is highly instructive.

The Court began its discussion noting certain historical facts:

The opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country. From colonial times through the founding of the Republic and ever since, the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom. . . .

[T]he Continental Congress, beginning in 1774, adopted the traditional procedure of opening its sessions with a prayer offered by a paid chaplain. . . . [T]he First Congress, as one of its early items of business, adopted the policy of selecting a chaplain to open each session with prayer. . . .

On Sept[ember] 25, 1789, three days after Congress authorized the appointment of paid chaplains, final agreement was reached on the language of the Bill of Rights. Clearly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment, for the practice of opening sessions with prayer has continued without interruption ever since that early session of Congress.

*Id.* at 786-88 (citations omitted). "In this context, historical evidence sheds light not only on what the draftsmen intended the Establishment Clause to mean, but also on how they thought that Clause applied to the practice authorized by the First Congress—their actions reveal their

intent." *Id.* at 790; *see also Wisconsin v. Pelican Ins. Co.,* 127 U.S. 265, 297 (1888) (noting that

Acts adopted by the First Congress are "contemporaneous and weighty evidence of [the

Constitution's] true meaning").

Plaintiff Earnest Chambers, himself a Nebraska representative who was offended

by the legislative prayers, argued that opposition by some Founding Fathers significantly

undercut any reliance on early practices. The Supreme Court disagreed:

> [E]vidence of opposition . . . infuses [the historical argument] with
> power by demonstrating that the subject was considered carefully
> and the action not taken thoughtlessly, by force of long tradition and
> without regard to the problems posed by a pluralistic society.

*Marsh*, 463 U.S. at 791. The Court concluded its historical discussion by summarizing:

> In light of the unambiguous and unbroken history of more than 200
> years, there can be no doubt that the practice of opening legislative
> sessions with prayer has become part of the fabric of our society.
> To invoke Divine guidance on a public body entrusted with making
> the laws is not, in these circumstances, an establishment of religion
> or a step toward establishment; it is simply a tolerable
> acknowledgment of beliefs widely held among the people of this
> country. As Justice Douglas observed, "we are a religious people
> whose institutions presuppose a Supreme Being." *Zorach v.
> Clauson*, 343 U.S. 306, 313 (1952).

*Id.* at 792.

Turning to the actual practices of the Nebraska legislature, the Court noted the

long tenure of its chaplain but also that "guest chaplains have officiated at the request of various

legislators and as substitutes during [Chaplain] Palmer's absences." *Id.* at 793. Without

evidence of "an impermissible motive," the Court found no conflict with the Chaplain's tenure

and the Establishment Clause. *Id.* The nature of the Chaplain's prayers did not offend the

Constitution, nor did the use of public funds to pay the Chaplain cause the Court any pause. *Id.*

at 794 ("Nor is the compensation of the chaplain from public funds a reason to invalidate the

Nebraska Legislature's chaplaincy; remuneration is grounded in historic practice . . . ."). Thus,

the Supreme Court concluded that there was no risk of the establishment of religion from the practice of the Nebraska legislature. *See id*. at 795 (citing *Abington School Dist. v. Schempp*, 374 U.S. 203, 308 (1963) (Goldberg, J., concurring) ("[T]he measure of constitutional adjudication is the ability and willingness to distinguish between real threat and mere shadow.")).

Following *Marsh*, the U.S. Court of Appeals for the District of Columbia Circuit had occasion to address the same question in *Kurtz v. Baker*, 829 F.2d 1133, 1136 (D.C. Cir 1987), when a nontheist professor brought suit after being denied the opportunity to present opening remarks to both the Senate and House. Mr. Kurtz challenged the exclusion of nontheists from the ranks of guest chaplains and the requirement that the guest chaplain utter a "prayer" as violations of the Free Speech and Religion Clauses of the First Amendment and the Due Process Clause of the Fifth Amendment. *See id*. The D.C. Circuit ultimately dismissed Mr. Kurtz's claims for lack of standing.

Although the D.C. Circuit found that the allegation "that Kurtz has been prevented from addressing each house of Congress . . . [satisfied] Article III's injury requirement because it is sufficiently personal and concrete," *id.* at 1142, it ultimately held that Mr. Kurtz failed to allege causation because Mr. Kurtz did not allege that even with the Chaplain's assent, there would be a "substantial probability" that he could address the House. *Id.* at 1142. Mr. Kurtz did not allege that the Chaplain had discretion to grant his request and his desired secular invocation was irreconcilable with the Court's interpretation of prayer as required by the House Rules. *See id*. The Circuit did not address the merits of Mr. Kurtz's constitutional claims.

In 2014, the Supreme Court had another opportunity to consider the constitutionality of legislature prayer in *Town of Greece*. *See* 134 S. Ct. 1811. *Town of Greece*

involved the complaint of two residents of the Town who appeared before the Town board on various items of civic business and objected to its practice of an opening prayer by an unpaid volunteer "chaplain for the month." *Id*. at 1816. Chaplains were identified by contacting those clergymen with congregations within Town limits and listed in the local directory, which meant that since "nearly all of the congregations in town were Christian; . . . from 1999 to 2007, all of the participating ministers were too." *Id*. The Town allowed guest clergy to write their own prayers which "often sounded both civic and religious themes." *Id*.

Plaintiffs in *Town of Greece* alleged that the prayer "violated the First Amendment's Establishment Clause by preferring Christians over other prayer givers and by sponsoring sectarian prayers." *Id*. at 1817. Plaintiffs sought an injunction to limit the prayers to "inclusive and ecumenical prayers that referred only to a generic God and would not associate the government with any one faith or belief." *Id*. The District Court rejected the argument that an acceptable prayer must be nonsectarian, while finding no inherent problem with sectarian prayer. *See id*. at 1818. The Second Circuit reversed, finding that the "steady drumbeat of Christian prayer, unbroken by invocations from other faith traditions, tended to affiliate the town with Christianity." *Id*.

In reversing the Second Circuit, the Supreme Court cited *Marsh v. Chambers*, which it said had "concluded that legislative prayer, while religious in nature, has long been understood as compatible with the Establishment Clause" and as a "'tolerable acknowledgement of beliefs widely held.'" *Id*. (quoting *Marsh*, 463 U.S. at 792). Indeed, *Marsh* "supported the conclusion that legislative invocations are compatible with the Establishment Clause." *Id*. Adding to the relevant historical record reviewed in *Marsh*, *Town of Greece* noted that in the middle of the Nineteenth Century, the Senate and House had reviewed their practice of official

chaplaincies and "concluded that the office posed no threat of an establishment because lawmakers were not compelled to attend the daily prayer, no faith was excluded by law, nor any favored, and the cost . . . imposed a vanishingly small burden." *Id.* at 1819. Comparing the practices in *Town of Greece* to those of Congress, the Court noted approvingly that "Congress continues to permit its appointed and visiting chaplains to express themselves in a religious idiom. It acknowledges our growing diversity not by proscribing sectarian content but by welcoming ministers of many creeds." *Id.* at 1820-21. It further emphasized that "*Marsh* nowhere suggested that the constitutionality of legislative prayer turns on the neutrality of its content." *Id.* at 1821.

The place and purpose of legislative prayers cabin their content to avoid any constitutional offense. Prayers at the opening of a legislative session are "meant to lend gravity to the occasion and reflect values long part of the Nation's heritage. . . . These religious themes provide particular means to universal ends . . . to solemnize the occasion" as long as they do not lead to proselytizing or advancement of a particular faith or belief. *Id.* at 1823. *Town of Greece* did not alter the permissibility of legislative prayers or hold that Congress must permit nonsectarian or nontheist statements by guest chaplains.[2]

---

[2] The Court has jurisdiction over Mr. Barker's case under 28 U.S.C. § 1331 because it involves a federal question arising under the First and Fifth Amendments of the Constitution and the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb-1(b). Political question immunity is inapplicable and venue is proper within the District of Columbia because the actions took place at the House of Representatives located in the District. *See* 28 U.S.C. § 1391.

# III.  ANALYSIS

## A.  Standing

### 1.  *Injury-in-Fact*

Allegations of speculative or possible future injury are insufficient to satisfy the Article III standing requirements.  *See Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013).  When an alleged injury has not yet occurred, courts must determine whether it is imminent.  An injury is imminent if the threatened injury is "certainly impending" or if there is substantial risk that the harm will occur.  *Id.*  "[P]laintiffs bear the burden of pleading . . . concrete facts showing that the defendant's actual action has caused the substantial risk of harm. Plaintiffs cannot rely on speculation about the unfettered choices made by independent actors not before the court."  *Id.* at 1150 n.5 (internal quotation and citation omitted).

Defendants argue that Mr. Barker failed to allege an injury-in-fact sufficient to satisfy the requirements for standing under Article III because the alleged injury—the denial of an opportunity to deliver a secular invocation—is the "loss of a speculative hope of 'notoriety'" and not a judicially cognizable injury.  Official Capacity MTD at 12.  Mr. Barker contends he suffered three distinct injuries-in-fact, all of which are sufficient to satisfy the first requirement for standing under Article III:  (1) personal exclusion injury, (2) exclusion based on discrimination due to religious beliefs and membership in a class, and (3) stigmatic injury.  *See* Official Capacity Opp'n at 19-21.

#### a.   Personal Exclusion Injury

Mr. Barker first contends he suffered a personal exclusion injury because he was barred from delivering an invocation to the House after satisfying the Chaplain's requirements. *See id.* at 19.  Mr. Barker cites *Kurtz II*, a factually similar case involving a secular humanist who was denied the opportunity to offer secular remarks to Congress during the time for prayer.  *See*

829 F.2d at 1142.  Mr. Barker argues that this Court should follow *Kurtz II* and find the injury-in-fact requirement satisfied because he alleges, as did Mr. Kurtz, and he was prevented from addressing the House, which is "sufficiently personal and concrete."  *Id.* at 1142; *see also* Official Capacity Opp'n at 19.

Defendants respond that Mr. Barker's "'exclusion from' or 'deprivation of' the ability to address the House" is a procedural exclusion injury, a type of injury the Supreme Court has ruled insufficient to create Article III standing in the absence of some nexus to cognizable personal harm, which Mr. Barker has not demonstrated.  Official Capacity Reply at 2-3 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)).  *Summers* instructs that where plaintiffs did not have an individual stake in the application of a challenged rule, or had not personally been affected by it, they had no standing.  *See Summers*, 555 U.S. at 496-97.  Important to the decision in *Summers* was that the plaintiffs had already resolved through settlement their individual claim about the application of the challenged rule and were only seeking to make a facial challenge to the rule.  *See id.* at 494.

*Kurtz II* and the instant case are distinguishable and not decided by *Summers*.  Messrs. Kurtz and Barker each challenged the application of a rule to them personally, not the rule itself.  Mr. Barker's personal exclusion from addressing the House is sufficient for an injury-in-fact for Article III standing because, just as in *Kurtz II*, Mr. Barker's exclusion was concrete, particularized, and non-speculative.  *See Kurtz II*, 829 F.2d at 1142.

### b.  Exclusion Based on Religious Beliefs and Membership in a Class

Mr. Barker also argues that he suffered an injury-in-fact because he was excluded from participating as guest chaplain due to discrimination because he is an atheist and is thus a member of two classes:  (1) those who do not believe in a supernatural higher power and (2)

those whose faith does not issue ordinations.  *See* Official Capacity Opp'n at 21.  Defendants

attempt to reformulate this injury to be contending classwide exclusion, which they argue that

Mr. Barker does not properly allege and is preempted by *Kurtz II*.  *See Kurtz II*, 829 F.2d at

1141.  The Court, however, interprets Mr. Barker's allegations of injury, both due to personal

exclusion and exclusion based on discrimination, as allegations of the same concrete and

imminent injury, but with different causes.  Mr. Barker has alleged he was excluded, which the

Court found above was sufficient for injury-in-fact; whether the exclusion came as a result of

religious discrimination or due to another action by Defendants, it is sufficient to satisfy injury-

in-fact.

      c.  Stigmatic Injury

      Mr. Barker's last injury-in-fact claim alleges stigmatic injury, resulting in a "loss

of benefits, honors, and congressional recognition" from his exclusion by Fr. Conroy.  Official

Capacity Opp'n at 21.  Mr. Barker alleges that he was denied the "prestige and status" of having

served as guest chaplain.  Compl. ¶ 68.  Defendants counter that this "loss of an unspecified and

speculative, potential reputational enhancement" is insufficient to confer standing.  Official

Capacity Reply at 4.

      The Court agrees the stigmatic injury Mr. Barker alleges is not sufficiently

"concrete and particularized" to satisfy the injury-in-fact threshold for Article III standing

because the future manifestation of the benefit he describes is entirely uncertain.  *Lujan*, 504

U.S. at 560.  Standing must affirmatively appear in the record, and may not be inferred from

argument.  *See Advanced Mgmt. Tech., Inc. v. FAA*, 211 F.3d 633, 636-37 (D.C. Cir. 2000).

      It is well established that "allegations of *possible* future injury are not sufficient."

*Clapper*, 133 S. Ct. at 1147 (emphasis in original); *see also Newdow v. Eagen*, 309 F. Supp. 2d

29, 37 (D.D.C. 2004) (finding a "threat of future stigmatic injury is too speculative to qualify as an injury in fact"). Mr. Barker's alleged future injury from an alleged loss of reputational benefits is too speculative because Mr. Barker fails to show that his alleged stigmatic injury is concrete or particularized, providing no examples of how or when such an injury may be likely to occur. This "conjectural or hypothetical" alleged injury is insufficient to satisfy Article III requirements. *Lujan*, 504 U.S. at 560-61.[3]

### 2. Causation

The second element of standing is causation, which requires "a causal connection between the injury and the conduct complained of." *Id*. at 560. The injury must be "fairly traceable to the defendant's conduct." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1391 n.6 (2014).

#### a. Ms. Bronson, Speaker Ryan, and the House of Representatives

Mr. Barker contends that his injuries are fairly traceable, not only to Fr. Conroy, but also his assistant Ms. Bronson, Speaker Ryan, and the House itself. *See* Official Capacity Opp'n at 25-26. Defendants argue that Mr. Barker failed to allege any actions by Ms. Bronson, Speaker Ryan, or the House that are fairly traceable to his alleged injuries. *See* Official Capacity Reply at 6-7. This is true—no such actions were alleged. The claims against Ms. Bronson, Speaker Ryan, and the House must be dismissed for lack of causation because Mr. Barker has failed to show that either individual, or the House, is the source of his injury.

As established above, Mr. Barker's alleged injuries stem from his personal exclusion from serving as guest chaplain. Mr. Barker fails to allege facts that link any conduct

---

[3] *Kurtz II* found stigmatic injury did not satisfy injury-in-fact, because plaintiff did not allege a personal benefit that had been denied. *See Kurtz II*, 829 F.2d at 1141.

by Ms. Bronson, Speaker Ryan, or the House to this injury. Mr. Barker alleges the "extensive and unreasonable delay" he experienced was itself a form of discrimination which may be fairly traceable to Ms. Bronson, but he does not allege that this delay is the source of his injury, nor does he explain why such a delay would give rise to a cognizable injury. *See* Compl. ¶ 172; *see also* Official Capacity Opp'n at 25-26; *but see* Official Capacity Reply at 6 n.3. Mr. Barker offers no allegations that link the potential delay of his application to serve as guest chaplain, or the act of passing along the requirements for serving as guest chaplain, to his ultimate exclusion. There are no allegations that Ms. Bronson played any role in the ultimate determination that Mr. Barker could not address the House.

Mr. Barker further claims that Speaker Ryan caused his injuries by failing to halt the ongoing discrimination by Fr. Conroy, *see* Official Capacity Opp'n at 26, but Mr. Barker failed to include any specific factual allegations of action or inaction by Speaker Ryan in the Complaint. In fact, the only reference to Speaker Ryan in the Complaint is in paragraphs 28-30 describing the role of the Speaker of the House and indicating Speaker Ryan has been sued in his official capacity. *See* Compl. ¶¶ 28-30. Additional claims of actions taken by Speaker Ryan included in Mr. Barker's opposition, but not his Complaint, will not be considered. *See Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.C. Cir. 2003) ("It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss.").

Finally, Mr. Barker contends that the House is "potentially" a cause of his alleged injury because it is the only entity with the authority to change the House Rules. Official Capacity Opp'n at 26. Causation is not satisfied where "speculative inferences" are needed to tie an alleged injury to the challenged actions. Where Mr. Barker's allegations are based in

speculation and rely on a significant inference, they are insufficient to provide the link for Article III standing.[4]  *See West v. Holder*, 60 F. Supp. 3d 197, 201 (D.D.C. 2015).  In sum, Mr. Barker's purported injuries are not fairly traceable to the alleged conduct or inaction by Ms. Bronson, Mr. Ryan or the House and they will be dismissed as defendants.

b.  Fr. Conroy

Defendants recognize that Mr. Barker's causation argument with respect to Fr. Conroy is most palatable, although they contend that *Kurtz II* dooms Mr. Barker's causation claim.  Defendants argue that *Kurtz II* found causation lacking because the denial to Mr. Kurtz of the opportunity to address the House was compelled by the House Rules, not by the Chaplain's discretion.  *See* Official Capacity MTD at 13-14.  Here, too, the House Rules similarly dictate that a guest chaplain may only recite a prayer, which precludes Mr. Barker's desired secular invocation.  *See* Official Capacity Reply at 7; *see also* Official Capacity MTD at 13-14. Defendants argue that Mr. Barker's theory of causation layers speculation on speculation, creating a chain of events too attenuated to establish causation.  *See* Official Capacity MTD at 13.

Mr. Barker would distinguish *Kurtz II* in two respects.  He argues that the D.C. Circuit found Mr. Kurtz's injury not traceable to those defendants' actions "because (1) there is no allegation that the chaplains had discretion to grant appellant's requests, and (2) such an allegation would in any event be untenable."  Official Capacity Opp'n at 23 (quoting *Kurtz*, 829 F.2d at 1142).  In contrast, he alleges that Fr. Conroy exercises discretion when selecting guest chaplains and Mr. Barker satisfied the requirements to become guest chaplain.  *See id.*  Mr.

---

[4] The Court also notes that, as with Speaker Ryan, the Complaint is devoid of specific allegations of actions taken by the House with respect to Mr. Barker's request to appear as guest chaplain.

Barker also argues that the Supreme Court in *Town of Greece* determined that a nonreligious statement is permissible under a government rule for prayer.

Mr. Barker argues that Fr. Conroy admitted that the Chaplain had the discretion to permit Mr. Barker to address the House and he satisfied the three requirements described by Fr. Conroy's staff, but he was still denied the opportunity to speak. He cites Fr. Conroy's letter to Representative Pocan. *See* Ex. C, Compl. [Dkt. 1-3] at 1 (Fr. Conroy letter to Rep. Pocan) (writing "I . . . from time-to-time have exercised my discretion to invite guest chaplains"). Although Fr. Conroy's letter used the word "discretion," it did not state that Fr. Conroy has absolute discretion to permit any or all individuals to address the House. Fr. Conroy specifically stated that he sometimes uses his "discretion to invite guest chaplains to fulfill [the chaplain's] responsibilities by *offering a prayer* at the commencement of a session of the House." *Id.* (emphasis added). Fr. Conroy added that Members can also recommend individuals to fulfill this duty. *See id.* Additionally, Fr. Conroy explained to Representative Pocan why Mr. Barker failed to satisfy the three requirements to serve as guest chaplain. *See id.* at 1-2. Despite Mr. Barker's arguments to the contrary, his request to address the House is functionally identical to the request made by Mr. Kurtz and must fail for the same reason. Like the plaintiff in *Kurtz II*, Mr. Barker has failed to allege that the chaplain "had the power to permit him to address the House . . . in the manner he sought"—through a secular invocation. *Kurtz II*, 829 F.2d at 1142. Under *Kurtz II*, Mr. Barker has failed to allege that Fr. Conroy caused his injury.[5]

---

[5] *Kurtz II* went on to hold that even if plaintiff had alleged the chaplain had the authority to grant floor privileges for a secular invocation, plaintiff "failed to show in any concretely demonstrable way that but for his exclusion from the chaplains' guest speaker programs, there is a substantial probability he would have been able to address a *non*-prayer to [the House]." *Kurtz II*, 829 F.2d at 1144.

To avoid the binding nature of *Kurtz II*, Mr. Barker argues that *Town of Greece* expanded the definition of prayer at public events to permit secular invocations. *See* Official Capacity Opp'n at 24-25. Defendants respond that *Town of Greece* merely upheld the Town's practice of prayer before its monthly board meetings, but did not expand or alter the Supreme Court's understanding of permissible prayers as described in *Marsh* and recognized in *Kurtz II*. *See* Official Capacity Reply at 8. The Court agrees that *Town of Greece* did not alter the understanding that a legislature, such as the House, may open its proceedings with a prayer. *Town of Greece* did not define prayer as necessarily including invocations by atheists, but instead found that the Town's policy of a prayer or invocation before its monthly board meetings—for which Town leaders indicated that a lay person, including an atheist, could provide the invocation—did not violate the Establishment Clause. *Town of Greece*, 134 S. Ct. at 1816, 1828. *Town of Greece* does not alter this Court's reading of *Kurtz II* and, therefore, as described above, Mr. Barker's claims must fail for the same reasons as those of the plaintiff in *Kurtz II*. Mr. Barker has failed adequately to allege that Fr. Conroy caused his injury and he thus lacks standing to sue. A close look at Mr. Barker's individual claims fares no better.

### B. Claims Against Defendants in Their Official Capacity

The history of legislative prayer and its judicial treatment are critical to appreciating the nature of Mr. Barker's argument and its resolution. In effect, his effort to thread a tiny needle—an inferred change in the law—is unavailing: there is no needle.

#### 1. Political Question

Defendants contend that Mr. Barker's claims should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) because they raise non-justiciable political questions. *See* Official Capacity MTD at 17-29. "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value

determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). The underlying rationale is that "courts are fundamentally underequipped to formulate national policies or develop standards of conduct for matters not legal in nature." *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1379 (D.C. Cir. 1981).

"The political question doctrine is 'primarily a function of the separation of powers.'" *Schneider v. Kissinger*, 310 F. Supp. 2d 251, 258 (D.D.C. 2004), *aff'd*, 412 F.3d 190 (D.C. Cir. 2005) (quoting *Baker*, 369 U.S. at 210). In *Baker*, the Supreme Court enumerated six factors that could render a case non-justiciable:

> Prominent on the surface of any case held to involve a political question is found (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; or (2) a lack of judicially discoverable and manageable standards for resolving it; or (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217 (numbers not in original); *see also Ralls Corp. v. Comm. on Foreign Inv.*, 758 F.3d 296, 313 (D.C. Cir. 2014). "Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence." *Baker*, 369 U.S. at 217.

Defendants argue that the House's rulemaking function has been committed by the Constitution to the House alone as the Rulemaking Clause grants the House the ability to "determine the Rules of its Proceedings," U.S. Const. art. I, § 5, cl. 2, and the Speech or Debate Clause precludes judicial review of the implementation of House Rules, the conduct in

proceedings, and the decisions on who may address the House during a session. U.S. Const. art. I, § 6, cl. 1 ("[F]or any Speech or Debate in either House, they shall not be questioned in any other Place."); *see also* Official Capacity MTD at 18-27. Defendants also argue that recognition and consideration of Mr. Barker's claims would demonstrate a lack of respect for a co-equal branch of government. *See* Official Capacity MTD at 27-29. These arguments can be boiled down to two points. First, Congress' rule establishing legislative prayer is constitutional, *see Marsh*, 463 U.S. at 794-95, and Congressional rulemaking authority is exclusively committed to the Congress. Second, because the prayer rule does not "ignore constitutional restraints or violate fundamental rights," *United States v. Ballin*, 144 U.S. 1, 5 (1892), the political question doctrine dictates the Court should refrain from deciding the issue. *See* Official Capacity MTD at 18-20.

Mr. Barker retorts that the decisions of Fr. Conroy are not protected by the Rulemaking Clause because there are no House Rules related to guest chaplains or the procedures for approving or denying a request to give the opening prayer. Official Capacity Opp'n at 31-33. Defendants argue that Fr. Conroy was operating under the broader Rule that requires each session of the House to be opened with a prayer and any decision by this Court would infringe on the House's ability to determine the Rules of its proceedings and control who would be admitted to the floor and gallery. *See* Official Capacity MTD at 18-20. The Court agrees that Mr. Barker is not challenging a Rule under the Rulemaking Clause, but the application of that Rule to him, and Fr. Conroy's use of his authority to provide the opening prayer before the House himself or through a guest chaplain. *See Kurtz v. Baker*, 630 F. Supp. 850, 856 (D.D.C. 1986) (*Kurtz I*), *vac'd on other grounds* 829 F.2d 1133 ("[P]laintiff does not directly challenge House or Senate rules. He challenges the discretionary behavior of their

chosen Chaplains. The Chaplains occupy publicly-funded offices and thus their conduct in those offices is subject to judicial scrutiny for adherence to the Constitution.").

Additionally, Mr. Barker cites *Vander Jagt v. O'Neill*, 699 F.2d 1166 (D.C. Cir. 1982) for the proposition that while courts have been cautioned to treat Congress' authorization to make its own rules with "special care," that "simply means that neither [the courts] nor the Executive Branch may tell Congress what rules it must adopt," but that "does not alter [the courts'] judicial responsibility to say what rules Congress may not adopt because of constitutional infirmity." *Id*. at 1173. Therefore, the rulemaking authority of the House does not permit it to enact or enforce Rules that violate the Constitution, which Mr. Barker claims has occurred here. Thus, the Rulemaking Clause does not provide immunity from Mr. Barker's claims.[6]

Mr. Barker also argues that the Speech or Debate Clause does not prevent his suit because that Clause only protects actions that occur within the legislative sphere and the selection of guest chaplains is not "part and parcel of the legislative process." *Gravel v. United States*, 408 U.S. 606, 626 (1972); *see also* Official Capacity Opp'n at 33-35. Defendants liken Mr. Barker's case to *Consumers Union of United States, Inc. v. Periodical Correspondents' Ass'n*, 515 F.2d 1341 (1975) where the District of Columbia Circuit held that the Speech or Debate Clause committed exclusively to Congress the power to determine who was admitted into

---

[6] This analysis applies equally to Defendants' argument that court action in this case would demonstrate a lack of respect for a co-equal branch of government. Defendants cite a number of cases dealing with internal disputes between members of Congress where the courts decided not to exercise jurisdiction to show respect for the internal decision-making of the Congress. *See* Official Capacity MTD at 28-29 (citing *Brown v. Hansen*, 973 F.2d 1118, 1119 (3rd Cir. 1992); *VanderJagt*, 699 F.2d 1166; and *Harrington v. Bush*, 553 F.2d 190, 214 (D.C. Cir. 1977)). Determining whether Mr. Barker has suffered discrimination at the hands of Fr. Conroy does not interfere with the legislature's ability to resolve internal disputes or signify a lack of respect for the tradition of legislative prayer.

the galleries and on the floor of Congress and made non-justiciable the question of whether Consumers Union was improperly denied accreditation and access to the press gallery. *Id*. at 1351; *see also* Official Capacity MTD at 23-25. Defendants argue that like the Correspondents' Association, Fr. Conroy was "acting by virtue of an express delegation of authority as [an] aide[] or assistant[] of Congress" when he denied Mr. Barker's request to serve as guest chaplain. *Id*. at 1350. Had the decision been made directly by a member of Congress, Defendants posit, that member would unquestionably be "immune from inquiry under the Speech or Debate Clause." *Id*. Therefore, they reason, so should Fr. Conroy.

The Court distinguishes Mr. Barker's claims from *Consumers Union* because the *Consumers Union* plaintiffs were challenging the Act of Congress that enacted the Rules which prohibited their admittance to the press balcony. The daily prayer is not similar legislative action. "An act is 'legislative' if it is 'generally done in a session of the House by one of its members in relation to the business before it.'" *Rangel v. Boehner*, 785 F.3d 19, 23 (D.C. Cir. 2015) (quoting *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880)). Legislative prayer is conducted at the beginning of the session and Members are not compelled to attend. *See Kurtz II*, 829 F.2d at 1146 n.2 (Ginsburg, J., concurring) ("I find no threshold blockage to Kurtz's claim against the chaplains and Treasury officers by reason of the Speech or Debate Clause. While inspirational, prayer in Congress does not appear to be 'integral to lawmaking.'") (quoting *Walker v. Jones*, 733 F.2d 923, 929 (D.C. Cir. 1984); *see also Kurtz I*, 630 F. Supp. at 856-57 ("The practice of legislative prayer does not provide meaningful input into legislative decisionmaking."); 6 C. Cannon, *Precedents of the House of Representatives* § 663 (1936) (Prayer by the Chaplain "is not a matter of business, but . . . a matter of ceremony."). Therefore

the prayer and any action taken by Fr. Conroy to designate a guest chaplain are not legislative actions and are not protected by Speech or Debate Clause immunity.

### 2. Failure to State a Claim

#### a. Establishment and Equal Protection Clauses

Defendants argue that Mr. Barker's Establishment Clause claim is barred because *Marsh* upheld the constitutionality of legislative prayer and, because *Marsh* recognized an exception for legislative prayer from the Establishment Clause, Mr. Barker's Equal Protection Clause claim must also fail. *See* Official Capacity MTD at 31. Mr. Barker counters that his claim is not barred by *Marsh* because it is an individual claim of discrimination, not a challenge to the constitutionality of legislative prayer as a practice. *See* Official Capacity Opp'n at 5.

There is logic to the argument Mr. Barker presents under the Establishment Clause. He asserts that the Chaplain to the House cannot discriminate against the nonreligious. He relies on *Larson v. Valente*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.") and *Wallace v. Jaffree*, 472 U.S. 38, 52-53 (1985) ("[I]ndividual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all."). He also notes that the Supreme Court has recognized that "the government may not favor one religion over another, or religion over irreligion." *McCreary Cty. v. ACLU*, 545 U.S. 844, 875-76 (2005).

Relying particularly on *Town of Greece*, Mr. Barker argues that the House practice of opening prayers constitutes "a government prayer program systematically and explicitly engineered to exclude atheists." Official Capacity Opp'n at 7. As he interprets *Town of Greece*, the Supreme Court held that prayer practices must include opportunities for prayers

from secularists. Mr. Barker stresses that the Town "maintained that a minister or layperson of any persuasion, including an atheist, could give the invocation." *Town of Greece*, 134 S. Ct. at 1816. In view of this description of the Town's practice, Mr. Barker concludes that the Court "conditioned its approval of the town's policy on that point: '*So long as the town maintains a policy of nondiscrimination*, the Constitution does not require additional efforts toward diversity.'" Official Capacity Opp'n at 7 (quoting *Town of Greece*, 134 S. Ct. at 1824).

Mr. Barker's logic is persuasive within its confines, but it is not traceable to the opinion in *Town of Greece*. Mr. Barker confuses apples with oranges by connecting the *facts* of the Town's practice as described in the majority opinion early on, *Town of Greece*, 134 S. Ct. at 1816, and the *analysis* of whether those practices "reflect an aversion or bias on the part of town leaders *against minority faiths*." *Id.* at 1824 (emphasis added). The entire paragraph from *Town of Greece* puts its point in context:

> Finally, the Court disagrees with the view taken by the Court of Appeals that the town of Greece contravened the Establishment Clause by inviting a predominantly Christian set of ministers to lead the prayer. The town made reasonable efforts to identify all of the congregations located within its borders and represented that it would welcome a prayer by any minister or layman who wished to give one. That nearly all of the congregations in town turned out to be Christian does not reflect an aversion or bias on the part of town leaders against minority faiths. So long as the town maintains a policy of nondiscrimination, the Constitution does not require it to search beyond its borders for non-Christian prayer givers in an effort to achieve religious balancing. The quest to promote a diversity of religious views would require the town to make wholly inappropriate judgments about the number of religions it should sponsor and the relative frequency with which it should sponsor each, a form of government entanglement with religion that is far more troublesome than the current approach.

*Id.* at 1824 (internal citation omitted). Thus, contrary to Mr. Barker's hopeful interpretation, *Town of Greece* did not reference atheists—who are, by definition, nontheists who do not believe in God or gods—but "any minister or layman who wished to give [a prayer]." *Id. Town of*

*Greece* is not an extension of the Supreme Court's decision in *Marsh*, but rather an affirmation that legislative prayer does not violate the Constitution. *See id.* at 1815 (concluding, "consistent with the Court's opinion in *Marsh* . . . , that no violation of the Constitution has been shown"); *id.* at 1818 (explaining that *Marsh* held that "legislative prayer, while religious in nature, has long been understood as compatible with the Establishment Clause").

Despite Mr. Barker's repeated attempts to characterize his claims as not challenging the constitutionality of legislative prayer, the reality is that his request to open the House with a secular invocation, which resulted in the denial of his request to serve as a guest chaplain, was a challenge to the ability of Congress to open with a prayer. To decide that Mr. Barker was discriminated against and should be permitted to address the House would be to disregard the Supreme Court precedent that permits legislative prayer. *Marsh* definitively found that legislative prayer does not violate the Establishment Clause. *See Marsh*, 463 U.S. at 791; *see also Town of Greece*, 134 S. Ct. at 1819 ("*Marsh* stands for the proposition that it is not necessary to define the precise boundary of the Establishment Clause where history shows that the specific practice is permitted.").

This Court concludes that the refusal of the House Chaplain to invite an avowed atheist to deliver the morning "prayer," in the guise of a non-religious public exhortation as a "guest chaplain," did not violate the Establishment Clause. For the same reasons that legislative prayer has been found consistent with the Establishment Clause, so is it consistent with the Equal Protection Clause. *See Kurtz II*, 829 F.2d at 1147 n.3 ("*Marsh* essentially affirmed that the historic practice of an opening prayer burdens no 'fundamental right' of non-theists. Thus Kurtz cannot salvage his failed First Amendment claim by cloaking it in a Fifth Amendment due process (equal protection component) mantle.") (citing *Perry Educ. Ass'n v. Perry Local*

*Educators' Ass'n*, 460 U.S. 37, 54 (1983) (concluding that the entitlement-to-access argument that the Supreme Court rejected under the First Amendment freedom-of-speech rubric "fares no better in equal protection garb")).

      **b.** Religious Freedom Restoration Act

      Defendants move to dismiss Mr. Barker's claim that they violated RFRA because Mr. Barker has failed adequately to allege that preventing him from serving as guest chaplain prevented him from following his secular practices free from government interference. *See* Official Capacity MTD at 38-43. RFRA protects bona fide exercises of religion from government interference. *See* 42 U.S.C. §§ 2000bb, 2000bb-1(a). It prohibits the government from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability." *Id.* § 2000bb-1(a). Taking as true Mr. Barker's allegations that atheism is his religion and assuming, but not finding, that RFRA applies to the House, the Court finds Mr. Barker has failed adequately to allege a claim under RFRA because he fails to allege a substantial burden.

      A substantial burden "exists when government action puts 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008) (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981)). A plaintiff can demonstrate a substantial burden by alleging that government action (1) "force[d] [the plaintiff] to engage in conduct that [his] religion forbids," *Henderson v. Kennedy*, 253 F.3d 12, 16 (D.C. Cir. 2001); (2) "prevent[ed] [him] from engaging in conduct [his] religion requires," *id.*; or (3) forced him "to choose between following the precepts of [his] religion and forfeiting benefits." *Kaemmerling*, 553 F.3d at 678. Mr. Barker alleges that he was prevented from serving as a guest chaplain, but fails to allege that serving as a guest chaplain was required by his

religion or that Fr. Conroy or any other individual at the House forced him to engage in any conduct contrary to his religion.

To overcome *Kaemmerling*, Mr. Barker argues that he was forced to choose between following his religion by giving a secular prayer and serving as the guest chaplain, which he describes as a benefit. *See* Official Capacity Opp'n at 40-41. The Complaint contains no allegations that Mr. Barker would have been permitted to serve as guest chaplain had he agreed to deliver a prayer inconsistent with his atheist beliefs. To the contrary, Fr. Conroy's letter to Representative Pocan stated that the decision was not based on the content of Mr. Barker's proposed invocation, but rather the inconsistency between his certificate of ordination and his claimed religion. *See* Fr. Conroy letter to Rep. Pocan at 1. Additionally, the types of benefits addressed in previous RFRA cases include distinct government benefits from "otherwise available public programs" such as unemployment benefits, *see Thomas*, 450 U.S. at 718; *Sherbert v. Verner*, 374 U.S. 398, 403-04 (1963); and veterans' educational benefits. *See Johnson v. Robison*, 415 U.S. 361, 385-86 (1974). The Court finds that the opportunity to serve as a guest chaplain is not the type of benefit covered by RFRA. Selection as a guest chaplain is more akin to an honor, not a benefit afforded to all. Accordingly, Mr. Barker's RFRA claim will be dismissed.

c. Religious Test Clause

Finally, Defendants move to dismiss Mr. Barker's claim under the Religious Test Clause, which states that "no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States," U.S. Const. art. VI, cl. 3, because the position of guest chaplain is not an office or position of public trust. *See* Official Capacity MTD at 43-45. Mr. Barker argues that the guest chaplain is an officer because he fulfills the duties of the official

Chaplain, who is a permanent employee of the House.  *See* Official Capacity Opp'n at 14-15.

An "officer of the United States" is traditionally considered to "embrace[] the ideas of tenure, duration, emolument, and duties," which are "continuing and permanent, not occasional or temporary."  *United States v. Germaine*, 99 U.S. 508, 511-12 (1878).  The guest chaplain position is therefore not an office of the United States because it is a temporary position, lasting only as long as the prayer itself.

In the alternative, Mr. Barker argues that a guest chaplain holds a position of public trust akin to those of jurors and notaries public, which have been found by other courts to constitute offices of public trust.  *See* Official Capacity Opp'n at 15; *see also Torcaso v. Watkins*, 367 U.S. 488, 489 (1961) (noting that a notary public is an office of trust); *Soc'y of Separationists, Inc. v. Herman*, 939 F.2d 1207, 1220-21 (5th Cir. 1991) (applying the no Religious Test Clause to witnesses and jurors).  The position of guest chaplain is easily distinguishable from that of notaries public and trial witnesses and jurors.  Notaries public are individuals authorized to swear to the validity of signatures on significant documents.  The public must trust that authorization in order to conduct business and complete legal documents.  Similarly, witnesses and jurors are in a position of public trust because they are entrusted with assisting in the carrying out of the law and serve under oaths.  Without this trust, the judicial system would lack credibility.

In contrast, the position of guest chaplain comes with no public expectations of trust.  It is surely an honor to serve as guest chaplain and open a session of the House with prayer, but while members of the public might recognize that opportunity as unique or significant, there is no indication or allegation in the Complaint that guest chaplains hold a position of public trust or special recognition.  Because Mr. Barker has failed to demonstrate

with factual allegations that the guest chaplain is an office or position of public trust, his

Religious Test Clause claim will be dismissed.

### C. Claim Against Fr. Conroy in his Personal Capacity

In addition to Mr. Barker's claims that Fr. Conroy acted in his official capacity when he prevented Mr. Barker from delivering the opening prayer to a session of the House, Mr. Barker also argues that Fr. Conroy is liable in his personal capacity for discriminating against Mr. Barker under the First and Fifth Amendments. *See* Compl. ¶¶ 201-206. Mr. Barker's personal capacity claims are brought under *Bivens*. *See* 403 U.S. 388. Fr. Conroy moves to dismiss Mr. Barker's *Bivens* claim, arguing *Bivens* has not previously been extended to cover the facts of this case and that extension is inappropriate if the Court considers special factors such as separation of powers. *See* Conroy MTD at 1.

*Bivens* recognized an implied right of action for damages when federal officials violate the Fourth Amendment. *See Bivens*, 403 U.S. 388. The Supreme Court has only recognized two other implied rights of action under *Bivens*. *See Carlson v. Green*, 446 U.S. 14 (1980) (recognizing a *Bivens* remedy under the Eighth Amendment for a prisoner against federal prison officials); *Davis v. Passman*, 442 U.S. 228 (1979) (recognizing a *Bivens* remedy for a claim of employment discrimination by a congressman in violation of the Fifth Amendment's Due Process Clause). The Supreme Court and circuit courts, including the D.C. Circuit, have since "tread carefully before recognizing *Bivens* causes of actions." *Meshal v. Higgenbotham*, 804 F.3d 417, 421-22 (D.C. Cir. 2015).

When determining whether or not to extend *Bivens*, courts take a "case-by-case approach" rather than asking "categorically[] whether a *Bivens* action can lie." *Id.* at 422. First, courts consider whether an "alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding

remedy in damages." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007). Second, even if no alternative process exists, courts evaluate "any special factors counselling hesitation before authorizing a new kind of federal litigation." *Id*. A court does not extend *Bivens* "simply for want of any other means for challenging a constitutional deprivation in federal court." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 69 (2001).

Recognizing the Supreme Court's reluctance to extend *Bivens* further, Mr. Barker argues that his claims are already permitted under *Davis v. Passman*. *See* Conroy Opp'n at 2-6. However, "[e]ven though the right and the mechanism of injury [are] the same . . . the contexts [may still be] different." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1859 (2017). "The proper test for determining whether a case presents a new *Bivens* context is as follows. If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new." *Id.* For example:

> A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id*. at 1859-60. Mr. Barker's *Bivens* claims are not covered by *Davis* merely because he also invokes the Fifth Amendment's prohibition on discrimination based on protected activities. Mr. Barker's claim is distinct from *Davis* because he alleges discrimination based on an absence of religious beliefs; the alleged discrimination was not in employment, but was related to offering a prayer before the daily session of the House; and he was denied that opportunity by the House Chaplain.

Fr. Conroy concedes there is no alternative system or process for Mr. Barker to challenge the denial of his request to open the House in prayer. Mr. Barker is not an employee of the House and, therefore, cannot challenge the action under the Congressional Accountability Act of 1995, § 207, 2 U.S.C.A. § 1317. Congress has not created a separate system for appealing a denial of the opportunity to be guest chaplain. Fr. Conroy's motion to dismiss focuses on the "special factors" that he argues weigh against extending *Bivens*, including (1) separation of powers concerns, (2) the availability of alternative remedies, (3) administrability concerns, and (4) Congress' activity in a particular field suggesting that its inaction here has not been inadvertent. *See* Conroy MTD at 13-23.

The Supreme Court has directed lower courts to be cautious about extending *Bivens* into realms already maintained by the executive or legislative branches. Separation of powers concerns have led the Supreme Court to deny a *Bivens* remedy to individuals in the military and in situations covered by the executive and legislative authority over national defense. *See Chappell v. Wallace*, 462 U.S. 296, 301 (1983) (citing *Rostler v. Goldberg*, 453 U.S. 57, 64-65 (1981) ("[O]ver national defense and military affairs, and perhaps in no other area[,] has the Court accorded Congress greater deference."). Congress has exclusive authority over its Rules and the manner in which it conducts its affairs. As such, the House has long since deemed it appropriate and necessary to open each session with a prayer, enacted a Rule to such affect, and hired a Chaplain to conduct the prayer or provide guest chaplains to fulfill that responsibility. As Congress is able to design the position of Chaplain, so to may Congress "tailor any remedy" to any abuse by its Chaplain. *Wilkie*, 551 U.S. at 562. The Court will not insert itself between the House and its own rulemaking process and will not extend *Bivens* to

First[7] or Fifth Amendment claims of discrimination against the House Chaplain based on a decision not to permit an individual to serve as guest chaplain.

## IV.  CONCLUSION

For the foregoing reasons, both motions to dismiss will be granted.  A memorializing Order accompanies this Opinion.

Date: October 11, 2017                       _____/s/_____
                                             ROSEMARY M. COLLYER
                                             United States District Judge

---

[7] The Court also notes that no other courts have extended a *Bivens* remedy to the First Amendment context.  *See, e.g., Iqbal*, 556 U.S. at 675; *Reichle v. Howards*, 132 S. Ct. 2088, 2093 n.4 (2012); *Bush v. Lucas*, 462 U.S. 367, 390 (1983); *Rezaq v. Fed. Bureau of Prisons*, No. 13-990, 2016 WL 97763, at *9 (S.D. Ill. Jan. 8, 2016).